IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VERSAR ENVIRONMENTAL SERVICES, LLC

    Plaintiff,

v.

BLACK & VEATCH SPECIAL PROJECTS CORP.,

    Defendant.

Civil Action No. 23-1450-RGA

MEMORANDUM OPINION

Michael A. Weidinger, Megan I. Brison, PICKNEY, WEIDINGER, URBAN, & JOYCE LLC, Wilmington, DE; Brian M. O'Shea, Joseph S. Guarino, Owen S. Walker, VARELA, LEE, METZ & GUARINO LLP, Tysons, VA,

    Attorneys for Plaintiff.

Christine D. Haynes, Jeffrey L. Moyer, RICHARDS, LAYTON & FINGER, PA, Wilmington, DE; Eric DuPont, Sarah Reeves, BAKER BOTTS LLP, New York, NY,

    Attorneys for Defendant.

December 12, 2024

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant's partial motion to dismiss. (D.I. 11). I have considered the parties' briefing. (D.I. 12, 15, 16). Plaintiff filed a motion to strike an argument in Defendant's reply brief, or, in the alternative, to file a sur-reply. (D.I. 17). That motion has been fully briefed. (D.I. 17, 20).[1] For the reasons set forth below, Plaintiff's motion to strike is DENIED. Plaintiff's motion to file a sur-reply is GRANTED. Defendant's partial motion to dismiss is GRANTED with leave for Plaintiff to amend its complaint.

## I. JURISDICTION

The basis for federal subject matter jurisdiction is diversity of citizenship. (D.I. 1 at 10). Federal district courts have jurisdiction when the parties are "citizens of different States." 28 U.S.C § 1332(a)(1). "The citizenship of an LLC is determined by the citizenship of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). A corporation is a citizen of every state in which it is incorporated and the state where it has its principal place of business. § 1332(c).

Plaintiff Versar Environmental Services is a single member LLC whose sole member is Versar, Inc. (D.I. 23). Versar, Inc. is a Delaware corporation with its principal place of business in the District of Columbia. (*Id.*). Defendant Black & Veatch Special Projects Corp. is a Missouri corporation with its principal place of business in Kansas. (*Id.*). Accordingly, Plaintiff and Versar are citizens of different states.

Because the amount in controversy exceeds $75,000, this court has jurisdiction. (D.I. 1 at 46 ("no less than $5.9 million")); 28 U.S.C. § 1332(a).

---

[1] Plaintiff waived its right to file a reply. (D.I. 21).

2

## II. BACKGROUND[2]

Plaintiff Versar Environmental Services ("Versar") is an operating segment of Versar, Inc. Versar, Inc. is a "government services business offering environmental, security, engineering and construction management, program management, and other professional services to government customers." (D.I. 1-2 at 15 of 115, Ex. 26). Versar, Inc. is privately owned by Kingswood Capital Management. (*Id.*).

Defendant Black & Veatch Special Projects Corp. ("Black & Veatch") is a division and wholly owned subsidiary of Black & Veatch Holding Company. (D.I. 1 at 11). Black & Veatch "provide[s] architectural, engineering, and waste management services, including advisory, consulting and planning services." (D.I. 1 at 11).

In June 2021, Defendant sold its Environmental Business Unit, called "Project Evergreen," to Plaintiff pursuant to the Asset Purchase Agreement ("APA"). (D.I. 1 at 1). In December 2023, Plaintiff filed its complaint alleging that Defendant fraudulently induced Plaintiff to purchase Project Evergreen based on false representations of material fact and intentional omissions of material fact. (D.I. 1 at 1, 44–47). In the alternative, Plaintiff sought damages for breach of contract concerning Defendant's duties regarding the post-closing Purchase Price Adjustment. Plaintiff also sought indemnification for breach of representations and warranties contained in the APA. (D.I. 1 at 1, 47–49).

In February 2024, Defendant filed the pending partial motion to dismiss Plaintiff's fraud and breach of contract claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (D.I. 11; D.I. 12 at 1).[3]

---

[2] I summarize the factual background in the light most favorable to Plaintiff.
[3] Defendant does not move to dismiss Plaintiff's breach of representations and warranties claim. (D.I. 12 at 1; *see* D.I. 1 at 47).

3

In April 2024, Plaintiff filed a motion to strike a new argument it alleges that Defendant raised in its reply brief in support of its partial motion to dismiss. In the alternative, Plaintiff sought leave to file a sur-reply. (D.I. 17 at 1).

The APA states:

> Except for the representations and warranties contained in this Article 3 (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding Seller furnished or made available to Buyer and its representatives, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

(D.I. 1-2 at 44 of 115, Ex. 29 (§ 3.15)).

> Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article 3 of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article 3 of this Agreement (including the related portions of the Disclosure Schedules).

(*Id.* at 52–53 of 115, Ex. 29 (§ 4.5)).

> This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

(*Id.* at 63 of 115, Ex. 29 (§ 7.5)).

> Except as set forth on Schedule 3.10, here [sic] is no claim, action, suit, proceeding or governmental investigation ("Action") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets (including the Assigned Contracts) or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(*Id.* at 43 of 115, Ex. 29 (§ 3.10)).

> Seller has delivered to Buyer and set forth on Schedule 3.11: (a) the unaudited balance sheet for the Business as of December 31, 2019; (b) the unaudited balance sheet for the Business as of December 31, 2020 (the "Base Balance Sheet"); (c) the unaudited balance sheet for the Business as of March 31, 2021; and (d) a statement of profit and loss for the Business for (i) the fiscal year ending December 31, 2019, (ii) the fiscal year ending December 31, 2020, and (iii) the period commencing January 1, 2021 and ending April 30, 2021. Each of the foregoing financial statements and the Estimated Statements (including in all cases the notes thereto, if any) (collectively, the "Financial Statements") is consistent with the books and records of the Business, Seller and Parent (which, in turn, are accurate and complete in all material respects), have been prepared in accordance with GAAP on a consistent basis across periods, present fairly in all material respects the financial condition and results of operations for the Business as of and for the periods referred to therein, subject to changes resulting from normal year-end adjustments and the inclusion of required footnotes (none of which shall be material individually or in the aggregate), and are in compliance with SEC Staff Accounting Bulletin (SAB) Topic 1.B.1. The Financial Statements reflect the allocation of assets, liabilities, income and expenses of the Business on a standalone basis in accordance with GAAP, all such amounts that can be specifically identified to the Business have been, and for any amounts that cannot be specifically identified, an allocation has been made in accordance with GAAP. . . .

(*Id.* at 43 of 115, Ex. 29 (§ 3.11)).

> Seller has, and has at all times been, in compliance in all material respects with applicable Environmental Laws in the operation of the Business. Seller has not received any written notice, claim, demand letter or request for information from any Governmental Authority or any other Person indicating that the Business is or may be in material violation of, or have material liability under, any Environmental Law, and Seller is not subject to any pending or threatened Action, order, decree or investigation under any Environmental Law in connection with the operation of the Business. . . . Seller has delivered or otherwise made available to Buyer copies of any material environmental investigation, assessment, study, test, audit, review or other material environmental information or report in the possession or reasonable

5

> control of Seller and relating to the current or former operations, properties or facilities primarily used for the Business.

(*Id.* at 43–44 of 115, Ex. 29 (§ 3.13)).

> (a) With respect to each Assigned Contract between Seller and any Governmental Authority for which performance is ongoing or to which the Seller has been a party within the past six (6) years (each a "Government Contract") . . . and each Assigned Contract between Seller and any prime contractor or upper-tier subcontractor relating to a Contract between such Person and any Governmental Authority for which performance is ongoing or to which Seller, in connection with the operation of the Business, has been a party within the past six (6) years . . .:
>
>> (ii) no event has occurred, and, to the knowledge of Seller, no facts, circumstances or conditions exist, other than circumstances related to approval of and execution of a novation agreement as set forth under Section 5.5, that will, or would reasonably be expected to, give rise to a claim by a Governmental Authority for any breach or violation in any respect of any Law, Contract, purchase order, task order, delivery order, certification, representation, clause, provision or requirement;
>>
>> (iii) neither any Governmental Authority nor any prime contractor, subcontractor or other Person or entity has ever notified Seller in writing, or, to the knowledge of Seller, orally, that Seller has, or may have, breached or violated any Law, certification, representation, clause, provision or requirement; . . .
>>
>> (v) except as set forth in Schedule 3.22(a)(v), Seller has not received any written notice of termination, "show cause" or cure notice pertaining to any Government Contract or Government Subcontract; . . .
>
> (c) There exist no outstanding material disputes with Seller, and there have not existed within the last seven years any material disputes with Seller, either by a Governmental Authority or by any prime contractor, subcontractor, vendor or other third party, arising under or relating to any Government Contract, Government Subcontract, or Bid. . . .

(*Id.* at 49–51 of 115, Ex. 29 (§ 3.22)).

> (c) Prior to the date hereof, Seller has delivered to Buyer and attached hereto on Schedule 1.4(b): (i) an estimated balance sheet of Seller as of immediately prior to the Closing, reflecting thereon Seller's best estimate of balance sheet items of Sellers [sic] calculated in accordance with GAAP (the "Estimated Closing Balance Sheet"); (ii) the Working Capital as of the Closing, based on the Estimated Closing Balance Sheet, calculated in accordance with GAAP

6

and the Illustrative Working Capital Example, along with supporting calculations and materials (the "Estimated Working Capital"); and (iii) the calculation of the Closing Cash Payment, along with supporting calculations and materials, based on the calculation of the foregoing amounts, in each case, without giving effect to the consummation of the transactions contemplated by this Agreement (collectively, the "Estimated Statements").

(*Id.* at 36 of 115, Ex. 29 (§ 1.4)).

> (a) Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller: (A) a balance sheet of Seller as of the Closing, reflecting Buyer's good faith determination, but adjusted to take into account the actual balances as of the Closing (the "Closing Balance Sheet"); and (B) the Working Capital as of the Closing, based on the Closing Balance Sheet, calculated in accordance with GAAP and the Illustrative Working Capital Example, along with supporting calculations and materials (the "Closing Working Capital" and, together with the Closing Balance Sheet, the "Closing Statements").
>
> (b) Unless Seller delivers a Dispute Notice within thirty (30) days after receipt of the Closing Statements, the Closing Statements shall be deemed the "Final Closing Statements" and shall be binding upon the parties hereto and shall not be subject to dispute or review. If Seller disagrees with any of the Closing Statements, Seller may, within thirty (30) days after receipt thereof, notify Buyer in writing (the "Dispute Notice"), which Dispute Notice shall provide reasonable detail of the nature of each disputed item on the Closing Statements, including all supporting documentation thereto along with a dollar value of Seller's proposed adjustments to the Closing Statements, and Seller shall be deemed to have agreed with all other items and amounts contained in the Closing Statements that are not disputed in the Dispute Notice. Buyer and Seller shall first attempt to resolve such dispute between themselves and, if Buyer and Seller are able to resolve such dispute, the Closing Statements shall be revised to the extent necessary to reflect such resolution, and such revised statements shall be deemed the "Final Closing Statements" and shall be conclusive and binding upon the parties hereto and shall not be subject to further dispute or review. If Seller and Buyer are unable to resolve such dispute within thirty (30) days after receipt by Buyer of the Dispute Notice, Buyer and Seller shall submit those items which remain in dispute to a mutually agreeable independent regionally recognized financial consulting or public accounting firm, which shall at the time of such submission certify its independence from Buyer and Seller (the "Accountants"). . . .
>
> (c) Following the final determination of the Final Closing Statements pursuant to Section 1.5(b), the Purchase Price shall be adjusted on a dollar-for-dollar basis as follows (the absolute value of the amount of the adjustment shall be referred to herein as the "Post-Closing Purchase Price Adjustment"):

7

    (i)    Downward by the amount that the Closing Working Capital as set forth in the Final Closing Statements is less than the Estimated Working Capital; or

    (ii)    Upward by the amount that the Closing Working Capital as set forth in the Final Closing Statements is greater than the Estimated Working Capital.

(*Id.* at 36–37 of 115, Ex. 29 (§ 1.5)).

### III.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Federal Rule of Civil Procedure 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 12. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant

8

is liable for the misconduct alleged. *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Rule 9 adds a heightened pleading standard for allegations of fraud. It states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). While courts have relaxed the requirements "where the factual information is peculiarly within the defendant's knowledge or control[,] . . . boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.*

In a fraud claim, Rule 9 allows that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, "[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'" *In re Burlington Coat Factory*, 114 F.3d at 1418 (agreeing with the Second Circuit's approach, which requires "specific facts that give rise to a 'strong inference'"). A plaintiff "must either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *Id.* at 1422.

9

## IV. DISCUSSION

### A. MOTION TO STRIKE

Before discussing Defendant's motion, I will consider Plaintiff's motion to strike Section II.A.2 of Defendant's reply brief.

Plaintiff argues that Defendant raised a new argument in its reply brief, which Defendant could have raised in its opening brief. (D.I. 17 at 1).[4] Plaintiff contends Defendant argued for the first time in its reply that Plaintiff's fraud allegations "merely concern 'estimates or predictions about the future,'" citing new legal authority for the contention that Plaintiff cannot therefore support a fraud claim. (*Id.* at 1, 4; *see* D.I. 16 at 6–7).

When a party raises an argument supporting a basis for dismissal for the first time in its reply brief, the argument violates Rule 7.1.3(c)(2). *See Marvel v. Prison Indus., Inc.*, 2000 WL 1239962, at *5 n.10 (D. Del. Aug. 24, 2000). However, a party "does not violate Local Rule 7.1.3(c)(2) when the new material in its reply brief responds to arguments raised in the . . . answering brief." *F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*, 2020 WL 4932223, at *1 (D. Del. June 24, 2020), *aff'd on other grounds*, No. 20-1996 (Fed. Cir. July 21, 2021).

Defendant raises a new ground for dismissal in its reply, arguing for the first time that Plaintiff fails to establish a viable theory of fraud by relying on predictions of the future and expressions of opinion to establish scienter. (D.I. 16 at 6). However, I agree that this argument is responsive to Plaintiff's assertion that Defendant's misrepresentations were "not predictions about future performance." (D.I. 15 at 14).

---

[4] Plaintiff cites Local Rule 7.1.3: "The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D. Del. LR 7.1.3(c)(2); (D.I. 17 at 2).

10

Generally, sur-reply briefs are disfavored. D. Del. LR 7.1.2(b). However, I may grant leave to file a sur-reply if the sur-reply "responds to new evidence, facts, or arguments raised for the first time" in a reply brief. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 103 (D. Del. 2016). Defendant does not oppose Plaintiff's request to file a sur-reply. (D.I. 20 at 5).

Therefore, I **DENY** Plaintiff's motion to strike Section II.A.2 of Defendant's reply brief. I **GRANT** Plaintiff's motion to file a sur-reply. I will consider Plaintiff's arguments presented in its sur-reply. (D.I. 17-1, Ex. A).

### B. FRAUD CLAIM

To make out a claim of common law fraud in Delaware, "the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006); *see Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

While Defendant asserts that Plaintiff's complaint does not state a fraud claim for a number of reasons, I concentrate on just the arguments concerning whether Plaintiff alleges actionable false representations. Plaintiff's complaint primarily reads as though it is relying upon false representations and material omissions that happened during due diligence. In the fraud count, Plaintiff says Defendant "repeatedly made repeated false representations . . . during due diligence." (D.I. 1 ¶ 272). "[B]efore the execution of the [APA], [Defendant] grossly misrepresented [ten items]." (*Id.* ¶ 274). Defendant did this "prior to Closing." (*Id.* ¶ 275).

11

Defendant did this so that Plaintiff would "execut[e] the APA." (*Id.* ¶ 276). The fraud count does not describe false representations in the APA.

### 1. Anti-reliance

Defendant argues that Plaintiff has failed to state a fraud claim because it relies on extracontractual representations that cannot be the basis for a fraud claim because they are barred by the APA. (D.I. 12 at 8). Defendant contends that Sections 3.15, 4.5, and 7.5 of the APA "add up to a clear expression of anti-reliance." (*Id.* at 9). Defendant argues the sections show that Plaintiff "has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." (*Id.* at 10 (quoting *Prairie Cap. III, L.P. v. Double E. Holding Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015))).

Sophisticated parties may contract to "eliminate the risk of future claims of fraud or misrepresentation by contractually specifying what representations the parties are and are not making and relying upon." *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, at *18 (Del. Super. Ct. Sept. 23, 2021). "An anti-reliance provision must be explicit, and a standard integration clause is not enough." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 140 (Del. Ch. 2009). "Only if the contract's terms, 'when read together, can be said to add up to a clear anti-reliance clause by which the [claimant] has contractually promised that it did not rely on statements outside the contract's four corners' will a court bar a fraud claim based on extra-contractual representations." *Humanigen*, 2021 WL 4344172, at *18 (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)) (alteration in original).

A positively framed disclaimer is sufficient as "Delaware law does not require magic words." *Prairie Cap. III*, 132 A.3d at 51 ("If a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party

12

relied."). However, to bar a fraud claim the disclaimer language must "come from the point of view of the aggrieved party." *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016).

Plaintiff and Defendant are both sophisticated parties. Despite Section 3.15's inadvertent double negative, Sections 3.15 and 4.5 together with the integration clause in Section 7.5 clearly disclaim reliance upon representations external to the contract. Section 4.5's disclaimer is positively framed from the point of view of the aggrieved party. (D.I. 1-2 at 52 of 115, Ex. 29 (§ 4.5) ("Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article 3 of this Agreement . . .")); *see FdG Logistics*, 131 A.3d at 860. Therefore, I find that the APA contains language sufficient to constitute an enforceable anti-reliance clause.

### 2. Extracontractual vs. contractual representations

Defendant contends that Plaintiff's fraud claim is improperly based on extracontractual representations because the complaint relies on statements that Defendant purportedly made during the due diligence period. (D.I. 12 at 10–13 (citing D.I. 1 ¶¶ 25, 28, 29, 54, 190, 260)). Defendant contends that without the extracontractual statements, Plaintiff's complaint boils down to "a narrow claim for breach of the representations and warranties related to certain financial statements [Defendant] provided pursuant to the APA." (D.I. 12 at 13).[5]

Plaintiff argues that the complaint describes the ways in which Defendant made false representations within Article 3 of the APA. In violation of Section 3.11, Plaintiff contends that

---

[5] Defendant contends that Section 6.4 of the APA contains an indemnity cap of $500,000. (D.I. 12 at 13; *see* D.I. 1-2 at 59, 66 of 115, Ex. 29 (§§ 6.4, 7.15)). This limitation does not apply to losses "aris[ing] out of . . . Fraud by Buyer or Seller." (D.I. 1-2 at 59 of 115, Ex. 29 (§ 6.4(c)(i))).

Defendant did not provide "Financial Statements that were 'accurate and complete in all material respects' and 'prepared in accordance with GAAP.'" (D.I. 15 at 6–7 (citing D.I. 1 ¶¶ 11, 39, 48); *see* D.I. 1-2 at 43 of 115, Ex. 29 (§ 3.11)). Section 3.11 defines "Financial Statements" as a combination of statements and balance sheets. (D.I. 15 at 6). Plaintiff argues that Defendant's financial statements "should have shown that Chem Fab [Project Evergreen's largest project] was behind schedule, [over budget], and experiencing cost overruns[.]" (*Id.* at 8). Plaintiff contends that any extracontractual statements cited in the complaint merely show that Defendant knew its financial statements were inaccurate at the time it made the statements. (*Id.* at 9).

Plaintiff argues that Defendant falsely stated in Section 3.10 of the APA "that there were no events or circumstances in existence that may give rise to or serve as a basis for any legal claim, suit, action, or Government investigation." (*Id.* at 10–11; *see* D.I. 1-2 at 43 of 115, Ex. 29 (§ 3.10)). Plaintiff contends that prior to the execution of the APA, the government sent multiple letters to Defendant regarding issues with Chem Fab, Defendant had disputes with a subcontractor over on-site and design work, and Defendant maintained a list of potential claims to prepare for lawsuits given that Chem Fab "was significantly behind schedule and significantly over budget." (D.I. 15 at 11–12; *see* D.I. 1 ¶¶ 227–29, 130–71, 153).

Plaintiff argues that Defendant made a false statement in Section 3.13, which states that Defendant "has not received any written notice, claim, demand letter or request for information from any Governmental Authority" over a potential environmental law violation, as the government sent Defendant a letter stating that Defendant had violated "the Environmental Protection Agency Acquisition Regulation." (D.I. 15 at 12 (citing D.I. 1 ¶¶ 99–100); *see* D.I. 1-1 at 9 of 65, Ex. 3 ("EPAAR 1552.237-72 Key Personnel"); D.I. 1-2 at 43–44 of 115, Ex. 29 (§ 3.13)); 48 C.F.R. § 1552.237-72 (2024).

Plaintiff argues that Defendant made a false statement in Section 3.22—which states that Defendant had not received cure notices on Chem Fab, that there were no facts that could give rise to a claim by the government regarding Chem Fab, and that Defendant had not had any disputes with a subcontractor for seven years—because Defendant had already received cure notices and was in a dispute with a subcontractor. (D.I. 15 at 12–13; *see* D.I. 1-2 at 49–50, Ex. 29 (§ 3.22)).

In its reply, Defendant contends that Plaintiff's answering brief tries to "re-write the words of its Complaint, which plainly, and impermissibly, plead [Plaintiff's] reliance on [Defendant's] alleged extra-contractual statements as the basis for its claim." (D.I. 16 at 3; *see* D.I. 1 ¶¶ 25, 28, 29, 54, 178, 181, 185, 187, 190, 260, 272, 274, 275). Indeed, Plaintiff cannot amend its complaint through its brief. *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted).

Because of the anti-reliance language in the APA, Plaintiff's fraud claim may not rest upon extracontractual representations. However, Plaintiff also cites information provided by Defendant that was represented to be true within the contract. Plaintiff was entitled to rely upon the "express representations and warranties of [Defendant] set forth in Article 3" of the APA. (D.I. 1-2 at 52 of 115, Ex. 29 (§ 4.5)).

Delaware public policy supports a theory of fraud "when the seller is proven to have induced the contract's formation or closing by lying about a contractually represented fact." *See Abry Partners V*, 891 A.2d at 1035–36. Taking Plaintiff's facts as true, Defendant failed to disclose at least the following facts: Defendant maintained a list of potential claims for lawsuits, failed to provide GAAP compliant financial statements, received multiple cure notices from the

government, and was in a dispute with a subcontractor at the time of the agreement. (D.I. 1 at 44–46).

At least some of Defendant's false representations upon which Plaintiff relied could have been those statements within the four corners of the APA and not extracontractual statements. The anti-reliance provisions (Sections 3.15, 4.5 and Section 7.5) do not bar Plaintiff's fraud claim, at least insofar as the claim is based on contractual representations. However, the statements Plaintiff pleads in support of Count I are largely extracontractual. (*Id.* at 44–47, ¶¶ 270–81). Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend lies within the discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see In re Burlington Coat Factory*, 114 F.3d at 1434. Therefore, I find that Plaintiff's complaint does not support its claim of contractual fraud with sufficient "precision" to satisfy Rule 9, but I grant Plaintiff leave to amend its complaint. *See Frederico*, 507 F.3d at 200. Plaintiff might want to consider a format that complies with Rule 8 – "a short and plain statement of the claim" – when amending its complaint. For example, "The APA at section X.XX represents and warrants, 'blah blah blah.' This representation is false because [stating facts that show the representation was false at the time it was made]."

I do not address Defendant's other arguments about the fraud count. Defendant's motion to dismiss Count I of Plaintiff's complaint is **GRANTED**. I dismiss Count I without prejudice. I grant Plaintiff leave to amend its complaint to plead its claim of fraud with particularity and on the basis of fraudulent representations (or material omissions, if that is possible) in the APA.

### C. BREACH OF CONTRACT CLAIM

Defendant argues that Plaintiff has failed to state a breach of contract claim because it misconstrues the "purchase price adjustment" provision in Section 1.5 of the APA. (D.I. 12 at

16

14; *see* D.I. 1-2 at 36–38 of 115, Ex. 29 (§ 1.5)). Defendant contends that a provision like Section 1.5 is used to "account for post-agreement changes in the value of the acquired company over the brief period between signing and closing. . . ." (D.I. 12 at 14–15 (quoting *In re Bracket Holding Corp. Litig.*, 2017 WL 3283169, at *7 (Del. Super. Ct. July 31, 2017))). Defendant argues that even if Plaintiff were entitled to a purchase price adjustment, it would need to follow the dispute resolution process described in the APA. (D.I. 12 at 16).

Plaintiff contends, "The purpose of [Section 1.5] is to make the necessary adjustments reflecting the difference between [Defendant's] false asset and liabilities values for Project Evergreen (Chem Fab in particular) and the actual corrected values." (D.I. 15 at 16). Plaintiff argues that the reasoning in *In re Bracket Holding* is inapplicable because the closing and signing occurred on the same day here, so there was no "brief period" between closing and signing. (*Id.* at 16–18).[6] Plaintiff further argues that even if it wanted to submit this dispute to accountants, "it would never have been able to do so" because Defendant "failed to prepare or provide . . . any financial statements and supporting materials that were consistent with GAAP." (*Id.* at 19). Plaintiff contends that Defendant "breached the parties' contract by failing to provide GAAP compliant financial statements before any dispute resolution could even get off the ground." (*Id.*).

When parties agree to a prescribed dispute resolution process, "Delaware courts strive to honor the reasonable expectations of the parties . . . ." *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155–56 (Del. 2002) (discussing arbitration agreements).

---

[6] In its reply, Defendant argues that the provision accounts for a limited gap in time: "the time between (1) [Defendant's] provision of the Estimated Working Capital prior to the date of execution, and (2) [Plaintiff's] provision of the Closing Working Capital, which was to be provided within 90 days of closing." (D.I. 16 at 8 (citing D.I. 1-2 at 36 of 115, Ex. 29 (§§ 1.4(c), 1.5(a)))).

17

Defendant maintains that Section 1.5 "sets out a clear dispute resolution process for adjusting the purchase price with the help of an independent accountant." (D.I. 12 at 16). Under Section 1.5, within 90 days of execution of the agreement, Plaintiff was required to prepare and deliver "Closing Statements" reflecting the actual balances as of the Closing. (D.I. 1-2 at 36 of 115, Ex. 29 (§ 1.5(a))). Plaintiff states that it communicated to Defendant that it believed a "substantial downward adjustment to the Post Closing Purchase Price" was required under Section 1.5. (D.I. 1 at 49). Defendant, however, states that Plaintiff never provided a Closing Balance Sheet. (D.I. 16 at 10). The complaint does not allege that Plaintiff did. If Plaintiff wished to adjust the purchase price under Section 1.5, it needed to follow the procedure outlined in the APA and provide its own good faith determination of balances and working capital to kick off the dispute resolution process, even if it thought that Defendant's statements were not GAAP compliant as required under Section 1.4. Therefore, I cannot say that Plaintiff has pleaded sufficiently to support an inference that Defendant breached Section 1.5. Defendant's motion to dismiss Plaintiff's Count II is **GRANTED**. I grant Plaintiff leave to amend its complaint.

### D. CONCLUSION

For the foregoing reasons, Defendant's partial motion to dismiss (D.I. 11) is GRANTED. Plaintiff's motion to strike an argument in Defendant's reply brief (D.I. 17) is DENIED. Plaintiff's motion to file a sur-reply (D.I. 17) is GRANTED. I grant Plaintiff leave to amend Counts I and II of its complaint.

An appropriate order will issue.

Entered this ____ day of December, 2024

_____
United States District Judge