IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VERSAR ENVIRONMENTAL :
SERVICES, LLC :
 :
  Plaintiff, :
 :
v. : C.A. No. 23-01450-RGA
 :
 :
BLACK & VEATCH SPECIAL :
PROJECTS CORP. :
 :
  Defendant. :

## SECOND AMENDED COMPLAINT

Plaintiff, Versar Environmental Services, LLC ("Versar"), by undersigned counsel, files this Second Amended Complaint against Defendant Black & Veatch Special Projects Corp. ("BVSPC") arising out of BVSPC's false representations of material fact made in furtherance of BVSPC's fraudulent scheme to induce Versar into purchasing BVSPC's Environmental Business Unit known as Project Evergreen. Versar also makes alternative claims for Breach of Contract and Indemnification.

## INTRODUCTION

1. The allegations and claims in this Second Amended Complaint stem from a fraudulent scheme by BVSPC to sell its Environmental Business Unit, Project Evergreen, including all the projects under Project Evergreen's umbrella, to Versar under false pretenses. As explained in detail in this Second Amended Complaint, to enter into this transaction, on June 21, 2021, BVSPC and Versar executed an Asset Purchase Agreement ("APA"). *See* Asset Purchase Agreement, attached as Exhibit 1. In the APA, BVSPC made numerous representations about Project Evergreen's and, by extension, Project Evergreen's projects', operational, financial, and

legal condition. This included Project Evergreen's largest project, known as the Chem Fab Superfund Site ("Chem Fab").

2. Unbeknownst to Versar until after the parties executed the APA, BVSPC made numerous deliberate misrepresentations to Versar in the APA for the purpose of inducing Versar into purchasing Project Evergreen. BVSPC's misrepresentations in the APA include:

   a. misrepresenting the existence of a List of Potential (legal) Claims despite representing in Section 3.10 (Legal Proceedings) of the APA that "no event has occurred or circumstances exist that may give rise to, or serve as a basis for" any legal action relating to Project Evergreen or its projects;

   b. despite providing a Profit & Loss Statement and Estimated Closing Balance Sheet that were inaccurate and otherwise not prepared in accordance with GAAP, falsely representing, under Section 3.11 (Financial Statements) of the APA, that BVSPC delivered to Versar financial statements that were consistent with "the books and records of [Project Evergreen]," that were "accurate and complete in all material respects[,]" that were "prepared in accordance with GAAP," and that the financial statements "present in all material respects the financial condition and results of operations for [Project Evergreen] as of and for the periods referred to therein[.]"; and

   c. misrepresenting the existence of numerous cure notices, and facts giving rise to a cure notice (Serial Letters 1, 3, and 4), as well as the existence of a dispute with its chief subcontractor, Product Recovery Management ("PRM") despite representing in Section 3.22 (Government Contracts) of the APA that BVSPC had received no cure notice on any Project Evergreen Project and that it had not had any "material disputes" with any subcontractor on a government project for the prior seven years.

3. All of these were intentional, fraudulent misrepresentations of fact that BVSPC made within the four corners of the APA.

4. On December 20, 2023, Versar filed its initial Complaint, which included the following counts: Count I: Fraud; and Count II: Indemnification and Breach of Contract (Pled in the Alternative) (D.I. 1).

5.      In response, on February 12, 2024, BVSPC filed a Partial Motion to Dismiss the fraud and breach of contract claims (D.I. 11).  Versar opposed BVSPC's Partial Motion to Dismiss (D.I. 15).

6.      On December 12, 2024 and December 16, 2024, the Court issued its Memorandum Opinion (D.I. 24) and Order (D.I. 25) granting Defendant's Partial Motion to Dismiss and granting Plaintiff leave to amend its Complaint on the bases stated in the Memorandum Opinion.

7.      Specifically, with respect to the fraud claim, the Amended Complaint was only to include allegations of fraud within the four corners of the APA (and not be based upon extracontractual misrepresentations).  Also, with respect to the breach of contract claim, the Amended Complaint was to confirm Versar's delivery of Closing Statements to BVSPC.

8.      As explained below, the purpose of this Second Amended Complaint is to plead an additional count (Count III) to request a declaratory judgment from the Court that the parties' Subordinated Promissory Note, dated June 21, 2021, and with a Maturity Date of June 21, 2026, is unenforceable as it is the product of the fraud committed by BVSPC in connection with the execution of the APA.

## **PARTIES**

9.      Versar Environmental Services, LLC is a Delaware-registered single member limited liability company.  Versar, Inc. is the sole member of Versar Environmental Services, LLC.

10.     Versar, Inc. is a Delaware corporation with its principal place of business in the District of Columbia (1025 Vermont Avenue, NW, Suite 500, Washington, DC 20005).

11.     Accordingly, Versar Environmental Services is a citizen of both Delaware and the District of Columbia.

12.     Black & Veatch Special Projects Corp. is a Missouri corporation with its principal

3

place of business located at 11401 Lamar Avenue, Overland Park, Kansas 66211.

13.    Black & Veatch Special Projects Corp. is licensed to do business in, and regularly does business in, the State of Delaware.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the causes of action against BVSPC, as the amount in controversy exceeds $75,000.00 and the parties are all citizens of different states.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this matter occurred in this District.

16.    The APA executed by the parties contains a forum and venue selection clause agreed to by the parties, which states:

> **7.11 Submission to Jurisdiction.** Each of the parties hereto irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by any other party or its successors or assigns may be brought and determined by a state or federal court of appropriate jurisdiction in New Castle County Delaware, and each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any action, suit or proceeding relating thereto except in such courts).

## FACTS

I.    **Overview of Black & Veatch Special Projects Corp. and its Environmental Services Business Unit, Project Evergreen**

17.    BVSPC is a division and wholly owned subsidiary of Black & Veatch Holding Company.

18.    BVSPC's stated purpose is "[t]o provide architectural, engineering, and waste

4

management services, including advisory, consulting and planning services."

19.     Project Evergreen, which Versar purchased from BVSPC, was BVSPC's full-service, environmental business unit specializing in investigation, assessment, design, remediation, and operations and maintenance for government clients across the United States.

20.     When Versar purchased Project Evergreen, Project Evergreen held numerous federal contracts, including the contract for the "Chem Fab Superfund Site."

## II.     Overview and History of the Chem Fab Project, the Largest Project Owned by Project Evergreen

21.     As of the date of the APA, Chem Fab was Project Evergreen's largest project.

22.     The Chem Fab Superfund Site ("the Site") is located at and around 300-360 North Broad Street, Doylestown, Pennsylvania 18901.

23.     On or about June 12, 2019, the EPA issued a Request for Information ("RFI") to qualified contract holders[1], including BVSPC, with a scope of work to construct and operate a groundwater extraction treatment system, which included piping, a treatment building, and other supporting components to address contaminated groundwater, to treat hazardous chemicals, and to generally clean up the Site.

24.     On or around July 29, 2020, after BVSPC had months to study Chem Fab and the scope of work, the EPA issued a Request for Offer ("RFO").[2]

25.     The RFO had substantially the same scope of work as the RFI.  However, the RFO also contained numerous personnel requirements, including designating a full-time, on-site, qualified Construction Quality Systems Manager ("CQSM") to monitor work at the Site and to ensure quality control.

---

[1] "Qualified contract holders" refers to EPA approved Remediation Environmental Services contractors
[2] At a superfund site, the EPA is generally responsible for the cleanup of the site, with USACE providing technical support.

26. The initial schedule for Chem Fab was as follows: (1) a Base Period lasting 14 months (4 months of pre-construction activities, 7 months of construction, and 3 months of startup and post-construction activities); (2) Option Period No. 1 lasting 16 months (operations and maintenance); (3) Option Period No. 2 lasting 12 months (operations and maintenance); and (4) Option Period No. 3 lasting 12 months (operations and maintenance).

27. BVSPC also identified the following key personnel for Chem Fab: (1) Project Manager, Edward Hicks, PE, PMP; (2) Project Superintendent, John Weir[3]; (3) CQSM Romiro Ojeda; and (4) Remedy Operator, Kenneth Fulford.

28. Ultimately, the EPA awarded Chem Fab to BVSPC and on October 9, 2020, the EPA issued BVSPC a Notice to Proceed.

III.    BVSPC's Hiring of PRM as its Main Subcontractor for Chem Fab

29. Shortly after winning Chem Fab, BVSPC began soliciting bids from potential subcontractors—one of which was PRM.

30. After receiving bids from numerous candidates, BVSPC decided to subcontract with PRM, and it submitted a Request for Consent to the EPA.

31. PRM's scope of work was generally to perform and provide all the engineering, design, labor, equipment, and materials necessary to complete the construction of the groundwater extraction treatment system building at the Chem Fab site.  Additionally, upon completing the treatment building, PRM was responsible for the routine and non-routine maintenance of the building during the operation and maintenance phase of the Project.

32. In BVSPC's Request for Consent, BVSPC represented that PRM was an experienced, qualified contractor that could complete the required work on Chem Fab correctly

---

[3] On or around March 11, 2021, BVSPC's Jan Dekker replaced John Weir as Project Superintendent.

and in a timely manner.

33.    The EPA approved BVSPC's Request for Consent and BVSPC contracted with PRM for the Project.

## IV.    BVSPC's Continued Failure to Abide by its Contractual Obligations, which Caused Critical, Undisclosed Delays to the Project Schedule

34.    Almost immediately after the EPA approved PRM and directed BVSPC to proceed on Chem Fab, significant, material issues developed with the Project.

### A.    USACE Serial Letter No. 1 to BVSPC for BVSPC's Failure to Provide a Qualified, Full-Time Construction Quality Systems Manager

35.    On December 17, 2020, well before BVSPC even mobilized to the Chem Fab Site, USACE sent BVSPC the first of several Serial Letters[4] on the Project.

36.    Serial Letter No. 1 addressed BVSPC's lack of, and need to appoint, a full-time CQSM for Chem Fab.  The letter expressed the Government's concern that "[w]ithout a consistent CQSM[,] we are concerned impacts may be seen with the overall project quality."  *See* Serial Letter No. 1, attached as Exhibit 2.

37.    Specifically, according to the Government, the original CQSM, Romiro Ojeda, failed to: (i) complete the Construction Quality Management (CQM) for Contractors course; (ii) prepare, review, and stamp submittals prior to submittal to the Government; and (iii) complete the required certification and approval statements prior to issuing submittals to the Government.  Ex. 2.

38.    The Government communicated that Mr. Ojeda was unqualified for his role, that BVSPC's lack of a qualified, full-time CQSM on Chem Fab was "unacceptable," and that it would result in a "poor performance evaluation" if it continued.  *See* Ex. 2.

---

[4] "Serial Letter" is the name used for cure notice on the Chem Fab Project.

39.     Eventually, after several weeks, BVSPC assigned a qualified, full-time CQSM, Shante Mason, to the Project.  However, BVSPC's budget for Chem Fab apparently did not include the costs for a full-time CQSM.

40.     On January 12, 2021, nearly a month after BVSPC received Serial Letter No. 1, BVSPC's Robert Gamble wrote to Ed Hicks about the process of designating a new CQSM:

> "Just to remove any doubt although I don't think there should be any. I have your back on this IDWA. We are out of options and time. Shante [Mason] is the answer. Scott [Olson] will have to live with the revenue loss. *We compromised our processes when we bid* Chem Fab.  *Now we (including Scott) will have to live with the pain*." (emphasis added).

*See* Robert Gamble January 12, 2021 Message, attached as Exhibit 3.

41.     The following day, Gamble added:

> "We need to remember how Chem-Fab came about, we *compromised our processes* to submit a bid and this is the *price we pay for that compromise*. Memories get short and selective and should not be lost. The project team is doing everything that can be done to minimize the impact, but facts are facts *we are one step away from a cure notice on* Chem-Fab." (emphasis added).

*See* Robert Gamble January 13, 2021 Email, attached as Exhibit 4.

42.     BVSPC's Scott Olson responded with his concern about Chem Fab and the impact the Project may have on Project Evergreen's already poor health, stating:

> "This is really troubling, especially considering the financial health of our BU [business unit].  I sincerely hope that we came away bruised and battered from fighting and negotiating for that PGM [project gross margin] hit and that we didn't simply roll over due to waiting until the last minute and being in a box.  We cannot afford any PGM erosion on our jobs."

*See* Scott Olson January 13, 2021 Message, attached as Exhibit 5.

43.     This correspondence, while not incorporated into the APA itself, is relevant to the BVSPC project team's knowledge that significant unanticipated costs were having an impact on the planned budget for Chem Fab and correspondingly that such unanticipated costs would reduce

8

the projected revenue.

44.     However, the APA's Profit & Loss Statement and an Estimated Closing Balance Sheet failed to account for the known and reasonably anticipated losses in PGM for Chem Fab.

**B.     USACE Serial Letter No. 3 to BVSPC for Failure to Mobilize at Chem Fab Site and BVSPC's Continued Failure to Mobilize Despite Promises in Mobilization Plan**

45.     On April 2, 2021, still before any mobilization or the beginning of any construction, the Government sent BVSPC a second Serial Letter, Serial Letter No. 3.[5]

46.     The Letter stated that there were "[s]everal issues" requiring BVSPC's "immediate attention[,]" including, but not limited to, BVSPC's failure to provide any mobilization plan, the lack of a construction support zone, and the lack of on-site office space.  *See* Serial Letter No. 3, attached as Exhibit 6.

47.     According to the Government, BVSPC had "been aware of this concern since the start of the Project" but "[t]o date, with mobilization to occur the week of [April 5, 2021], none has been provided.  *This is unacceptable.*"  *See* Ex. 6. (emphasis added).

48.     While BVSPC eventually provided a plan, the flaws in the plan were exposed on the first day of mobilization.

49.     According to EPA Project Manager Bob Stank, despite months of supposed planning, BVSPC "didn't make it 15 minutes" on the first day before encountering problems. Stank warned that BVSPC needed to "work to do better."  *See* Bob Stank April 6, 2021 Email, attached as Exhibit 7.

50.     Despite Serial Letters No. 1 and No. 3 being well known to BVSPC prior to executing the APA, in Section 3.22(a)(v) of the APA, BVSPC falsely stated to Versar that BVSPC

---

[5] For unknown reasons (potentially a clerical error), there is no Serial Letter No. 2.

had not received any cure notices pertaining to any Government Contract in the prior six years.

51.   The continued deficiencies identified on the Project resulted in BVSPC having to undertake corrective action that further diminished the possibility of returning a profit on Chem Fab.  However, as explained below, the APA's financial documents failed to account for such additional costs.

## V.   BVSPC's List of Potential Legal Claims on Chem Fab and Undisclosed Disputes with PRM

52.   In addition to the avalanche of pre-mobilization issues BVSPC encountered on Chem Fab, once construction began, BVSPC quickly encountered problems with PRM's work as well.

53.   Yet, BVSPC falsely represented in the APA that there were no disputes whatsoever with PRM.

### A.   BVSPC's Undisclosed Operational Disputes and Chem Fab Site Shutdown over PRM's Deficient Work

54.   BVSPC's legion of problems with PRM included: (a) alleged "employee misconduct" by Project Manager Chris Stone against PRM Superintendent Tim Vernia, (b) PRM's supervision of its work at the Chem Fab site, (c) BVSPC's lack of progress in responding to PRM's RFIs, and (d) PRM's generally deficient designs and work.  *See* PRM May 1, 2021 Letter to BVSPC, attached as Exhibit 8.

55.   Ultimately, when issues with both PRM's and BVSPC's work hit a critical mass, BVSPC (through Project Manager Chris Stone) determined that it had to stop work at the Site to fix these issues.  PRM objected to BVSPC's decision.  *See* Ex. 8.

56.   According to PRM President Mel Phillips, "I need Black and Veatch to understand that Chris [Stone] is making poor decisions and they are affecting our schedule and our finances."

10

*See* Ex. 8.

57.     In the following days, on May 2 and 3, 2021, BVSPC sent cure notices to PRM to both address PRM's issues and to communicate additional issues of its own.  *See* May 2, 2021 Email from Chris Stone, attached as Exhibit 9; BVSPC May 3, 2021 Letter to PRM, attached as Exhibit 10.

58.     According to BVSPC, PRM's work was deficient and was negatively impacting Chem Fab because PRM did not have enough personnel on-site to complete the work, there were safety violations, and the work and supervision of PRM Superintendent Tim Vernia was inadequate.

59.     Also, problematically, BVSPC raised concerns to PRM about the results of an April 29, 2021 USACE informal inspection, which identified numerous, serious issues, including, but not limited to, issues with fuel storage, counterfeit construction materials, and inadequate construction personnel and available equipment to safely receive aggregate and material deliveries. *See* Ex. 10.

60.     BVSPC warned PRM that "PRM does not recognize the *gravity of our current situation* on the Chem Fab Project" and that "corrective action is necessary."  *See* Ex. 10. (emphasis added).

61.     These concerns were consistent with internal alarm raised within BVSPC about the status of the Chem Fab project—including that Chem Fab was a "beast" and that "the client has no patience for excuses why we aren't adhering to our plans[,]" as well as BVSPC not being "mature enough in construction to easily pull off Chem Fab."  *See* Carrie McCoy April 20, 2021 Email, attached as Exhibit 11; John Jenkins April 22, 2021 Message, attached as Exhibit 12.

11

**B.** **BVSPC's Ongoing Design and Construction Issues with the Slab Foundation for the Chem Fab Treatment Building, which it Misrepresented in the APA**

62.     In addition to the operational issues and BVSPC-ordered site shut down described above, starting long before mobilization or construction began, there were numerous, serious deficiencies with the design and construction of the concrete slab foundation for the treatment building at the Chem Fab Site.

63.     As part of its scope of work, PRM was to construct an 80' x 100' x 8" thick concrete slab foundation for the treatment building.

64.     To do this work, PRM submitted numerous drawings and design calculations for the slab foundation to BVSPC for review.  BVSPC Project Engineer, Anja Schlagel, reviewed the submissions.

65.     From the outset, PRM's drawings and designs were deficient and failed to comply with project specifications.

66.     According to Anja Schlagel, PRM's initial submission for the slab foundation was "based on outdated code references that are non-spec-compliant."  She added that the submission needed to be "overhauled" and "certified by a licensed professional engineer."  *See* Anja Schlagel February 17, 2021 Email, attached as Exhibit 13.

67.     On or around April 5, 2021, twenty-six days late according to the Project schedule, PRM provided a revised submission.

68.     Anja Schlagel then provided Project Manager Ed Hicks with extensive comments on PRM's revised submission, stating that, "If this would have been a submittal for DOR review, I would have *E-coded it without hesitation and rather quickly*."[6]  *See* Anja Schlagel April 7, 2021

---

[6] "E Coded" refers to a USACE engineering code that means a submittal is generally not up to code or is otherwise disapproved.

12

Email, attached as Exhibit 14. (emphasis added).

69.    As a result, PRM needed to submit yet another round of designs and drawings, which resulted in both delays and increased costs on the Project.

70.    BVSPC Project Superintendent Jan Dekker knew this when he warned BVSPC that they needed "time for our strategy on the submission *since the slab is so much more than the original bid design on the HGL PE stamped drawings*." *See* Jan Dekker April 28, 2021 Email, attached as Exhibit 15. (emphasis added).

71.    According to Anja Schlagel, once PRM submitted additional drawings, PRM's third submission was still inadequate and incomplete because it was missing critical calculations. Also, the design of the concrete slab that PRM submitted did not account for the weight of the building.

72.    These issues were so serious that, as explained above, on or around May 1, 2021, BVSPC stopped work on Chem Fab to develop a corrective action plan.

73.    According to BVSPC's Chris Stone, the deficient foundation forced BVSPC into a "holding pattern" on Chem Fab, that BVSPC was negotiating with "a gun to [its] head", and that BVSPC was "designing on the fly." *See* Chris Stone May 5, 2021 Email, attached as Exhibit 16.

74.    However, despite the work stoppage and apparent corrective action plan, the problems and deficiencies with PRM's drawings and calculations remained unresolved.

75.    On May 10, 2021, PRM submitted to BVSPC its "final stamped drawings with the calculations for the foundation and slab." According to PRM, "[a] tremendous amount of energy went into the drawings and [calculations] as the provided plans were found to be inadequate." *See* BVSPC/PRM May 10-12, 2021 Emails, attached as Exhibit 17.

76.    However, PRM's drawings and calculations were still deficient.

13

77.     Apparently, PRM merely copied a prior inadequate submission, put it on "engineering paper," and then re-submitted it to BVSPC.  *See* Ex. 17.

78.     Among other issues, the proposed slab continued to be too weak to support the weight of the treatment building.  According to Anja Schlagel:

> "Some stuff was addressed, more was not, some addressed areas are *now worse than before*.... I wish they would have set up the call with the engineer, because I doubt they fully understood half of my comments based on what I am seeing here. I am not sure that one can construct this thing from these drawings, and *I still do not think that the design is adequate* considering missing load factors, questionable tank loading etc. If they don't think my comment has merit then at a bare minimum I would have expected some type of acknowledgement and justification why my comment did not apply, and I didn't see that. The[y] modified some of the drawing notes and added another sheet that contains the previously missing rebar details (even though these details are in parts not legible). However, they also now have no rebar continuing underneath the drain, *so that is where the concrete will crack and possibly separate.*
>
> I would say, we need that call to get onto the same page, because I don't think I can sign off on what I am looking at right now."

*See* Ex. 17 (emphasis added).

79.     Ed Hicks echoed Anja Schlagel's alarm, stating, "I went ahead and forwarded PRM's revised submittal to Anja to see if PRM had addressed her most critical comments. *They really did not.  I think we are flirting with disaster here*, if we don't have PRM's engineer address Anja's comments."  *See* Ex. 17. (emphasis added).

80.     Based on its review, BVSPC knew that the slab needed to be fifty percent thicker to support the weight of the treatment building.  *See* BVSPC's List of Potential Claims, attached as Exhibit 18.

81.     BVSPC also knew that the slab foundation was undersized.  As Chris Stone wrote:

> "I have not been able to get to writing an RFI identifying the *undersized slab* from the HGL design. Maybe this already exists but if it does, I do not know where it is at the moment. Would you please put together the basic

> text needed to identify the issue and indicating there would be a cost impact primarily for increased materials in terms of concrete and rebar and a reasonable effort for our engineering costs."

*See* Chris Stone May 21, 2021 Email, attached as Exhibit 19 (emphasis added).

82. Clearly, based on Chris Stone's internal email, BVSPC knew well before Closing that the slab foundation was deficient, defective, and needed a significant redesign to meet project requirements. BVSPC also knew that addressing these issues would delay the Project schedule and increase the cost of completion. *See* Ex. 19.

83. In fact, BVSPC identified these issues with the slab foundation in writing in its internal List of Potential Claims, which it shared amongst BVSPC personnel, including, upon information and belief, BVSPC legal, to prepare for potential litigation over Chem Fab against either PRM, the Government, or both.

84. BVSPC's List of Potential Claims further identifies that in May 2021, BVSPC knew that the Project budget was "too low", meaning that it would be impossible to complete Chem Fab to specification unless the Project's budget was increased.

85. Despite BVSPC's knowledge regarding the actual costs exceeding its planned budget, in the APA, BVSPC failed to accurately reflect the loss by misrepresenting Chem Fab's expected PGM as $1,279,738.00 despite knowing that this expected PGM could never come to fruition.

86. Ultimately, on June 3, 2021, less than three weeks before Closing, BVSPC sent PRM a Correction of Work. *See* BVSPC June 3, 2021 Letter to PRM, attached as Exhibit 20.

87. The Correction of Work states "[i]t has become evident that PRM has not performed this work to an acceptable level of quality or timeliness after multiple attempts to do so

15

and that the Project Schedule will be *further* adversely impacted if BVSPC does not intervene to correct the deficient design." *See* Ex. 20 (emphasis added).

88.     The Correction of Work further states that "BVSPC hereby provides written notice to PRM that we are taking the immediate action of producing a new Concrete Slab Design submittal with our own engineering resources. [. . .] The cost of this intervening corrective action will be incurred by PRM, per the terms of this referenced subcontract clause." *See* Ex. 20.

89.     Despite the Correction of Work, and still prior to Closing, BVSPC personnel working on Chem Fab continued to raise alarms about PRM's work, the Project, and its condition.

90.     On June 7, 2021, Anja Schlagel wrote that PRM's latest submittal was "missing the contractually required control joints to control cracking of the slab[.]" *See* Anja Schlagel June 7, 2021 Message, attached as Exhibit 21.

91.     Schlagel also continued to raise alarm about "the concrete strength." *See* Anja Schlagel June 21, 2021 Message, attached as Exhibit 22.

92.     Inexplicably, despite the disputes with PRM and the List of Potential Claims being well known to BVSPC, BVSPC did not disclose the above disputes with PRM, the List of Potential Claims, or PRM's critical performance issues to Versar in the APA, which directly conflicted with BVSPC's representations in Article 3.

93.     Yet, while BVSPC kept Versar in the dark in the APA with respect to PRM, BVSPC did not keep the Government in the dark.

94.     On June 15, 2021, less than a week before Closing, the Government called a meeting with BVSPC to discuss "Potential major changes to the concrete slab design." *See* June 15, 2021 Ian Stewart Email, attached as Exhibit 23.

16

95.     At around the same time as the meeting, and as a last-ditch effort to potentially salvage the slab foundation, PRM requested that BVSPC allow it to hire temporary contract workers to construct the foundation.  BVSPC referred PRM's request to its legal department, which, unbeknownst to Versar, was at least the second time a Chem Fab dispute went to, or was supposed to go to, BVSPC's legal counsel for guidance.  BVSPC rejected PRM's request as an improper attempt to hire a subcontractor without BVSPC's permission.

96.     Again, despite BVSPC personnel working on Chem Fab knowing that Chem Fab was a "slow moving disaster" that was negatively and severely impacting Project Evergreen, BVSPC misrepresented Project Evergreen's condition in Article 3 of the APA.  *See* Carrie McCoy May 5, 2021 Message, attached as Exhibit 24.

97.     In fact, BVSPC's financial statements, which are discussed below, and which were incorporated into the APA, painted a glowing financial picture to hide these critical issues from Versar—and to induce a sale.

## VI.    Asset Purchase Agreement, BVSPC's Fraudulent Financial Statements, and Close of Sale of Project Evergreen

98.     Before completing the sale, BVSPC and Versar prepared the APA.

99.     In connection with the APA, Versar issued a Subordinated Promissory Note ("Promissory Note") in the amount of Two Million and 00/100 Dollars ($2,000,000) to BVSPC as holder. A copy of the Note is attached to this Second Amended Complaint as Exhibit 33.

100.    The Promissory Note was part of the financing for Versar's acquisition of Project Evergreen.  *See* APA, Ex. 1 §1.4(a) (Purchase Price); §2.2(a)(viii) (Closing Deliverables).

101.    The Promissory Note has a stated maturity date of June 21, 2026 ("Maturity Date").

17

102.    Article 3 of the APA contained numerous representations and warranties that BVSPC warranted were true and correct and upon which Versar was entitled to rely.  *See* Ex. 1, Section 3.15 No Other Representations.

103.    In Article 3, BVSPC represented and warranted, in relevant part:

a.  **3.10 Legal Proceedings.** Except as set forth on Schedule 3.10, there is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets (including the Assigned Contracts) or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

b.  **3.11 Financial Statements.** Seller has delivered to Buyer and set forth on Schedule 3.11: (a) the unaudited balance sheet for the Business as of December 31, 2019; (b) the unaudited balance sheet for the Business as of December 31, 2020 (the "**Base Balance Sheet**"); (c) the unaudited balance sheet for the Business as of March 31, 2021; and (d) a statement of profit and loss for the Business for (i) the fiscal year ending December 31, 2019, (ii) the fiscal year ending December 31, 2020, and (iii) the period commencing January 1, 2021 and ending April 30, 2021. Each of the foregoing financial statements and the Estimated Statements (including in all cases the notes thereto, if any) (collectively, the "**Financial Statements**") is consistent with the books and records of the Business, Seller and Parent (which, in turn, are accurate and complete in all material respects), have been prepared in accordance with GAAP on a consistent basis across periods, present fairly in all material respects the financial condition and results of operations for the Business as of and for the periods referred to therein, subject to changes resulting from normal year-end adjustments and the inclusion of required footnotes (none of which shall be material individually or in the aggregate), and are in compliance with SEC Staff Accounting Bulletin (SAB) Topic 1.B.1. The Financial Statements reflect the allocation of assets, liabilities, income and expenses of the Business on a standalone basis in accordance with GAAP, all such amounts that can be specifically identified to the Business have been, and for any amounts that cannot be specifically identified, an allocation has been made in accordance with GAAP. There are no liabilities of the Business, other than (i) liabilities reflected, fully reserved, or disclosed on the Base Balance Sheet, and (ii) liabilities that have been incurred in the ordinary course of business consistent with past practice since the date of the Base Balance Sheet.

    c.  **3.22 Government Contracts.** Except as set forth in Schedule 3.22(a)(v), Seller has not received any written notice of termination, "show cause" or cure notice pertaining to any Government Contract or Government Subcontract (*see* Section 3.22(a)(v)).

    d.  **3.22 Government Contracts.** There exist no outstanding material disputes with Seller, and there have not existed within the last seven years any material disputes with Seller, either by a Governmental Authority or by any prime contractor, subcontractor, vendor or other third party, arising under or relating to any Government Contract, Government Subcontract, or Bid. (*see* Section 3.22(c)).

*See* Ex. 1.

104.    As represented in Article 3.11 of the APA, BVSPC provided Versar with what BVSPC represented to be GAAP compliant financial statements for all of Project Evergreen, including Chem Fab.

105.    The Financial Statements included a Profit & Loss Statement and an Estimated Closing Balance Sheet.  *See* Project Evergreen Profit & Loss Statement, attached as Exhibit 25; Estimated Closing Balance Sheet, attached as Exhibit 26.

106.    On its Profit & Loss Statement, BVSPC stated that Project Evergreen's PGM was $690,397.00.  *See* Ex. 25.

107.    On its Estimated Closing Balance Sheet, BVSPC stated that Project Evergreen's contract assets were $1,204,957.00.  *See* Ex. 26.

108.    Moreover, on Chem Fab specifically, BVSPC stated that Chem Fab had a positive "expected" PGM of $1,279,738.00, which BVSPC represented to be consistent with Project Evergreen's books and records.

109.    However, as discussed below, BVSPC knew that these financial statements and their contents were not true.  These were fraudulent numbers that BVSPC knew could never be realized.

110. These were not actual, honest amounts that reflected Project Evergreen's and Chem Fab's financial reality—a reality about which Versar did not know but about which BVSPC management had full knowledge.

111. As BVSPC Project Accountant Catherine Nelson wrote, just a week before Closing: "I'm pretty sure it was quite a shock when [management] saw the *actual numbers*. I'm worried about the Project review. It's not going to be pretty." *See* Catherine Nelson June 14, 2021 Message, attached as Exhibit 27 (emphasis added).

112. Contrary to BVSPC's representations in its financial statements, Chem Fab was not making money, it was losing money and would always lose money.

113. Yet, BVSPC warranted that its representations in the APA, including its financial statements about Project Evergreen and Chem Fab, were true and correct—notwithstanding that the "actual" and "constructive knowledge" of BVSPC employees Todd Dudley, Susan Granholm, Scott Olson, and Jay Sigman, among others, who knew otherwise.

114. BVSPC's employees' knowledge of the material misrepresentations BVSPC made to Versar in the APA were also known by, or at least imputed, to the managing members of Black & Veatch including, but not limited to, Martin G. Travers.

115. Due to BVSPC's representations in the APA, which Versar reasonably believed at the time to be, true and accurate, Versar executed the APA to purchase Project Evergreen.

## VII.    Versar's Post-Closing Discovery of BVSPC's Misrepresentations and False Statements in the APA about Project Evergreen and Chem Fab

116. Only after Closing did Versar discover the true state of Project Evergreen, Chem Fab, and the myriad misrepresentations (financial, operational, and otherwise) that BVSPC made in the APA.

117. But for BVSPC's misrepresentations in the APA, Versar would never have

20

purchased, or even considered purchasing, Project Evergreen from BVSPC.

**A.    Chem Fab's Operational and Legal Problems that BVSPC Misrepresented in the APA**

118.    Again, there were numerous operational, performance, scheduling, and design issues with Project Evergreen's largest project, Chem Fab, about which BVSPC knew, intentionally misrepresented to Versar in the APA, and that Versar could not have reasonably discovered at the time on its own.

119.    Specifically, as explained above and unbeknownst to Versar due to BVSPC's misrepresentations in the APA, BVSPC was in a prolonged dispute on the Chem Fab Project with PRM over PRM's deficient designs and work.

120.    These disputes included PRM's deficient design of the slab foundation for the Chem Fab treatment building, which was too thin, too small, and in danger of cracking. Versar had to completely rework the slab foundation, at significant time and expense, to salvage the Project.

121.    Ultimately, as explained above, prior to execution of the APA, BVSPC issued multiple cure notices and stop work orders to PRM on the Project.

122.    However, based on BVSPC's representations in Section 3.22 of the APA regarding disputes with subcontractors, and as far as Versar was able to determine based on its due diligence, there were no work stoppages, cure notices, or any material disputes whatsoever between BVSPC and PRM.   Despite its representations to the contrary in the APA, BVSPC deliberately misrepresented this material information about PRM in the parties' agreement.  As a result, Versar did not discover the nature of BVSPC's dispute with PRM until after Closing.

123.    In addition to BVSPC's prolonged dispute with PRM that it misrepresented in Article 3 of the APA, BVSPC misrepresented the numerous cure notices that it received from the

21

Government on Chem Fab—again, despite being required to disclose them in Section 3.22 of the APA (or otherwise in violation of the express representation in this Section).

124.    BVSPC neither disclosed Serial Letter No. 1 (regarding BVSPC's failure to designate a qualified CQSM for the Project) nor Serial Letter No. 3 (BVSPC's lack of a mobilization plan and other operational issues).

125.    Moreover, BVSPC misrepresented to Versar the facts underlying Serial Letter No. 4.  While the EPA sent BVSPC Serial Letter No. 4 on June 24, 2021, three days after Closing, the Letter addressed problems on Chem Fab that all existed prior to Closing—issues about which BVSPC was fully aware but misrepresented in the APA.  *See* Serial Letter No. 4, attached as Exhibit 28.

126.    Serial Letter No. 4 stated:

> "The government has concerns with the project proceeding diligently. . . . The government is concerned with the milestone slippage to date and the probable risk of future missed milestones.  The schedule update narrative report did not include a discussion of the delaying factors nor corrective action as required" by BVSPC's contract.

> "The lack of key project design related submittals is concerning for construction progress as field work on specific definable features of work cannot commence without approved submittals. This may lead to missing future milestones."  As a result, "[t]he government is not able to efficiently conduct remedial construction management duties with the provided services."  "[BVSPC] is notified that the Government considers the performance delays and other items mentioned to be endangering performance of the contract."

*See* Ex. 28.

127.    The EPA ordered that by July 9, 2021, BVSPC was to "provide a schedule narrative report detailing a description of current and anticipated problem areas or delaying factors and their impact, and an explanation of corrective actions taken or required to be taken."  *See* Ex. 28.

128.    Again, BVSPC misrepresented to Versar, in the APA, the issues described in Serial Letter No. 4.  This was because, as BVSPC well knew, Chem Fab was "headed towards a wall" because of "self-inflicted wounds" and it wanted to get out of Dodge.  *See* June 7, 2021 Message from John Jenkins, attached as Exhibit 29.

129.    Versar did not discover Serial Letters No. 1, No. 3, and No. 4, or the issues described in the letters, until after Closing.

130.    As explained above, and due to the litany of issues on Chem Fab, BVSPC prepared a List of Potential Claims involving the Project to advance in litigation—either against the Government, PRM, or both.

131.    BVSPC's project team then sought and, upon information and belief, received approval to share this List of Potential Claims with BVSPC legal counsel for review and legal advice.

132.    Additionally, beyond the List of Potential Claims, BVSPC's legal counsel knew of additional disputes between BVSPC and PRM—including, specifically, an attempt by PRM to circumvent Chem Fab subcontracting requirements by hiring temporary laborers to salvage the slab foundation.  This too was misrepresented.

133.    Despite BVSPC representing in Section 3.10 of the APA that "no event has occurred or circumstances exist that may give rise to, or serve as a basis for" legal action, these events and circumstances show that this representation was false. BVSPC misrepresented these issues.

134.    If BVSPC had accurately represented in the APA Project Evergreen's (and Chem Fab's) true operational and legal condition, and the true nature of these disputes, Versar would not have executed the APA to purchase Project Evergreen.

B. **Financial Problems on Project Evergreen and Chem Fab, which BVSPC Misrepresented in the APA**

135. Similarly, as Versar discovered after Closing, BVSPC misrepresented in the APA Project Evergreen's financial condition.

136. BVSPC stated in Section 3.11 of the APA that it provided Versar with a GAAP compliant Profit & Loss Statement and Estimated Closing Balance Sheet prior to Closing. Versar could not have known at the time that BVSPC's representation was false.

137. BVSPC did not prepare its financial statements, including its Profit & Loss Statement and Estimated Closing Balance Sheet, in accordance with GAAP—and BVSPC knew they did not comply with GAAP.

138. The financial statements were wrong and did not accurately reflect Project Evergreen's true financial condition. Nevertheless, to complete the sale, BVSPC provided the statements to Versar anyway.

139. Specifically, BVSPC misrepresented and inflated Project Evergreen's revenue, PGM, and EBT on its Profit & Loss Statement by approximately $2.5 million each.[7]

140. Additionally, the Estimated Closing Balance Sheet intentionally misrepresented and overstated Project Evergreen's contract assets by approximately $2.5 million.

141. Both sets of misrepresentations are clear violations of GAAP.

142. Moreover, as BVSPC knew from the Chem Fab project team and its own project accountant, BVSPC's financial statements did not accurately reflect Project Evergreen's and, by extension, Chem Fab's financial condition. Yet, BVSPC represented to Versar that these financial statements were true and correct anyway.

---

[7] The inflated EBT would have had a 20-30 times negative impact on the basis of the investment in Project Evergreen and the associated enterprise value. In addition, due to the lack of appropriate GAAP treatment of the Project, the result was an overstatement of the assets of Project Evergreen by $2.5 million.

24

143.   The same is true with respect to Chem Fab's "expected" PGM.  While BVSPC represented that that Chem Fab's "expected" PGM was $1,279,738.00, BVSPC knew this figure did not reflect reality and was impossible to achieve.

144.   The reality, as Versar learned after assuming control of Chem Fab, was that Chem Fab's actual PGM, due to the issues, delays, and cost overruns described above, is a loss of approximately $4,460,000.

145.   Simply put, BVSPC both misrepresented that the financial statements it disclosed were consistent with GAAP and it intentionally failed to provide Versar with an accurate accounting of Chem Fab's financial condition—in contravention of BVSPC's express representations and warranties in the APA.

146.   If Versar had seen Project Evergreen's and Chem Fab's "actual numbers," which BVSPC management knew, and if BVSPC accurately communicated Project Evergreen's (and Chem Fab's) true financial condition, Versar would not have executed the APA.

147.   As BVSPC President Randy Castro stated after Closing, BVSPC had "serious performance issues" on Chem Fab about which BVSPC knew, and that "[t]he lack of communication on this project [was] appalling."  *See* Randy Castro June 25, 2021 Email, attached as Exhibit 30.

148.   However, by this point, the damage was done.

149.   It is now clear that many of BVSPC's representations in the APA were false—and that these false representations were key to BVSPC's scheme to offload the "dumpster fire" that was Project Evergreen/Chem Fab onto an unwitting, unsuspecting buyer that would not have purchased the business unit but for BVSPC's misrepresentations.

25

**VIII.  Versar's Post-Closing Delivery of "Closing Statements" in accordance with Article 1 of the APA**

150.    Under APA, Article 1 Purchase and Sale, adjustments were to be made to the Purchase Price of Project Evergreen following Closing based on the difference in value between Project Evergreen's Closing Working Capital and the Estimated Working Capital.

151.    Specifically, Section 1.4(b) required BVSPC to provide Versar with certain GAAP compliant estimated financial statements (i.e., the profit and loss statements and balance sheets identified in APA Section 3.11) and the "supporting calculations and materials" necessary to support the basis for those Estimated Statements.

152.    Then, under Section 1.5, and within ninety days of Closing, Versar was to "prepare and deliver to Seller: (A) a balance sheet of Seller as of the Closing, reflecting Buyer's good faith determination, but adjusted to take into account the actual balances as of the Closing (the "Closing Balance Sheet"); and (B) the Working Capital as of the Closing, based on the Closing Balance Sheet, calculated in accordance with GAAP and the Illustrative Working Capital Example, along with supporting calculations and materials (the "Closing Working Capital" and, together with the Closing Balance Sheet, the "Closing Statements")."

153.    Versar complied with its contractual requirements by providing BVSPC with timely Closing Statements, in accordance with Section 1.5.  *See* BVSPC Final Closing Statement, attached as Exhibit 31; Versar Closing Balance Sheet, attached as Exhibit 32.

154.    Versar provided its Closing Statements based on the only information available to it at the time, which, again, was incomplete because BVSPC failed to provide correct Estimated Statements and failed to provide the documentary support for these statements.

26

155.    In particular, BVSPC's reported "net asset" values in BVSPC's Estimated Working Capital for Chem Fab were substantially incorrect and were never supported with adequate documentation.

156.    Further, BVSPC failed to provide support for the recognized revenue, actual cost, the estimates to complete, and the estimates at completion that were critical to Versar's ability to properly validate BVSPC's reported net asset values for the projects under Project Evergreen.

157.    Versar spent months, including through multiple email exchanges and engaging in meetings with BVSPC, in its attempt to obtain the supporting documents and information to substantiate BVSPC's reported "net asset" values.

158.    BVSPC, however, failed and refused to provide the necessary support to validate estimated net asset values and based on the information available to Versar, BVSPC's reported estimated net asset values and asset calculations were materially incorrect.

159.    Accordingly, BVSPC failed to satisfy its contractual obligation to provide GAAP compliant estimated financial statements and the "supporting calculations and materials" to support the basis for those statements.

160.    Nevertheless, and despite BVSPC's failure to abide by its obligations under the APA, Versar determined that, based on its assessment of Chem Fab's financial condition, the Purchase Price Adjustment under the APA required a substantial downward adjustment to the Post Closing Purchase Price, thereby requiring that BVSPC remit payment to Versar for the full amount of the appropriate Purchase Price Adjustment.

161.    Even after repeated demands by Versar, BVSPC failed and refused to consider any payment to Versar in relation to the Purchase Price Adjustment.

162. Due to BVSPC's failure to provide GAAP compliant financial statements, it was not possible to submit the price adjustment dispute to the Accountants in accordance with Section 1.5(b) of the APA, as the Accountants could not render a decision due to BVSPC's incomplete and non-GAAP compliant financial information in the Estimated Statements.

## COUNT I: FRAUD

163. Versar incorporates Paragraphs 1 through 162 as if set forth fully herein.

164. Versar has satisfied all conditions precedent to bringing this action or such conditions have otherwise been waived.[8]

165. BVSPC knowingly and repeatedly made false representations of material fact that it had a duty to disclose in the parties' APA, which the parties executed for BVSPC to sell its Environmental Business Unit, named Project Evergreen, to Versar.

166. BVSPC's intentional false representations and omissions of material fact involved the operational, financial, and legal condition and status of both Project Evergreen and its largest project, Chem Fab.

**A.     BVSPC's Fraudulent Misrepresentations in Section 3.10 of the APA**

167. In Section 3.10 of the APA, BVSPC represented to Versar that:

   a. **3.10 Legal Proceedings.** Except as set forth on Schedule 3.10, there is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets (including the Assigned Contracts) or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

---

[8] On June 22, 2022, pursuant to Section 6.4(c) of the parties' Asset Purchase Agreement, Versar sent the required written notice to BVSPC of the facts and allegations described in this Second Amended Complaint as a pre-requisite to filing this lawsuit.

168.   BVSPC's representation in Section 3.10 of the APA was false because BVSPC maintained a List of Potential Claims, in which it listed legal issues, potential impacts, and supporting and detracting documents, to prepare for litigation against the Government, PRM, or both.  BVSPC also internally distributed the List of Potential Claims within the business unit and, upon information and belief, with its legal counsel.

169.   In the APA, BVSPC misrepresented the existence of the List of Potential Claims, which it developed to prepare for litigation on Chem Fab against the Government, PRM, or both, as well as the nature of its ongoing dispute with PRM over its performance on the Chem Fab project.   According to BVSPC's representations in Section 3.10 of the APA, "no event has occurred or circumstances exist that may give rise to, or serve as a basis for" legal action.

170.   BVSPC knowingly made this false statement, and Versar could not have reasonably determined this representation to be false through its investigation. BVSPC made this statement with the intent of fraudulently inducing Versar into purchasing Project Evergreen.

171.   Versar justifiably relied upon this statement and was injured as a result.

**B.      BVSPC's Fraudulent Misrepresentations in Section 3.11 of the APA**

172.   In Section 3.11 of the APA, BVSPC represented, in relevant part, that it delivered to Versar financial statements that were consistent with "the books and records of [Project Evergreen]," that were "prepared in accordance with GAAP," and that the financial statements "present in all material respects the financial condition and results of operations for [Project Evergreen] as of and for the periods referred to therein[.]"

173.   This was a false statement because the financial statements that BVSPC delivered to Versar under Section 3.11 of the APA were not "prepared in accordance with GAAP" and did

29

not "present in all material respects the financial condition and results of operations for [Project Evergreen] as of and for the periods referred to therein[.]"

174. BVSPC's Profit & Loss Statement stated that Project Evergreen had a PGM of $690,397.00. However, the represented PGM was not GAAP compliant and BVSPC knew this PGM was false when it was made.

175. The same is true for BVSPC's Estimated Closing Balance Sheet. BVSPC's Estimated Closing Balance Sheet stated that Project Evergreen's contract assets were $1,204,957.00. This was false because in its financial statements, BVSPC misrepresented and inflated Project Evergreen's contract assets, revenue, PGM, and EBT by approximately $2.5 million each.

176. With respect to Chem Fab specifically, BVSPC represented that Chem Fab's "expected" PGM was $1,279,738.00. However, again, this statement was false because BVSPC knew, as documented by its own employees, that Chem Fab would never make money. Specifically, according to BVSPC's own employees:

a. BVSPC knew that it compromised its process when it bid for Chem Fab and that it would "have to live with the pain." *See* Ex. 3.

b. BVSPC knew that Project Evergreen was in poor financial health. *See* Ex. 5.

c. BVSPC knew that it had received two cure notices from the Government pertaining to deficient staffing, inadequate planning, and inadequate equipment—and it knew of the facts underlying a third cure notice that the Government issued mere days after Closing.

30

d. BVSPC knew of the prolonged disputes with its chief subcontractor, PRM, about PRM's deficient and delayed work on Chem Fab, which resulted in BVSPC issuing multiple cure notices and stop work orders to address PRM's work.

e. BVSPC knew of the issues with the slab foundation for the treatment building at the Chem Fab site and how it was too small, too thin, and at risk of cracking.

f. BVSPC knew of the List of Claims it developed to prepare for litigation against the Government, PRM, or both over Chem Fab.

g. BVSPC knew that, because of the above, it experienced significant delays and cost overruns on Chem Fab that a buyer, like Versar, would be forced to address.

h. BVSPC knew that there "was quite a shock when [BVSPC] management saw the *actual numbers*" for Chem Fab and that project review was "not going to be pretty." *See* Ex. 27.

177. All of these factors, according to BVSPC's own project team, caused Chem Fab to be a "dumpster fire," a "fire drill," and a "slow moving disaster."

178. If BVSPC delivered financial statements prepared in accordance with GAAP, these financial statements would have reflected the additional costs and losses resulting from Chem Fab's significant delays and cost overruns.

179. Pursuant to GAAP, a reserve was necessary to deal with the known and anticipated liabilities on the Project including schedule delays, deficient designs, and deficient construction, among other issues affecting Chem Fab's finances. The necessary and GAAP required reserve would have materially impacted Project Evergreen and specifically Chem Fab's PGM as well as the Chem Fab contract assets.

31

180. BVSPC, however, misrepresented Chem Fab's finances in the APA by failing to include a GAAP required reserve for the known and anticipated liabilities on the Project.

181. Versar reasonably relied upon BVSPC's fraudulent financial statements and false representations made in the APA concerning these financial statements, and Versar was damaged as a result.

**C.    BVSPC's Fraudulent Misrepresentations in Section 3.22 of the APA**

182. In Section 3.22(a)(v) of the APA, BVSPC represented, in relevant part, that "[BVSPC] has not received any written notice of termination, "show cause" or cure notice pertaining to any Government Contract or Government Subcontract[.]"

183. This representation was false because prior to executing the APA, BVSPC had received two Serial Letters from the Government on Chem Fab (Serial Letters No. 1 and No. 3). In the APA, BVSPC falsely represented to Versar that these Serial Letters did not exist.

184. Furthermore, BVSPC knew of the facts underlying Serial Letter No. 4, which the Government sent to BVSPC three days after Closing to document its concerns about delays on Chem Fab that BVSPC needed to remedy.

185. In the APA, BVSPC misrepresented these facts to Versar, representations upon which Versar relied to its detriment.

186. In Section 3.22(c) of the APA, BVSPC represented, in relevant part, that, for the prior seven years, it had no disputes with any subcontractor "arising under or relating to any Government Contract [or] Government Subcontract[.]"

187. This was a false representation because, as explained above, BVSPC issued numerous cure notices and stop work orders to PRM because of PRM's deficient and delayed work. *See* Ex. 9; Ex. 10.

32

188.    Yet, BVSPC falsely represented these facts to Versar.  According to BVSPC's express representations in the APA, BVSPC had no dispute with PRM (or any other subcontractor).

189.    Versar reasonably relied upon, to its detriment, BVSPC's false representations because, but for these false representations in the APA, Versar would never have purchased Project Evergreen or executed the Note as part of the Purchase Price.

190.    As a direct and proximate result of BVSPC's fraudulent scheme and conduct, Versar has sustained damages in the form of the additional and unanticipated substantial cost overruns and cost of capital expenses related to the completion of Chem Fab in an amount to be determined at trial, but no less than $5.9 million.

191.    As a direct and proximate result of BVSPC's fraudulent scheme and conduct, Versar has sustained damages in the form of the lost enterprise value associated with the Project Evergreen acquisition in an amount to be determined at trial.

## COUNT II: INDEMNIFICATION AND BREACH OF CONTRACT
### (Pled in the alternative)

192.    Versar realleges and incorporates Paragraphs 1 through 162 as if set forth fully herein.

193.    Versar has satisfied all conditions precedent to bringing this action or such conditions have otherwise been waived.

### A.    Indemnification for Breach of Representations and Warranties

194.    BVSPC warranted to Versar that the Representations and Warranties contained in Article 3 of the APA were true and correct as of Closing.

33

195. BVSPC is required under Article 6 of the APA to indemnify Versar from "any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement." APA, Article 6 Indemnification, § 6.2(a).

196. BVSPC, however, breached numerous Representations and Warranties by providing inaccurate and false information including, but not limited to, the following:

    a. Section 3.10 Legal Proceedings

    b. Section 3.11 Financial Statements;

    c. Section 3.22 Government Contracts.

**B.      Breach of the APA Concerning the Purchase Price Adjustment**

197. As explained above, under APA, Article 1 Purchase and Sale, adjustments were to be made to the Purchase Price of Project Evergreen following Closing based on the difference in value between Project Evergreen's Closing Working Capital and the Estimated Working Capital.

198. Accordingly, after Closing, BVSPC prepared and delivered certain Estimated Statements and Versar prepared and delivered Closing Statements, in accordance with its contractual obligations.

199. However, BVSPC failed to comply with its contractual obligations because its Estimated Statements were incorrect—and BVSPC failed to provide the contractually required documentary support for these statements.

200. Specifically, BVSPC's reported "net asset" values in BVSPC's Estimated Working Capital for Chem Fab were substantially incorrect and were never supported with adequate documentation.

34

201. Also, BVSPC provided no support for the recognized revenue, actual cost, the estimates to complete, and the estimates at completion, which Versar needed to validate BVSPC's reported net asset values for the projects under Project Evergreen.

202. Again, after Closing, Versar repeatedly requested this information from BVSPC so Versar could attempt to substantiate BVSPC's reported net asset values.

203. However, BVSPC failed and refused to provide the necessary support for Versar to validate the above-described information in BVSPC's Estimated Statements.

204. As a result, Versar determined that, based on its assessment of Chem Fab's financial condition, the Purchase Price Adjustment under the APA required a substantial downward adjustment to the Post Closing Purchase Price, thereby requiring that BVSPC remit payment to Versar for the full amount of the appropriate Purchase Price Adjustment.

205. Again, despite repeated demands by Versar, BVSPC failed and refused to consider any payment to Versar in relation to the Purchase Price Adjustment.

206. Due to BVSPC's failure to provide GAAP compliant Estimated Statements, it was not possible to submit the price adjustment dispute to the Accountants in accordance with Section 1.5(b) of the APA, as the Accountants could not render a decision based upon BVSPC's incorrect financial information.

207. As a direct and proximate result of BVSPC's breach of Representations and Warranties in the APA and breach of its duties regarding the post-closing Purchase Price Adjustment, Versar has sustained damages in an amount to be proven at trial and is entitled to indemnification as provided in the APA and damages associated with the Purchase Price Adjustment in an amount to be determined at trial.

35

## COUNT III: DECLARATORY JUDGMENT

208.    Versar realleges and incorporates Paragraphs 1 through 162 as if set forth fully herein.

209.    Versar bring this action for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

210.    The Note was issued "in connection with the APA" and is part of the financing for Versar's acquisition of Project Evergreen.

211.    For the reasons alleged in the Second Amended Complaint, the Note is unenforceable, as it is the product of BVSPC's fraud.

212.    As explained in the preceding Paragraphs, BVSPC intentionally made numerous false representations, within the four corners of the APA, about BVSPC's operational, financial, and legal condition and status of both Project Evergreen and its largest project, Chem Fab.

213.    Specifically, BVSPC fraudulently misrepresented its representation and warranty in Section 3.10 of the APA that, to BVSPC's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any legal proceedings.

214.    BVSPC's representation in Section 3.10 of the APA was false because BVSPC maintained a List of Potential Claims, in which it listed legal issues, potential impacts, and supporting and detracting documents, to prepare for litigation against the Government, PRM, or both.  BVSPC also internally distributed the List of Potential Claims within the business unit and, upon information and belief, with its legal counsel.

215.    BVSPC knowingly made this false statement, and Versar could not have reasonably determined this representation to be false through its investigation. BVSPC made this statement

36

with the intent of fraudulently inducing Versar into purchasing Project Evergreen, which included executing the Note.

216. In Section 3.11 of the APA, BVSPC represented, in relevant part, that it delivered to Versar financial statements that were consistent with "the books and records of [Project Evergreen]," that were "prepared in accordance with GAAP," and that the financial statements "present in all material respects the financial condition and results of operations for [Project Evergreen] as of and for the periods referred to therein[.]"

217. However, this too was an intentionally false representation, within the four corners of the APA.

218. The financial figures BVSPC provided, including, specifically, BVSPC's Profit & Loss Statement stating that Project Evergreen has a PGM of $690,397.00, BVSPC's Estimated Closing Balance Sheet stating that Project Evergreen's contract assets were $1,204,957.00, and the representation that Chem Fab's "expected" PGM was $1,279,738.00, were false because these figures were not prepared in accordance with GAAP and did not accurately reflect Project Evergreen's and Chem Fab's finances.

219. Versar reasonably relied upon BVSPC's representation that it provided Versar with accurate financial information prepared in accordance with GAAP, and but for these false representations, BVSPC would not have purchased Project Evergreen and executed the Note.

220. In Sections 3.22(a)(v) and 3.22(c) of the APA, BVSPC represented, in relevant part, that it had received no cure notices on any Government Contract or Government Subcontract, and that it had had no disputes with any subcontractor "arising under or relating to any Government Contract [or] Government Subcontract[.]"

37

221.    As explained in the preceding Paragraphs, both representations were false. BVSPC had received numerous Serial Letters on the Chem Fab project, and it also had ongoing disputes with its subcontractor, PRM.

222.    Versar reasonably relied upon the truth of these statements within the APA, and but for these false representations, BVSPC would not have purchased Project Evergreen and executed the Note.

223.    There is a substantial and immediate controversy between Versar and BVSPC regarding the enforceability of the Note, which Versar requests the Court deem unenforceable, and the parties' respective obligations thereunder.

224.    The controversy is ripe for judicial determination because there is an active dispute between the parties regarding whether BVSPC made fraudulent representations in procuring the APA, which included the Note as part of the Purchase Price. The Note will mature during the pendency of the litigation with a maturity date of June 21, 2026.

225.    The interests of Versar and BVSPC regarding the enforceability of the Note are genuinely adverse.

226.    Versar will be harmed if BVSPC is permitted to enforce the Note, and BVSPC should be barred, in any and all respects, from holding Versar in default over Versar not paying any dollar amount allegedly owed under the Note.

### **RELIEF REQUESTED**

227.    WHEREFORE, Plaintiff Versar Environmental Services, LLC respectfully requests that this Court:

    a.    Enter judgment in favor of Plaintiff Versar Environmental Services, LLC;

b.  Enter declaratory judgment in favor of Versar Environmental Services, LLC that

   the Note is unenforceable and BVSPC is barred from any enforcement of the Note;

c.  Award Plaintiff compensatory damages;

d.  Award Plaintiff punitive damages;

e.  Award Plaintiff indemnification damages;

f.  Award Plaintiff its costs and reasonable attorneys' fees;

g.  Award Plaintiff such other and further relief as this Court deems just and proper.

Dated: July 15, 2026

SMITH KATZENSTEIN & JENKINS LLP

*/s/ Megan Ix Brison*
Megan Ix Brison (No. 6721)
Daniel A. Taylor (No. 6934)
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
mib@skjlaw.com
dat@skjlaw.com

and

Joseph S. Guarino, Esq.
Owen S. Walker, Esq.
Brian M. O'Shea, Esq.
VARELA LEE METZ GUARINO, LLP
1600 Tysons Blvd., Suite 900
Tysons Corner, VA 22102
Telephone: (703) 454-0170
Email: jguarino@vlmglaw.com
owalker@vlmglaw.com boshea@vlmglaw.com

*Attorneys for Plaintiff Versar Environmental*
*Services, LLC*

39