# EXHIBIT 1

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

by and between

**BLACK & VEATCH SPECIAL PROJECTS CORP.**

and

**VERSAR ENVIRONMENTAL SERVICES, LLC**

dated as of

June 21, 2021

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 PURCHASE AND SALE** ...................................................................................1
1.1    Purchase and Sale of Assets .................................................................................1
1.2    Excluded Assets ...................................................................................................1
1.3    Assumption of Liabilities ......................................................................................1
1.4    Purchase Price .......................................................................................................2
1.5    Purchase Price Adjustment ....................................................................................2
1.6    Allocation of Purchase Price ..................................................................................4
1.7    Withholding ...........................................................................................................4

**ARTICLE 2 CLOSING** .........................................................................................................5
2.1    Closing ...................................................................................................................5
2.2    Closing Deliverables .............................................................................................5

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER** .............................6
3.1    Organization and Authority; Enforceability .........................................................6
3.2    No Conflicts; Consents .........................................................................................6
3.3    Title to Purchased Assets ......................................................................................7
3.4    Capitalization; Subsidiaries ...................................................................................7
3.5    Condition of Assets ...............................................................................................7
3.6    Assigned Contracts ...............................................................................................7
3.7    Customers and Suppliers .......................................................................................8
3.8    Permits ..................................................................................................................8
3.9    Compliance With Laws .........................................................................................8
3.10    Legal Proceedings ................................................................................................9
3.11    Financial Statements ...........................................................................................9
3.12    Affiliate Transactions .........................................................................................9
3.13    Environmental Matters .......................................................................................9
3.14    Brokers ...............................................................................................................10
3.15    No Other Representations ....................................................................................10
3.16    Taxes ..................................................................................................................10
3.17    Real Property ......................................................................................................11
3.18    Employees; Employee Benefits ...........................................................................12
3.19    Intellectual Property ...........................................................................................14
3.20    Data Privacy .......................................................................................................14
3.21    Government Loans ..............................................................................................15
3.22    Government Contracts .........................................................................................15

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER** .............................18
4.1    Organization and Authority of Buyer; Enforceability ..........................................18
4.2    No Conflicts; Consents .......................................................................................18
4.3    Legal Proceedings ..............................................................................................18
4.4    Brokers ...............................................................................................................18
4.5    Independent Investigation ...................................................................................18

**ARTICLE 5 COVENANTS** ................................................................................................19

- i -

**5.1    Public Announcements** ................................................................**19**
**5.2    Tax Matters** ................................................................**19**
**5.3    Restrictive Covenants** ................................................................**21**
**5.4    Further Assurances** ................................................................**22**
**5.5    Third Party Consents** ................................................................**22**
**5.6    Confidentiality** ................................................................**22**

**ARTICLE 6 INDEMNIFICATION** ................................................................**23**
**6.1    Survival** ................................................................**23**
**6.2    Indemnification By Seller** ................................................................**24**
**6.3    Indemnification By Buyer** ................................................................**24**
**6.4    Limitations on Indemnification** ................................................................**25**
**6.5    Indemnification Procedures** ................................................................**26**
**6.6    Tax Treatment of Indemnification Payments** ................................................................**27**
**6.7    Exclusive Remedies** ................................................................**27**

**ARTICLE 7 MISCELLANEOUS** ................................................................**28**
**7.1    Expenses** ................................................................**28**
**7.2    Notices** ................................................................**28**
**7.3    Headings** ................................................................**28**
**7.4    Severability** ................................................................**29**
**7.5    Entire Agreement** ................................................................**29**
**7.6    Successors and Assigns** ................................................................**29**
**7.7    No Third-party Beneficiaries** ................................................................**29**
**7.8    Amendment and Modification** ................................................................**29**
**7.9    Waiver** ................................................................**29**
**7.10    Governing Law** ................................................................**30**
**7.11    Submission to Jurisdiction** ................................................................**30**
**7.12    Waiver of Jury Trial** ................................................................**30**
**7.13    Specific Performance** ................................................................**30**
**7.14    Counterparts** ................................................................**30**
**7.15    Certain Definitions** ................................................................**30**

ACTIVE/110509963.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June 21, 2021 is entered into by and between Black & Veatch Special Projects Corp., a Missouri corporation ("**Seller**"), and Versar Environmental Services, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities (as defined herein), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## Purchase and Sale

**1.1     Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets set forth on Schedule 1.1, other than to the extent they constitute Excluded Assets hereunder (collectively, the "**Purchased Assets**"), free and clear of any mortgage, pledge, charge, security interest, claim or other Lien, other than Permitted Liens.

**1.2     Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include (A) Cash or (B) the assets set forth on Schedule 1.2 (the "**Excluded Assets**").

**1.3     Assumption of Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following specific liabilities of Seller:  (a) those amounts listed under the heading "accounts payable" on Schedule 1.3 and not discharged as of the Closing (to the extent, but only to the extent, such amounts are included in the final determination of Closing Working Capital); and (b) liabilities and obligations of Seller under the contracts being assumed hereunder and constituting Purchased Assets (collectively, the "**Assumed Liabilities**"). Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether existing as of the Closing Date or hereinafter created including without limitation any and all environmental liabilities (collectively, "**Excluded Liabilities**").  For the avoidance of doubt, Excluded Liabilities shall include (i) all liabilities for Taxes that relate to the Business or ownership of the Purchased Assets attributable to a Pre-Closing Tax Period, (ii) all Taxes (or the nonpayment thereof) of the Seller (or for which the Seller is liable) for any taxable period, (iii) all Taxes (or the nonpayment thereof) relating to the assets of the Seller other than the Purchased Assets for any taxable period, and (iv) any Transfer Taxes assumed by Seller (determined pursuant to Section 5.2(b)).

- 1 -

ACTIVE/110509963.1

**1.4    Purchase Price.**

(a)    <u>Purchase Price</u>.  The aggregate purchase price for the Purchased Assets shall be (i) the Base Cash Consideration (as adjusted pursuant to <u>Section 1.5</u>) (the "**Purchase Price**"), plus (ii) the assumption of the Assumed Liabilities, plus (iii) the issuance of the Seller Note.

(b)    <u>Closing Cash Payment</u>.  At the Closing, the Buyer shall pay to Seller the net amount from the following calculation (such net amount, the "**Closing Cash Payment**"): (i) the Base Cash Consideration, plus (ii) the amount, if any, by which the Estimated Working Capital exceeds the Working Capital Target, minus (iii) the amount, if any, by which the Working Capital Target exceeds the Estimated Working Capital. The Closing Cash Payment shall be paid as follows: (x) $175,000 of the Closing Cash Payment shall be paid to CC Capital Advisors, and (y) the remainder of the Closing Cash Payment shall be paid to Seller, with such payments paid by wire transfer of immediately available funds in accordance with the wire transfer instructions delivered to Buyer prior to the date hereof.

(c)    Prior to the date hereof, Seller has delivered to Buyer and attached hereto on <u>Schedule 1.4(b)</u>: (i) an estimated balance sheet of Seller as of immediately prior to the Closing, reflecting thereon Seller's best estimate of balance sheet items of Sellers calculated in accordance with GAAP (the "**Estimated Closing Balance Sheet**"); (ii) the Working Capital as of the Closing, based on the Estimated Closing Balance Sheet, calculated in accordance with GAAP and the Illustrative Working Capital Example, along with supporting calculations and materials (the "**Estimated Working Capital**"); and (iii) the calculation of the Closing Cash Payment, along with supporting calculations and materials, based on the calculation of the foregoing amounts, in each case, without giving effect to the consummation of the transactions contemplated by this Agreement (collectively, the "**Estimated Statements**").

**1.5    Purchase Price Adjustment.**

(a)    Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller:  (A) a balance sheet of Seller as of the Closing, reflecting Buyer's good faith determination, but adjusted to take into account the actual balances as of the Closing (the "**Closing Balance Sheet**"); and (B) the Working Capital as of the Closing, based on the Closing Balance Sheet, calculated in accordance with GAAP and the Illustrative Working Capital Example, along with supporting calculations and materials (the "**Closing Working Capital**" and, together with the Closing Balance Sheet, the "**Closing Statements**").

(b)    Unless Seller delivers a Dispute Notice within thirty (30) days after receipt of the Closing Statements, the Closing Statements shall be deemed the "**Final Closing Statements**" and shall be binding upon the parties hereto and shall not be subject to dispute or review.  If Seller disagrees with any of the Closing Statements, Seller may, within thirty (30) days after receipt thereof, notify Buyer in writing (the "**Dispute Notice**"), which Dispute Notice shall provide reasonable detail of the nature of each disputed item on the Closing Statements, including all supporting documentation thereto along with a dollar value of Seller's proposed adjustments to the Closing Statements, and Seller shall be deemed to have agreed with all other items and amounts contained in the Closing Statements that are not disputed in the Dispute Notice.  Buyer and Seller shall first attempt to resolve such dispute between themselves and, if Buyer and Seller are able to

- 2 -

resolve such dispute, the Closing Statements shall be revised to the extent necessary to reflect such resolution, and such revised statements shall be deemed the "**Final Closing Statements**" and shall be conclusive and binding upon the parties hereto and shall not be subject to further dispute or review.  If Seller and Buyer are unable to resolve such dispute within thirty (30) days after receipt by Buyer of the Dispute Notice, Buyer and Seller shall submit those items which remain in dispute to a mutually agreeable independent regionally recognized financial consulting or public accounting firm, which shall at the time of such submission certify its independence from Buyer and Seller (the "**Accountants**").  The Accountants shall only decide the specific items under dispute by Buyer and Seller, and the Accountants' decision for each disputed amount must be within the range of values assigned to each such item in the Closing Statements and Dispute Notice, respectively.  Promptly, but no later than thirty (30) days after engagement, the Accountants shall deliver a written report to Buyer and Seller as to the resolution of the disputed items, and the Closing Statements shall be revised to the extent necessary to reflect such resolution, and such revised statements shall be deemed the "**Final Closing Statements**" and shall be conclusive and binding upon the parties hereto.  The fees, costs and expenses of the Accountants' review and report shall be allocated to and borne by Buyer and Seller based on the inverse of the percentage that the Accountants' determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Accountants.  For example, in the event that the items in dispute total in amount to $1,000 and the Accountants award $600 in favor of Seller's position, 60% of the costs of its review would be borne by Buyer and 40% of the costs would be borne by Seller.

(c)    Following the final determination of the Final Closing Statements pursuant to Section 1.5(b), the Purchase Price shall be adjusted on a dollar-for-dollar basis as follows (the absolute value of the amount of the adjustment shall be referred to herein as the "**Post-Closing Purchase Price Adjustment**"):

(i)    Downward by the amount that the Closing Working Capital as set forth in the Final Closing Statements is less than the Estimated Working Capital; or

(ii)    Upward by the amount that the Closing Working Capital as set forth in the Final Closing Statements is greater than the Estimated Working Capital.

(d)    In the event that the Post-Closing Purchase Price Adjustment is a downward adjustment then within ten (10) business days following the date on which the Final Closing Statements become binding pursuant to this Section 1.5, the Seller shall pay to Buyer an amount in cash equal to the Post-Closing Purchase Price Adjustment by wire transfer of immediately available funds to an account or accounts as Buyer may notify Seller in writing.

(e)    In the event that the Post-Closing Purchase Price Adjustment is an upward adjustment, then within ten (10) business days following the date on which the Final Closing Statements become binding pursuant to this Section 1.5, Buyer shall pay to Seller an amount in cash equal to the Post-Closing Purchase Price Adjustment by wire transfer of immediately available funds to the account specified in writing by Seller.

- 3 -

(f)      All payments made pursuant to this Section 1.5 in connection with a Post-Closing Purchase Price Adjustment shall be treated by the parties as an adjustment to the Purchase Price for all applicable Tax purposes, unless otherwise required by law.

**1.6      Allocation of Purchase Price.** Buyer and Seller agree that the purchase price and all other relevant items, as determined for U.S. federal income tax purposes, to the Purchased Assets, Assumed Liabilities  and the restrictive covenants set forth in Section 5.3 shall be based on and consistent with the methodology set forth on Schedule 1.6 (the "**Purchase Price Allocation**").  Buyer shall prepare and deliver to Seller within sixty (60) days following the determination of the Post-Closing Purchase Price Adjustment its determination of the Purchase Price Allocation in accordance with Section 1060 of the Code. Seller shall, within thirty (30) days following its receipt of the Purchase Price Allocation, accept or reject the Purchase Price Allocation. If Seller disagrees with the Purchase Price Allocation, then it shall give written notice to Buyer of such dispute and any reason therefor within such thirty (30)-day period. If Seller fails to notify Buyer of a dispute within such thirty (30)-day period, then Seller shall be deemed to agree with the Purchase Price Allocation, which shall become final, binding and conclusive on the parties and their respective Affiliates. In the event there is a dispute, Buyer and Seller shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive on the parties and their respective Affiliates. If Seller and Buyer are unable to reach a resolution with such effect within thirty (30) days after the receipt by Buyer of Seller's written notice of dispute, then Seller and Buyer shall submit the items remaining in dispute for resolution to the Accountants, who shall render a final resolution in writing based upon, and consistent with, the methodology set forth on Schedule 1.6, to Seller and Buyer (which final resolution shall be requested by Seller and Buyer to be delivered not more than thirty (30) days following submission of such disputed matters to the Accountants), that, absent fraud or manifest error, shall be final, conclusive and binding on the parties and their respective Affiliates with respect to such items in the Purchase Price Allocation. The fees, costs and expenses of the Accountants' review and report shall be allocated to and borne by Buyer and Seller based on the inverse of the percentage that the Accountants' determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Accountants. Buyer and Seller shall each timely file an IRS Form 8594 and all other Tax Returns in a manner based on and consistent with the Purchase Price Allocation.  Neither Buyer nor Seller shall take any position for tax purposes (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Purchase Price Allocation unless otherwise required by applicable law; provided, that the parties hereto acknowledge that Buyer and its Affiliates (each, a "**Buyer Entity**" and collectively, the "**Buyer Entities**") may use a different allocation for financial reporting purposes.

**1.7      Withholding**.  Buyer shall be entitled to deduct and withhold from any amounts otherwise payable under this Agreement such amounts as Buyer, in its reasonable judgment, determines must be deducted and withheld with respect to the making of such payment under the Code, or any applicable provisions of U.S. federal, state, or local or non-U.S. tax law; provided however, that Buyer shall use commercially reasonable efforts to provide Seller at least five (5) day prior notice of any contemplated withholding (other than any contemplated withholding as a result of a failure by Seller to comply with Section 2.2(a)(v)), so Seller may provide such information or documentation to avoid any such withholding.  Such amounts so deducted and

- 4 -

withheld shall be treated for all purposes of this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

## ARTICLE 2
### Closing

2.1    **Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") by electronic transmission of documents unless otherwise agreed by the parties hereto. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. Eastern Time on the Closing Date.

2.2    **Closing Deliverables**.

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    all tangible Purchased Assets;

(ii)    a bill of sale in form and substance satisfactory to Buyer, duly executed by Seller, transferring the Purchased Assets to Buyer;

(iii)    an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**"), duly executed by Seller effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iv)    a transition services agreement in form and substance reasonably satisfactory to Buyer (the "**Transition Services  Agreement**"), duly executed by Seller;

(v)    a duly completed and valid IRS Form W-9 executed by Seller;

(vi)    a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder;

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement;

(viii)    the Seller Note, duly executed by Seller;

(ix)    copies of all consents, approvals, waivers, authorizations and notices referred to on Schedule 2.2(a)(ix);  and

(b)    At the Closing, Buyer shall deliver to Seller the following:

- 5 -

(i)      the Closing Cash Payment;

(ii)     the Assignment and Assumption Agreement, duly executed by Buyer;

(iii)    the Transition Services Agreement, executed by Buyer;

(iv)     a certificate of the Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the managing member of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder; and

(v)      the Seller Note, duly executed by Buyer.

## ARTICLE 3
### Representations and Warranties of Seller

Seller warrants to Buyer that the statements contained in this **Article 3** are true and correct as of the Closing. For purposes of this **Article 3**, "Seller's knowledge," "knowledge of Seller" and any similar phrases shall mean the actual or constructive knowledge of Todd Dudley, Susan Granholm, Scott Olson, and Jay Sigman, after due inquiry.

**3.1     Organization and Authority; Enforceability.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. Seller has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**3.2     No Conflicts; Consents.**

(a)      Except as set forth on Schedule 3.2, the execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (i) violate or result in a violation of, conflict with or constitute or result in a default (whether after the giving of notice, lapse of time or both) under, accelerate or create any obligation under, or give rise to a right of termination, modification or change in terms of, as applicable (A) the articles of incorporation, bylaws or other organizational documents of Seller, (B) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller, the Business or the Purchased Assets, or (C) any

- 6 -

ACTIVE/110509963.1

contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (ii) result in the creation or imposition of any Lien on the Purchased Assets, other than Permitted Liens.

(b)     Except as set forth on Schedule 3.2, and as described in Section 5.5,  no consent, approval, waiver or authorization is required to be obtained by Seller from any Person in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

**3.3     Title to Purchased Assets.** Seller owns and has good and marketable title to, or a valid leasehold interest in all of, the Purchased Assets, free and clear of all Liens, other than Permitted Liens.

**3.4     Capitalization; Subsidiaries.** Parent owns all of the issued and outstanding capital stock of Seller. There are no other equity or voting securities of Seller, options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts that could require Seller to issue, sell or otherwise cause to become outstanding any of its equity interests or securities convertible, exercisable for or exchangeable into equity or voting interests.  There are no voting trusts, proxies or other agreements or understandings with respect to the voting, transfer or other rights of the outstanding capital stock of Seller.  Seller does not control, directly or indirectly, any corporation, limited liability company, partnership, joint venture, association or other business entity, and Seller does not own any equity interests or any other securities of, and has not at any time made any other investment in, any other business entity.

**3.5     Condition of Assets.** The Purchased Assets that are tangible personal property are in good condition and repair and are adequate for the uses to which they are being put, and none of such Purchased Assets are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  No inventory or finished goods are used in the Business.

**3.6     Assigned Contracts.** Schedule 3.6 lists each contract included in the Purchased Assets and being assigned to and assumed by Buyer (each contract set forth on Schedule 3.6 or required to be set forth on Schedule 3.6,  the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has received any notice that any other party to any Assigned Contract intends to cancel, terminate, breach or attempt to alter the terms of any such Assigned Contract, or to exercise or not to exercise any option to renew thereunder. To Seller's knowledge, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assigned Contract have been made available to Buyer. There are no disputes pending or, to Seller's knowledge, threatened under any Assigned Contract. Other than as set forth on Schedule 3.6, none of the Assigned Contracts (i) prohibits or limits the right of Seller to make, sell or distribute any products or services (including, for the avoidance of doubt, any limitation on the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time, but excluding for the

- 7 -

ACTIVE/110509963.1

avoidance of doubt, any limitations created by applicable federal, state and local laws and regulations), or (ii) includes "most favored nation" pricing or any arrangement whereby Seller has agreed with any Person that such Person will receive the most favorable terms and conditions that are provided by Seller to any other Person. Seller's representations under this Section 3.6 are made subject to the post-closing covenant set forth in Section 5.5, and the lack of approval of or execution of a novation agreement shall not be considered a breach or default of an Assigned Contract for purposes of this Section 3.6.

  **3.7**  **Customers and Suppliers**.

    (a)  Schedule 3.7(a) sets forth the name of each of the top ten (10) customers of the Business by revenue during the twelve (12) month period ending December 31, 2020 (the "**Material Customers**"), the amounts currently owed by each such Material Customer to the Business and whether such amounts are past due. No customer has canceled or otherwise terminated its relationship with the Business or materially decreased its usage, or materially amended its contract terms including any pricing terms, or purchase of the services of the Business. To the Seller's knowledge, no customer intends to terminate, cancel or otherwise modify its relationship with the Business (or with Buyer post-Closing) or to decrease or limit its usage, purchase or distribution of the services of the Business.

    (b)  Schedule 3.7(b) sets forth the name of each of the top ten (10) subcontractors of the Business by expense during the twelve (12) month period ending December 31, 2020 (the "**Material Subcontracts**"), the amounts currently owed by each such Material Subcontract to the Business and whether such amounts are past due. No subcontractor has canceled or otherwise terminated its relationship with the Business or materially decreased its usage, or materially amended its contract terms, including any pricing terms, or purchase of the services of the Business. To the Seller's knowledge, no subcontractor intends to terminate, cancel or otherwise modify its relationship with the Business (or with Buyer post-Closing) or to decrease or limit its usage, purchase or distribution of the services of the Business.

    (c)  Schedule 3.7(c) sets forth the name of each of the top ten (10) suppliers (each, a "**Supplier**") of the Business by gross expenditure paid to such Supplier the gross expenditures paid to such Supplier during the twelve (12) month period ending December 31, 2020, the amount currently owed by the Business to such Supplier and whether any such amounts are past due. No Supplier has canceled or otherwise terminated its relationship with the Business or materially decreased the services or materials made available to the Business. To Seller's knowledge, no Supplier intends to terminate, cancel or otherwise materially modify its relationship with the Business (or with Buyer post-Closing) or to materially decrease or limit the services or materials made available to the Business.

  **3.8**  **Permits.** There are no permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets.

  **3.9**  **Compliance With Laws.** Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets.

- 8 -

**3.10    Legal Proceedings.** Except as set forth on Schedule 3.10, here is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets (including the Assigned Contracts) or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**3.11    Financial Statements.** Seller has delivered to Buyer and set forth on Schedule 3.11:  (a) the unaudited balance sheet for the Business as of December 31, 2019; (b) the unaudited balance sheet for the Business as of December 31, 2020 (the "**Base Balance Sheet**"); (c) the unaudited balance sheet for the Business as of March 31, 2021; and (d) a statement of profit and loss for the Business for (i) the fiscal year ending December 31, 2019, (ii) the fiscal year ending December 31, 2020, and (iii) the period commencing January 1, 2021 and ending April 30, 2021. Each of the foregoing financial statements and the Estimated Statements (including in all cases the notes thereto, if any) (collectively, the "**Financial Statements**") is consistent with the books and records of the Business, Seller and Parent  (which, in turn, are accurate and complete in all material respects), have been prepared in accordance with GAAP on a consistent basis across periods, present fairly in all material respects the financial condition and results of operations for the Business as of and for the periods referred to therein, subject to changes resulting from normal year-end adjustments and the inclusion of required footnotes (none of which shall be material individually or in the aggregate), and are in compliance with SEC Staff Accounting Bulletin (SAB) Topic 1.B.1. The Financial Statements reflect the allocation of assets, liabilities, income and expenses of the Business on a standalone basis in accordance with GAAP, all such amounts that can be specifically identified to the Business have been, and for any amounts that cannot be specifically identified, an allocation has been made in accordance with GAAP.  There are no liabilities of the Business, other than (i) liabilities reflected, fully reserved, or disclosed on the Base Balance Sheet, and (ii) liabilities that have been incurred in the ordinary course of business consistent with past practice since the date of the Base Balance Sheet. Except as set forth on Schedule 3.11, all of the accounts receivable of the Business are valid and enforceable claims and to the knowledge of Seller are subject to no set-off or counterclaim.  Since the date of the Base Balance Sheet, Seller has collected its accounts receivable for the Business in the ordinary course of business and in a manner which is consistent with past practices and has not accelerated any such collections outside the ordinary course of business.  All accounts payable and notes payable of the Business arose in bona fide arm's length transactions in the ordinary course of business and no such account payable or note payable is delinquent in its payment.  Since the date of the Base Balance Sheet, Seller has paid its accounts payable for the Business in the ordinary course of business and in a manner which is consistent with its past practices.

**3.12    Affiliate Transactions.** Except as set forth on Schedule 3.12, no officer, manager, employee, equity holder or other Affiliate of any of Seller, nor any family member of any such Person, nor any entity in which any of the foregoing owns any beneficial interest, is (a) a party to any Assigned Contract, or (b) has any interest in any property, real or personal or mixed, tangible or intangible, used in or pertaining to the Business.

**3.13    Environmental Matters.**  Seller has, and has at all times been, in compliance in all material respects with applicable Environmental Laws in the operation of the Business.  Seller has

- 9 -

not received any written notice, claim, demand letter or request for information from any Governmental Authority or any other Person indicating that the Business is or may be in material violation of, or have material liability under, any Environmental Law, and Seller is not subject to any pending or threatened Action, order, decree or investigation under any Environmental Law in connection with the operation of the Business. There are no Environmental Permits required to be obtained by Seller in connection with the operation of the Business. No Hazardous Material is present or has been Released as a result of the operation of the Business in an amount, manner, condition or concentration that would reasonably be expected to result in material liability to Seller under Environmental Law. The Business has not assumed (whether by contract or operation of law) any material liability (including any investigatory, corrective or remedial obligation) of any other Person arising under Environmental Laws. Seller has delivered or otherwise made available to Buyer copies of any material environmental investigation, assessment, study, test, audit, review or other material environmental information or report in the possession or reasonable control of Seller and relating to the current or former operations, properties or facilities primarily used for the Business.

**3.14** **Brokers.** Except as set forth on Schedule 3.14, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**3.15** **No Other Representations.** Except for the representations and warranties contained in this Article 3 (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding Seller furnished or made available to Buyer and its representatives, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

**3.16** **Taxes.**

(a) Seller has timely filed all Tax Returns that are required to be filed in connection with the operation of the Business and the Purchased Assets, and all such Tax Returns are true, correct and complete in all material respects. All Taxes due and payable by Seller in connection with the operation of the Business and the Purchased Assets, whether or not shown or required to be shown on any Tax Return, have been timely paid and no Taxes are delinquent.

(b) There are no Liens for Taxes upon any of the Purchased Assets, other than Liens for Taxes not yet due and payable.

(c) Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, securityholder or other third party in connection with the operation of Business, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

- 10 -

(d)    Seller has not waived any statute of limitations in respect of Taxes in connection with the operation of the Business nor agreed to, nor is subject to, any extension of time with respect to a Tax deficiency or assessment.

(e)    No deficiency for any amount of Tax has been asserted, written or orally, or assessed by a Governmental Authority against Seller in connection with the operation of Business or the Purchased Assets, and Seller does not reasonably expect that any such assertion or assessment of Tax liability will be made.  There is no action, suit, proceeding or audit or any notice of inquiry of any of the foregoing pending against or with respect to Seller regarding Taxes in connection with the operation of Business or the Purchased Assets, and no action, suit, proceeding or audit has been threatened against or with respect to Seller regarding Taxes in connection with the operation of Business or the Purchased Assets.

(f)    No claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller, due to the operation of the Business or the Purchased Assets, is or may be subject to taxation by that jurisdiction or may be required to file a Tax Return in that jurisdiction.

(g)    Seller is not a party to any Tax allocation, sharing, indemnity or reimbursement agreement or arrangement.

(h)    The provisions of Section 197(f)(9) of the Code and the Treasury Regulations thereunder will not prevent any Purchased Assets that are intangible assets from qualifying as "amortizable section 197 intangibles" within the meaning of Section 197 of the Code in the hands of Buyer.

(i)    None of the Purchased Assets is subject to any "Section 467 rental agreement" within the meaning of Section 467(d) of the Code or Treasury Regulations Section 1.467-1(c).

(j)    Seller has no obligation for Taxes pursuant to any Assigned Contract that Buyer is assuming as a result of the transactions contemplated by this Agreement.

(k)    None of the Assigned Contracts is treated as a partnership or other entity for any applicable Tax purposes.

(l)    None of the Purchased Assets consists of an equity interest in any entity treated as a partnership or corporation for U.S. federal income Tax purposes.

(m)    At all times since January 3, 2015, Seller (i) has been a qualified subchapter S subsidiary of Parent, and (ii) has been disregarded as an entity separate from Parent for U.S. federal income and applicable state and local Tax purposes.

Seller has not made an election to defer any Taxes for the Business under Section 2302 of the CARES Act for 2020, or any similar election under state or local Tax law.

**3.17**    **Real Property**. No owned or leased real property is included in the Purchased Assets.

- 11 -

**3.18    Employees; Employee Benefits**.

(a)    Schedule 3.18(a)(i) sets forth a complete list (as of the date set forth therein) of names, positions, whether classified as exempt or non-exempt for wage and hour purposes, current annual salaries or hourly wage rates, part-time or full-time status, bonus and other compensation (including any sale and transaction bonuses), date of hire, work location (both prior to any required remote location due to the impact of COVID-19 and following any such required remote location due to the impact of COVID-19), status (i.e., active or inactive and if inactive, the type of leave and estimated duration) of all the full-time and part-time employees of Seller who primarily work for the Business (the "**Business Employees**").  Except as shown in Schedule 3.18(a)(ii), there are no written or oral employment agreements, bonus agreements, or severance agreements with any Business Employees.  There are no independent contractors of Seller who primarily work for the Business.

(b)    Schedule 3.18(b) lists each material Seller Benefit Plan. For purposes of this Agreement, "**Seller Benefit Plan**" means (A) an employee benefit plan within the meaning of Section 3(3) of the Employment Retirement Income Security Act, as amended ("**ERISA**") whether or not subject to ERISA in which any Business Employee participates; (B) any stock option plans, stock purchase plans, bonus or incentive award plans, severance pay plans, programs or arrangements, deferred compensation arrangements or agreements, employment agreements, consulting agreements, executive compensation plans, programs, agreements or arrangements, change in control plans, programs or arrangements, supplemental income arrangements, vacation plans, and all other employee benefit plans, agreements, and arrangements, not described in (A) above in which any Business Employee participates; and (C) plans or arrangements providing compensation to any Business Employee, in each case in which the Seller or any ERISA Affiliate sponsors, contributes to, or provides benefits under or through such plan, or has any obligation to contribute to or provide benefits under or through such plan, or if such plan provides benefits to or otherwise covers any current or former employee, consultant or independent contractor, officer or director of the Seller or any ERISA Affiliate employed or used by the Seller in connection with the operation of the Business (or their spouses, dependents, or beneficiaries.

(c)    Each Seller Benefit Plan in which any Business Employees participate that is intended to qualify under Section 401(a) of the Code has received a favorable determination or approval letter from the IRS with respect to such qualification, or may rely on an opinion letter issued by the IRS with respect to a prototype plan adopted in accordance with the requirements for such reliance, and no event or omission has occurred to the knowledge of Seller that would cause any such Company Benefit Plan to lose such qualification.

(d)    No Seller Benefit Plan that provides benefits to any current or former employees used in connection with the Business is or was subject to Title IV of ERISA, Section 412 of the Code, Section 302 of ERISA, or is a "multiemployer plan" (as defined in Section 3(37) of ERISA).

(e)    No Seller Benefit Plan that provides benefits to any Business Employee is subject to the laws of any jurisdiction outside the United States.

- 12 -

(f)      None of the Seller Benefit Plans, nor any liability of any kind thereunder or with respect thereto, will be required by operation of law or otherwise (except as expressly provided herein) to be transferred to Buyer and/or its Affiliates as a result of the transactions contemplated hereby.

(g)      Except as set forth in Schedule 3.18(g), with respect to all Business Employees (i) the Seller is, and for the past four (4) years has been, in material compliance with all applicable laws and regulations respecting labor, employment, fair employment practices, restrictive covenants, pay equity, background checks, equal opportunity, harassment, discrimination, retaliation, termination or discharge, hours of work and the payment of wages, overtime pay, payroll documents and wage statements, classification of employees, immigration, health and safety, affirmative action, workers' compensation, disability, unemployment compensation, plant closings and layoffs, whistleblower protection, labor relations and collective bargaining, and all applicable Laws and legal requirements of all Governmental Authorities related to the outbreak of the virus known as "SARS-CoV-2" or any mutation thereof or the disease known as "coronavirus disease 2019" as it exists as of the date of this Agreement and the COVID-19 pandemic, including (A) the Families First Coronavirus Response Act, including provisions thereof relating to leaves of absence, (B) the CARES Act, (C) guidance by the U.S. Department of Labor, including the Occupational Safety and Health Administration and Wage and Hour Division, (D) guidance by the Equal Employment Opportunity Commission, (E) guidance from the Centers for Disease Control and Prevention and (F) all orders concerning the continued operation and/or closure of businesses; (ii) the Seller is not delinquent in any payments to any Business Employee for any wages, salaries, commissions, bonuses, fees or other direct compensation due with respect to any services performed for it or amounts required to be reimbursed to such Business Employee; (iii) there are no, and within the past four (4) years there have been no, formal grievances, complaints, litigation, arbitration, governmental audits, governmental investigations or charges with respect to employment or labor matters (including allegations of employment discrimination, retaliation, or unfair labor practices, and noncompliance with wage and hour laws) pending or, to the Seller's knowledge, threatened against the Seller in any judicial, regulatory or administrative forum, under any private dispute resolution procedure or internally; (iv) none of the employment policies or practices of any of the Seller are currently being audited or investigated or has been audited or investigated within the past four (4) years; (v) the Seller or any of its respective officers, is not, or within the past four (4) years has not been, subject to any order, decree, injunction or judgment by any Governmental Authority or private settlement contract in respect of any labor or employment matters; (vi) the Seller is in compliance with the requirements of the Immigration Reform Control Act of 1986; and (vii) all Business Employees are employed at-will and no Business Employee is subject to any employment contract with the Seller whether oral or written.

(h)      With respect to all Business Employees, (i) there is no, and during the past three (3) years there has not been, any labor strike, picketing of any nature, organizational campaigns, labor dispute, slowdown or any other concerted interference with normal operations, stoppage or lockout pending or, to the Seller's knowledge, threatened against or affecting the Business; (ii) the Seller does not have any duty to bargain with any union or labor organization or other person purporting to act as exclusive bargaining representative ("**Union**") of any Business Employees with respect to the wages, hours or other terms and conditions of

- 13 -

ACTIVE/110509963.1

employment of any Business Employee; (iii) there is no collective bargaining agreement or other contract with any Union, or work rules or practices agreed to with any Union, binding on the Seller or being negotiated, with respect to any Business Employee; and (iv) the Seller has never engaged in any unfair labor practice.

(i) With respect to all Business Employees, the Seller has not experienced a "plant closing," "business closing," or "mass layoff" or similar group employment loss as defined in the federal Worker Adjustment and Retraining Notification Act (the "**WARN Act**") or any similar state, local or foreign law or regulation affecting any site of employment of the Seller or one or more facilities or operating units within any site of employment or facility of the Seller. With respect to all Business Employees, during the ninety (90) day period preceding the date hereof, no Business Employee has suffered an "employment loss" as defined in the WARN Act. With respect to all Business Employees, in the last four (4) years, no allegations of sexual harassment have been made internally or, to the Seller's knowledge, threatened, to the Seller against any Business Employee. To the Seller's knowledge, there are no facts that would reasonably be expected to give rise to a claim of sexual harassment, other unlawful harassment or unlawful discrimination or retaliation against or involving any Business Employee.

(j) Each Business Employee hired since September 2009 executed a confidentiality and patent agreement with the Seller at the time of hiring, and the Seller has provided a form of each such agreement.

**3.19     Intellectual Property**. No patents, trademarks, service marks and trade names, and registered copyrights and domain names, and applications for and licenses (to or from Seller) with respect to any of the foregoing, and all computer software and software licenses (other than commercial "shrink-wrap" software and "shrink-wrap" software licenses), proprietary information, websites, trade secrets, material and manufacturing specifications, drawings and designs owned by Seller or with respect to which Seller has any license or use rights (collectively, the "**Intellectual Property**") is included in the Purchased Assets. All issued registrations and pending applications for trademarks and service marks, issued patents, pending patent applications, and registered copyrights and domain names used in the Business are owned exclusively by Seller, free and clear of all Liens. To the knowledge of Seller, Seller has the right to use all of the Intellectual Property used in the Business without infringing on or otherwise acting adversely to the rights or claimed rights of any Person, and, except as set forth on Schedule 3.19, Seller is not obligated to pay any royalty or other consideration to any Person in connection with the use of any of the Intellectual Property used in the Business. To the knowledge of Seller, there is no outstanding complaint, claim, demand, charge or notice alleging that Seller has infringed on, misappropriated or otherwise acted adversely to the rights of any Person in connection with the use of the Intellectual Property in the Business. To the knowledge of Seller, no other Person is infringing the rights of Seller in any of the Intellectual Property used in the Business.

**3.20     Data Privacy**. Seller and each third party acting on behalf of Seller for the Business that has or has had access to Personal Information collected by or on behalf of Seller in connection with the operation of the Business comply, and have always complied, with all (i) applicable laws, guidance and best practices, (ii) contractual obligations (including, but not limited to, those with identified customers), (iii) internal and public-facing privacy, data handling and/or security policies of Seller, (iv)  public statements that Seller has made regarding their respective privacy,

- 14 -

data handling and/or data security policies or practices, (v) rules of applicable self-regulatory organizations, (vi) the Payment Card Industry Data Security Standard, and all other rules and requirements of payment card brands and (vii) applicable published industry standards (collectively, "**Privacy Laws and Requirements**") relating to (A) the privacy of users of any web properties, products and/or services of Seller, (B) the collection, use, storage, retention, disclosure, transfer, disposal, or any other processing of any Personal Information collected or used by Seller and/or by third parties having access to such information and (C) the transmission of marketing and/or commercial messages through any means, including, without limitation, via email, text message and/or any other means.  The execution, delivery and performance of this Agreement complies with all Privacy Laws and Requirements.

**3.21**    **Government Loans**.  Seller has never applied for, or directly or indirectly accepted or received, any benefit (monetary or otherwise), loan, payment, funding, credit, relief, forgiveness or deferral arising under the Coronavirus Aid, Relief and Economic Security Act of 2020 (as in effect from time to time, together with all amendments thereto and all regulations and guidance issued by any Governmental Authority with respect thereto, regardless of the date enacted adopted, issued or implemented, the "**CARES Act**"), the Families First Corona Virus Response Act, the Coronavirus Preparedness and Response Supplemental Appropriations Act or any similar Law enacted or promulgated by the government of the United States of America or any political subdivision thereof in response to or in connection with the Coronavirus Disease 2019 (COVID-19) or any mutation, strain or variant thereof, or any similar or related disease caused by the SARS-CoV-2 virus (all as in effect from time to time, together with all amendments thereto and all regulations and guidance issued by any Governmental Authority with respect thereto, regardless of the date enacted adopted, issued or implemented, "**COVID Relief Law**").

**3.22**    **Government Contracts**.

(a)    With respect to each Assigned Contract between Seller and any Governmental Authority for which performance is ongoing or to which the Seller has been a party within the past six (6) years (each a "**Government Contract**"), and each bid, quotation or proposal by the Seller for the Business that is outstanding (each, a "**Bid**") that if accepted or awarded could lead to a Contract between the Seller for the Business and any Governmental Authority, and each Assigned Contract between Seller and any prime contractor or upper-tier subcontractor relating to a Contract between such Person and any Governmental Authority for which performance is ongoing or to which Seller, in connection with the operation of the Business, has been a party within the past six (6) years, and each outstanding Bid that if accepted or awarded could lead to a Contract between Seller for the Business and a prime contractor or upper-tier subcontractor relating to a Contract between such Person and any Governmental Authority (each such Assigned Contract or Bid, a "**Government Subcontract**"):

(i)    each Government Contract or Government Subcontract was legally awarded, is binding on the parties thereto, is valid and in full force and effect in accordance with its terms and is enforceable by Seller in accordance with its terms;

(ii)    no event has occurred, and, to the knowledge of Seller, no facts, circumstances or conditions exist, other than circumstances related to approval of and execution of a novation agreement as set forth under Section 5.5, that will, or

- 15 -

ACTIVE/110509963.1

would reasonably be expected to, give rise to a claim by a Governmental Authority for any breach or violation in any respect of any Law, Contract, purchase order, task order, delivery order, certification, representation, clause, provision or requirement;

(iii)     neither any Governmental Authority nor any prime contractor, subcontractor or other Person or entity has ever notified Seller in writing, or, to the knowledge of Seller, orally, that Seller has, or may have, breached or violated any Law, certification, representation, clause, provision or requirement;

(iv)     all facts set forth in or acknowledged by any representations, claims or certifications submitted by or on behalf of Seller were current, accurate and complete as of their effective dates;

(v)     except as set forth in Schedule 3.22(a)(v), Seller has not received any written notice of termination, "show cause" or cure notice pertaining to any Government Contract or Government Subcontract;

(vi)     to the knowledge of Seller, no money due to Seller pertaining to a Government Contract or Government Subcontract has been withheld or offset, nor has any claim been made in writing to withhold or offset money;

(vii)     Seller and its employees, officers, and directors have complied in all respects with (A) all requirements relating to the safeguarding of, and access to, classified information under each Government Contract or Government Subcontract and (B) any Law relating to the safeguarding of, and access to, classified information (or, in the case of Contracts governed by Laws other than the state or federal Laws of the United States, the functional equivalents thereof, if any); and all violations thereof have been reported to the appropriate Governmental Authority and contracting parties as required by any Government Contracts or Government Subcontracts or any Law relating to the safeguarding of, and access to, classified information;

(viii)     Seller does not have credible evidence that a Principal, Employee, Agent, or Subcontractor (as such terms are defined by Federal Acquisition Regulation ("**FAR**")) of Seller committed a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act, and Seller has not conducted and is not conducting an investigation to determine whether credible evidence exists that a Principal, Employee, Agent, or Subcontractor of Seller has committed a violation of Federal criminal law involving anti-trust violations found in Title 15 of the United States Code, fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act; and

(ix)     Seller does not have credible evidence of any significant overpayment(s), other than overpayments resulting from contract financing

- 16 -

ACTIVE/110509963.1

payment as defined in the FAR, and Seller has not conducted and is not conducting any investigation to determine whether credible evidence exists of any significant overpayment(s) on Government Contracts or Government Subcontracts, other than overpayments resulting from contract financing payment as defined in the FAR.

(b)    Neither Seller or any of its Principals as that term is defined in the FAR has been suspended or debarred or, to the knowledge of Seller, threatened to be suspended or debarred from doing business with any Governmental Authority or been the subject of a finding of non-responsibility or ineligibility to contract with a Governmental Authority. To the knowledge of Seller, no such exclusion, suspension or debarment has been initiated in writing or otherwise; and the consummation of the transactions contemplated by this Agreement will not result in any such exclusion, suspension or debarment of Seller. Except as set forth on Schedule 3.22(b), Seller has never been audited or, to the knowledge of Seller, investigated by any Governmental Authority and, to the knowledge of Seller, no such audit or investigation has ever been threatened.

(c)    There exist no outstanding material disputes with Seller, and there have not existed within the last seven years any material disputes with Seller, either by a Governmental Authority or by any prime contractor, subcontractor, vendor or other third party, arising under or relating to any Government Contract, Government Subcontract, or Bid.

(d)    Schedule 3.22(d) correctly and completely lists any Government Contract or Government Subcontract for which performance is ongoing or that was awarded to Seller within the past six (6) years that was awarded contingent on Seller's designation as a qualifying small business concern under 13 C.F.R. Part 121 or any similar provision under state Law ("**Small Business Status**"), or that was otherwise set aside for entities with Small Business Status. Other than those Contracts listed in Schedule 3.22(d), Seller is not currently a party to or bound by any Government Contract or Government Subcontract that was awarded contingent on Seller's Small Business Status, or that was otherwise set aside for entities with Small Business Status.  To the knowledge of Seller, none of the higher-tier contractors for Seller's Government Subcontracts are relying on or using the Seller's Small Business Status as part of a small business subcontracting plan or to meet small business subcontracting goals.  All representations, claims and certifications made by Seller relating to its Small Business Status (including its certification under the 8(a) Business Development program or Service Disabled Veteran Owned Small Business ("**SDVOSB**")) were complete and accurate at the time they were made or submitted to a Governmental Authority.

(e)    (i) Neither Seller nor any of its respective directors, officers or Principals (as such term is defined in the FAR) is, or has ever been, under indictment with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract, Government Subcontract, or Bid and (ii) Seller has never entered into any consent order or administrative agreement relating directly or indirectly to any such Government Contract, Government Subcontract, or Bid with a Governmental Authority.

(f)    To the knowledge of Seller, the past performance evaluations received by Seller from a Governmental Authority in relation to a Government Contract or Government Subcontract have been satisfactory or better.

- 17 -

## ARTICLE 4
## Representations and Warranties of Buyer

Buyer represents and warrants to Seller that the statements contained in this **Article 4** are true and correct as of the date hereof. For purposes of this **Article 4**, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual or constructive knowledge of Dwane Stone and Suzanne Bates, after due inquiry.

**4.1** **Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**4.2** **No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any Governmental Authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**4.3** **Legal Proceedings.** There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**4.4** **Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**4.5** **Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article 3 of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any

- 18 -

ACTIVE/110509963.1

representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article 3 of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE 5
## Covenants

**5.1    Public Announcements.** Unless otherwise required by applicable law, neither party shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).

**5.2    Tax Matters.**

(a)    Tax Treatment. For U.S. federal and applicable state and local income tax purposes, the parties hereto agree to treat Buyer's purchase of the Purchased Assets and assumption of the Assumed Liabilities from Seller as a taxable sale of an interest in the Purchased Assets by the Seller to Buyer for the Purchase Price (as finally determined).  Each of the parties shall file all Tax Returns in a manner consistent with such treatment, unless otherwise required by applicable Law.

(b)    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) (collectively, "**Transfer Taxes**") incurred in connection with this Agreement and the documents to be delivered hereunder shall be paid 50% by Seller and 50% by Buyer when due. Seller shall timely file any Tax Return or other document with respect to such taxes or fees, and Buyer shall cooperate with respect thereto as necessary and shall pay 50% of the out-of-pocket expenses incurred by Seller.

(c)    Tax Claims. Notwithstanding anything herein to the contrary, Buyer shall be permitted to control the conduct and resolution of any claim relating to Taxes that involves the assertion of any claim or the commencement of any action, in respect of which an indemnity may be sought pursuant to this Agreement (a "**Tax Claim**"); provided that the Seller may participate in such proceedings at its own expense. If Buyer elects not to control the conduct and resolution of a Tax Claim pursuant to this Section 5.2(c), then Seller may control the conduct and resolution of such Tax Claim; provided that the Buyer may participate in such proceedings at its own expense. Buyer and the Seller agree to give prompt written notice to each other of the receipt of any written notice which involves a Tax Claim; provided, further, that the failure to give such notice shall not affect the indemnification provided hereunder unless the party who was entitled to receive such notice has been materially prejudiced by such failure.  In the case of a conflict between this Section 5.2(c) and Section 6.5, this Section 5.2(c) shall govern.

(d)    Tax Deficiencies.  The Seller shall not permit to exist any Tax deficiencies (including penalties and interest) of any kind assessed against or relating to the Seller with respect to any taxable periods ending on or before, or including, the Closing Date of a character or nature that would reasonably be expected to result in Liens or claims on any of the Purchased

- 19 -

ACTIVE/110509963.1

Assets or on Buyer's title or use of the Purchased Assets following the Closing or that would reasonably be expected to result in any claim against or liability of any Buyer Entity.

(e)    Apportioned Taxes. All real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a Straddle Period (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller, on the one hand, and Buyer, on the other hand, as of the Closing Date based on the number of days of such Straddle Period ending on and including the Closing Date (the "**Pre-Closing Apportioned Period**") and the number of days of such Straddle Period beginning from the day after the Closing Date through the end of such taxable period (the "**Post-Closing Apportioned Period**"). Seller shall be liable for the proportionate amount of Apportioned Obligations that is attributable to the Pre-Closing Apportioned Period.  Buyer shall be liable for the proportionate amount of the Apportioned Obligations that is attributable to the Post-Closing Apportioned Period.  Within ninety (90) days after the Closing, Seller, on the one hand, and Buyer, on the other hand, shall each present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 5.2(e) (which shall take into account, any Taxes previously overpaid by Buyer or Seller) together with such supporting evidence as is reasonably necessary to calculate such amount to be reimbursed.  Such amount shall be paid by the party owing it to the other party within ten (10) business days after delivery of such statement.  Thereafter, Buyer shall notify Seller of its receipt of any bill for real property Taxes, personal property Taxes or similar ad valorem obligations relating to the Purchased Assets, part or all of which are attributable to the Pre-Closing Apportioned Period, and shall promptly deliver such bill to Seller who shall pay the same to the appropriate Governmental Authority; provided, that if such bill also relates to the Post-Closing Apportioned Period, Seller shall remit to Buyer, prior to the due date of assessment, payment only for the proportionate amount of such bill that is attributable to the Pre-Closing Apportioned Period.  If Seller or Buyer shall make a payment for which it is entitled to reimbursement under this Section 5.2(e) the party or parties liable for such payment pursuant to this Section 5.2(e) shall make such reimbursement promptly, but in no event later than ten (10) business days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled, along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Any Tax refunds, credits or overpayments attributable to real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets shall be apportioned between Buyer, on the one hand, and Seller, on the other hand, in accordance with the apportionment provided in this Section 5.2(e).

(f)    Tax Cooperation. The parties shall cooperate fully, as and to the extent reasonably requested by any other party, in connection with: (i) the preparation and filing of any Tax Return of the Seller; (ii) any Tax Claim; and (iii) any other matter under this Agreement relating to Taxes of the Seller, in each case with respect to any Pre-Closing Tax Period or Straddle Period.  Such cooperation shall include the retention and, upon the other party's request, the provision of records and information that are reasonably relevant to any such Tax matter and access to employees and representatives on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Seller shall (A) retain all books and records relevant to Tax matters of the Seller for the Purchased Assets with respect to the Pre-Closing Tax Period until the expiration of the statute of limitations (and any extensions

- 20 -

thereof) of the applicable Tax period, and (B) give Buyer reasonable written notice prior to destroying or discarding any such books and records and, if Buyer so requests, upon such notice the Seller shall allow Buyer to take possession of any such books and records.

      **5.3**    **Restrictive Covenants.**

      (a)    <u>Non-Competition</u>.  In consideration for the payments made by Buyer hereunder and the other substantial direct and indirect benefits received from the transactions contemplated hereby, for a period of three (3) years from the Closing Date (the "**Non-Compete Period**"), Seller shall not, and shall cause its respective Affiliates not to, directly or indirectly, anywhere within North America or the rest of the world, other than pursuant to relationships with Buyer, engage in any business activity that is competitive with the Business (any such business, a "**Competitive Business**"); <u>provided</u>, that (i) ownership of less than 1% of the outstanding stock of any publicly-traded corporation shall not be deemed to be engaging, solely by reason thereof, in a Competitive Business, (ii) nothing in this Section 5.3 shall restrict Seller or its Affiliates from performing under the Transition Services Agreement or any contract in accordance with <u>Section 5.5</u>, and (iii) nothing in this Section 5.3 shall restrict Seller or its Affiliates from engaging in the Retained Business.

      (b)    <u>Non-Solicitation and No Hire</u>.  As a separate and independent covenant, and in consideration for the payments made by Buyer hereunder and the other substantial direct and indirect benefits received from the transactions contemplated hereby, Seller agree that, for a period of four (4) years from the Closing Date, without the prior written consent of Buyer, Seller shall not, shall cause its respective Affiliates not to, directly or indirectly:

      (i)    (A) hire, employ or engage, or attempt to hire, employ or engage, for or on behalf of itself or any other Person (whether or not a competitor of Buyer) any of the officers, employees or independent contractors of Buyer or any of its Affiliates, or any former officers, employees or independent contractors employed or retained for work by Buyer or any of its Affiliates during the six (6)-month period immediately preceding the date of solicitation or hire, or (B) solicit, persuade or attempt to persuade, or induce or attempt to induce any such officers, employees or independent contractors to leave the employ of, or terminate their relationship with, Buyer or any of its Affiliates, or violate the terms of their contracts or any employment arrangements with Buyer or any of its Affiliates, including, without limitation, by offering employment to any such Person during such period; or

      (ii)    solicit, persuade or attempt to persuade, or induce or attempt to induce, any customer, supplier, vendor, service provider, lessor, licensor or other business relation of the Business into any business relationship that would interfere with the Business, or otherwise divert or take away from any business with the Business

      (c)    <u>Relief</u>.  The covenants and undertakings contained in this <u>Section 5.3</u> relate to matters which are of a special, unique and extraordinary character, and Seller acknowledge and agree that a violation of any of the terms of this <u>Section 5.3</u> may cause irreparable harm to Buyer, the amount of which may be impossible to estimate or determine and which cannot be adequately compensated.  Accordingly, Seller acknowledges and agrees that the remedy at law for any breach of this <u>Section 5.3</u> may be inadequate.  Therefore, Seller

- 21 -

acknowledges and agrees that Buyer will be entitled to seek an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 5.3 without the necessity of proving actual damages or posting any bond whatsoever. The rights and remedies provided by this Section 5.3 are cumulative and in addition to any other rights and remedies which Buyer may have hereunder.  The existence of any claim or cause of action by Seller against Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of the restrictive covenants contained in Section 5.3.

**5.4** **Further Assurances.** Each party hereto covenants and agrees to use its reasonable best efforts to effectuate the transactions contemplated by this Agreement and the other documents and agreements contemplated hereby, and to do all acts and things as may be required to carry out its obligations hereunder, including executing, sealing and delivering all such other instruments and other documents, and take all such other actions, to more effectively transfer, convey and assign from Seller to Buyer, and to confirm title of Buyer to, all of the Purchased Assets, to put Buyer in actual possession and operating control thereof, to assist Buyer in exercising all rights with respect thereto and to carry out the purposes and intents of this Agreement.

**5.5** **Third Party Consents.** Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not constitute an agreement to assign any contract if an attempted assignment thereof, without consent of a third party thereto, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller thereunder. Immediately after Closing, Seller and Buyer will work together as expeditiously as commercially practicable to obtain the consent of the other parties to any such contract for the assignment thereof to Buyer, and to obtain approval of an execution of novation agreements, including all actions and submittals required by FAR 42.1204.  Unless and until such consents are obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Buyer or Seller thereunder so that Buyer would not in fact receive all rights under such contract, then pursuant to the Transition Services Agreement, to the maximum extent permitted by applicable law, (a) Buyer will, obtain the benefits and assume the obligations under such contracts, (b) Seller will enforce, at Buyer's expense, for the benefit of Buyer, with Buyer assuming at Buyer's expense Seller's obligations, any and all rights of Seller against a third party under such contracts, and (c) and Seller will promptly pay to Buyer when received all monies received by such Person under any such contracts.

**5.6** **Confidentiality.**  Seller agrees that it will not disclose to any person other than (a) Seller's legal counsel, accountants and other representatives who have a need to know such information and are informed of its confidential nature and (b) representatives of Buyer, any information of a confidential or proprietary nature relating to any products, properties, methods, designs, know-how, inventions, improvements, trade secrets, suppliers, customers, or customers' requirements relating to the Business or Buyer's businesses; provided, that this provision shall not apply to any information that, at the time of disclosure, is available publicly or that Seller is legally compelled to disclose.

**5.7** **Employee Matters.**  On or prior to the Closing Date, the employees of the Seller who primarily work for the Business listed on Schedule 5.7 who are actively employed by the Seller as of the Closing Date (the "**Offered Employees**") shall be offered at-will employment by

- 22 -

Buyer at salaries and positions substantially similar to those of the Offered Employees at Seller. The Offered Employees who accept employment on the terms and conditions set forth by Buyer shall be referred to herein as "**Transferred Employees**."  The employees of the Seller who primarily work for the Business who are not offered employment, or who do not accept employment, with Buyer shall be referred to herein as "**Non-Transferred Employees**."  On or prior to the Closing Date, the Seller shall terminate the employment of all Transferred Employees and either retain or terminate the employment of all Non-Transferred Employees.  Except as described in this Section 5.7, neither Buyer nor any of its Affiliates shall have any liability with respect to any Non-Transferred Employee or former employee, consultant or retiree of the Seller (including any Business Employee currently covered by any Company Benefit Plan of the Seller who is not a Transferred Employee), regardless of when such liability arose or occurred (whether on, prior to or after the Closing Date).  The Seller shall be solely responsible for the payment of, and shall pay, all wages, salaries and other compensation and employee benefits (including any vacation pay, severance pay, notice pay, insurance, supplemental pension, deferred compensation, "stay" or other similar incentive bonuses, change-in-control bonuses (or other bonuses or compensation related in any way to the execution, delivery or performance of this Agreement), retirement and any other benefits, premiums, claims and related costs) to any of the current employees, former employees, consultants, former consultants or retirees of the Seller based on or arising under their employment or engagement with the Seller.  After the Closing, Buyer shall be solely responsible for the payment of all wages, salaries and other compensation and employee benefits (including any vacation pay, severance pay, notice pay, insurance, supplemental pension, deferred compensation, bonuses, retirement and any other benefits, premiums, claims and related costs) to any of the Transferred Employees relating to or arising out of their employment with Buyer or any of its Affiliates.  Neither Buyer nor any of its Affiliates shall assume any liability with respect to any Seller Benefit Plan or other employee benefit plan of any kind or nature maintained by the Seller for any of its employees, former employees, consultants, former consultants or retirees.  Notwithstanding anything in this Agreement to the contrary, no Transferred Employee, and no other employee of the Seller, shall be deemed to be a third-party beneficiary of this Agreement.

5.8     **Payments Received After Closing.** If any payments, proceeds or distributions are received by Seller after the Closing, the right to which payments, proceeds or distributions are included in the Purchased Assets or otherwise constitute, relate to or arise directly out of the Purchased Assets, such payments, other proceeds or distributions shall be for the account of Buyer. If any payments, proceeds or distributions are received by Seller after the Closing, the right to which payments, proceeds or distributions are included in the Excluded Assets, such payments, proceeds or distributions shall be for the account of Seller. All such payments, proceeds and distributions so received shall be held by the receiving party in trust for the benefit of the applicable other party and shall be paid within ten (10) Business Days to such other party.

### ARTICLE 6
### Indemnification

**6.1**     **Survival**. All representations and warranties set forth in this Agreement shall survive the Closing Date until the Applicable Limitation Date of such representation or warranty. For purposes of this Agreement, the term "**Applicable Limitation Date**" means the eighteen (18) month anniversary of the Closing Date; provided, that the Applicable Limitation Date of the

- 23 -

representations and warranties set forth in: Section 3.1 (Organization and Authority; Enforceability), Section 3.2(a)(i)(A), 3.2(a)(i)(B) and 3.2(a)(ii) (No Conflicts), Section 3.4 (Capitalization; Subsidiaries), Section 3.14 (Brokers), and Section 3.16 (Taxes), Section 3.18(b) (Employee Benefits), Section 4.1 (Organization and Authority of Buyer; Enforceability), Section 4.2(a)(i), 4.2(a)(ii) and 4.2(b) (No Conflicts; Consents) and Section 4.4 (Brokers) shall be the maximum period of time permitted for contract claims under Delaware law (all such representations, collectively, the "**Fundamental Representations**").

**6.2** **Indemnification By Seller.** Seller, shall defend, indemnify and hold harmless Buyer, its Affiliates and their respective stockholders, directors, officers and employees (collectively, the "**Buyer Indemnified Parties**") from and against all Losses arising from or relating to:

(a) Subject to Section 6.1, any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement;

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement;

(c) any Excluded Asset or Excluded Liability;

(d) any liabilities and obligations of the Assumed Contracts that (i) were required to be performed or arose out of underlying events, actions or failures to act occurring before the Closing, and (ii) result from any violation of law, rule or regulation, or breach or default (or event that with notice or lapse of time would constitute a breach or default) by Seller before the Closing; or

(e) the ChemFab Incident.

**6.3** **Indemnification By Buyer.** Buyer shall defend, indemnify and hold harmless Seller, and its respective Affiliates and their respective stockholders, directors, officers and employees (collectively, the "**Seller Indemnified Parties**," and, together with the Buyer Indemnified Parties, the "**Indemnified Parties**") from and against all Losses arising from or relating to:

(a) Subject to Section 6.1, any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement;

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement;

(c) any Assumed Liability other than those covered by Section 6.2(d); or

(d) any liabilities and obligations of the Assumed Contracts, including under the Transition Services Agreement, that (i) are required to be performed or arise out of underlying events, actions or failures to act occurring after the Closing, and (ii) result from any violation of law, rule or regulation, or breach or default (or event that with notice or lapse of time would constitute a breach or default) by Buyer after the Closing.

- 24 -

**6.4**    **Limitations on Indemnification**. The indemnification obligations provided for in Sections 6.2 and 6.3 above are subject to the following limitations:

(a)    An Indemnifying Party shall have no indemnification obligation in respect of claims made pursuant to Sections 6.2 and 6.3 unless the Indemnified Party gives written notice of the claim with reasonable specificity (to the extent known at such time) to the Indemnifying Party in accordance with the procedures set forth in this Agreement on or before the Applicable Limitation Date.  If the Indemnified Party delivers such written notice of a claim on or prior to the Applicable Limitation Date, then the Indemnifying Party's indemnification obligation in respect of the claims described in the notice shall survive the Applicable Limitation Date, notwithstanding that the representations and warranties on which such claim is based have expired.

(b)    For purposes of determining the amount of Losses incurred as a result of such breach, in each case, in connection with any indemnification claims made under Sections 6.2 and 6.3, all representations and warranties set forth herein or in the Disclosure Schedules that are qualified by reference to "material," "materially," "Material Adverse Effect" or any similar term (collectively, "**Materiality Qualifiers**") shall be deemed to have been made without giving effect to such Materiality Qualifiers.

(c)    Recovery by Indemnified Parties of their indemnifiable Losses in the aggregate will be subject to the following limitations:

(i)    Except to the extent indemnifiable Losses arise out of (1) Fraud by Buyer or Seller, or (2) an inaccuracy or breach of any Fundamental Representation, the maximum amount of Losses that an Indemnifying Party may be required to pay under Section 6.2(a) or Section 6.3(a), as applicable, shall be the Indemnity Cap Amount;

(ii)    The maximum amount of Losses that an Indemnifying Party may be required to pay under Section 6.2(a) or Section 6.3(a), as applicable, shall be the Aggregate Consideration Amount; and

(iii)    Except to the extent indemnifiable Losses arise out of (1) Fraud by Buyer or Seller, or (2) an inaccuracy or breach of any Fundamental Representation, the Buyer Indemnified Parties, on the one hand, and the Seller Indemnified Parties, on the other, shall not be entitled to indemnification under Section 6.2(a) or Section 6.3(a), respectively, in respect of any Losses, except to the extent the cumulative amount of such Losses exceeds Forty Thousand Dollars ($40,000) (the "**Deductible**"), whereupon the Indemnifying Party shall only be liable for Losses in excess of the Deductible.

(d)    Payments pursuant to Section 6.2 or Section 6.3 shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received by the Indemnified Party in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for

- 25 -

any Losses prior to seeking indemnification under this Agreement; provided, however, that nothing within this Section 6.4(d) shall require the Buyer to initiate litigation to recover any amounts from such collateral sources.

(e)      Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(f)      With respect to an indemnification claim pursuant to Section 6.2(e), the Parties agree that (i) the project gross margin dollars for the ChemFab Project (the "**ChemFab Margin**") is expected to be $1,279,738 (the "**Expected ChemFab Margin**"), (ii) if the ChemFab Incident results in a material reduction in the actual ChemFab Margin from the Expected ChemFab Margin (the "**ChemFab Margin Reduction**"), the amount of such reduction shall be indemnified Losses for purposes of Section 6.2(e), and (iii) Seller will be responsible for the ChemFab Margin Reduction in accordance with Section 6.2(e) and subject to the indemnification procedures set forth in this Article 6.

## 6.5    Indemnification Procedures.

(a)      Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"), including reasonable detail of the claim (to the extent known at the time).

(b)      If the Indemnified Party provides written notice to the Indemnifying Party regarding a direct claim, then the Indemnified Party and the Indemnifying Party hereby agree to negotiate in good faith for thirty (30) in order to promptly resolve such claim before the Indemnified Party files any formal legal action related to such claim.

(c)      In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement or an Affiliate or representative of a party to this Agreement, the Indemnifying Party, at its sole cost and expense, may assume and control the defense of any such Action at the Indemnifying Party's expense with counsel reasonably satisfactory to the Indemnified Party (which consent shall not be unreasonably withheld or delayed). The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom.

(d)      The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed),

- 26 -

except as provided in this Section 6.5(d). If a firm offer is made to settle an Action without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Action and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Action and in such event, the maximum liability of the Indemnifying Party as to such Action shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Action, the Indemnifying Party may settle the Action upon the terms set forth in such firm offer to settle such Action. If the Indemnified Party has assumed the defense pursuant to Section 6.5(e), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(e)    Notwithstanding any of the foregoing, the Indemnifying Party shall not have the right to assume control of the defense, and shall pay the reasonable fees and expenses of counsel retained by the Indemnified Party, if the third party claim which such Indemnifying Party seeks to assume control of: (1) seeks non-monetary relief against the Indemnified Party; (2) involves criminal or quasi-criminal allegations; (3) is one in which an Indemnifying Party and the Indemnified Party are both named in the complaint, and joint representation by the same counsel would be inappropriate under applicable standards of ethical conduct; (4) involves a claim for which an adverse determination would have a material and adverse effect on the Indemnified Party's reputation or future business prospects; or (5) involves potential liability to the Indemnified Party after accounting for the maximum amount of indemnification remaining available to the Indemnified Party pursuant to this Agreement.

**6.6**    **Tax Treatment of Indemnification Payments.** All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for all applicable Tax purposes, unless otherwise required by law.

**6.7**    **Exclusive Remedies.** Subject to Section 5.4(c) and Section 7.13, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from Fraud) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article 6. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective representatives arising under or based upon any law, except pursuant to the indemnification provisions set forth in this Article 6. Nothing in this Section 6.7 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's Fraud.

ACTIVE/110509963.1

## ARTICLE 7
## Miscellaneous

**7.1    Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**7.2    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.2):

| | |
|---|---|
| If to Seller: | 11401 Lamar Ave<br>Overland Park, KS 66211<br>E-mail: TraversMG@bv.com<br>Attention: Martin G. Travers |
| with a copy to: | Husch Blackwell LLP<br>4801 Main Street, Suite 1000<br>Kansas City, MO 64112<br>E-mail: john.moore@huschblackwell.com<br>Attention: John Moore |
| If to Buyer: | Versar, Inc.<br>c/o Kingswood Capital Management, LLC<br>11812 San Vicente Blvd, Suite 604<br>Los Angeles, CA 90049<br>E-mail: awolf@kingswood-capital.com<br>Attention: Alex Wolf |
| with a copy to: | Goodwin Procter LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY 10018<br>Attention:  Christian C. Nugent; Liam F. Timoney<br>E-mail: cnugent@goodwinlaw.com;<br>ltimoney@goodwinlaw.com |

**7.3    Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

ACTIVE/110509963.1

**7.4     Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**7.5     Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**7.6     Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, that notwithstanding the foregoing, Buyer may at any time without the consent of any other party assign, in whole or in part:  (a) its right to purchase the Purchased Assets and assume the Assumed Liabilities to one or more of its Affiliates (provided that no such assignment shall release Buyer from its obligations hereunder); (b) its rights under this Agreement and any other agreement contemplated hereby for collateral security purposes to any lender providing financing to Buyer, such permitted assign or any of their Affiliates, and any such lender may exercise all of the rights and remedies of such assignee hereunder and thereunder; and (c) its rights under this Agreement and any other agreement contemplated hereby to any subsequent purchaser of Buyer or any of its divisions or any material portion of its assets (whether such sale is structured as a sale of equity, sale of assets, merger, recapitalization or otherwise). No assignment shall relieve the assigning party of any of its obligations hereunder.

**7.7     No Third-party Beneficiaries.** Except as provided in Article 6, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**7.8     Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**7.9     Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder

- 29 -

preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**7.10    Governing Law.** The internal laws, including the statute of limitations, of the State of Delaware shall govern this Agreement, the interpretation and enforcement of its terms, and any claim or cause of action (in law or equity), controversy or dispute arising out of or related to it or its negotiation, execution or performance, whether based on contract, tort, statutory or other law, in each case without giving effect to any conflicts-of-laws or other principle requiring the application of the law of any other jurisdiction.

**7.11    Submission to Jurisdiction.** Each of the parties hereto irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by any other party or its successors or assigns may be brought and determined by a state or federal court of appropriate jurisdiction in New Castle County Delaware, and each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any action, suit or proceeding relating thereto except in such courts).

**7.12    Waiver of Jury Trial**. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**7.13    Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**7.14    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**7.15    Certain Definitions.** For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person. As used in this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Aggregate Consideration Amount**" means $4,000,000.00.

- 30 -

"**Base Cash Consideration**" means an amount equal to $2,000,000.

"**Business**" means the provision of environmental services to United States Federal governmental entities, including consulting, investigation, assessment, design, remediation and operations and maintenance services.

"**Cash**" means, as of any date, all cash, cash equivalents (including marketable securities and short-term investments) and cash deposits of the Seller; *provided*, that, for purposes of clarity, Cash shall not include any restricted cash, Tax refunds, Tax credits, Tax attributes or other Tax assets; provided, further, that Cash shall include all checks, wires and drafts in transit to the accounts of the Seller that clear to the accounts of Seller post-closing, and no accounts receivable asset shall be included in respect of such amounts within Closing Working Capital.

"**ChemFab Project**" means the existing project at the ChemFab site that is subject to the ChemFab Incident.

"**ChemFab Incident**" means the incident as described on Exhibit B.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Disclosure Schedules**" means the Disclosure Schedules attached hereto and incorporated by reference herein, dated as of the date hereof, delivered by Seller to Buyer in connection with this Agreement.

"**Environmental Law**" means any law relating to: (a) pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment; or (b) the presence of, exposure to, or the Release, management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Permit**" means any license required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**Fraud**" means with respect to a party, actual (not constructive) fraud as defined under Delaware common law, but, in any case, with the intent to deceive in relation to this Agreement or the transactions contemplated hereby.

ACTIVE/110509963.1

"**GAAP**" means United States generally accepted accounting principles, as in effect as of the relevant dates thereof, and in respect of the Closing Statements, as agreed by Buyer and Seller.

"**Governmental Authority**" means any national, federal, state, provincial, municipal, local, foreign or other government, governmental, legislative, regulatory or administrative authority, agency or commission, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law) or any court, tribunal or other judicial body.

"**Hazardous Materials**" means any substance listed, defined, designated or classified as hazardous, toxic, radioactive, dangerous, or as a "pollutant" or "contaminant", or otherwise regulated, under any Environmental Law, and shall include any toxic waste, solid waste, pollutant, contaminant, hazardous material, hazardous substance, toxic substance, hazardous waste, medical or infectious waste, electronic waste, special waste, petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos, asbestos containing material, urea formaldehyde foam insulation, per- or polyfluoroalkyl substance, lead, mold, mold spores, mycotoxins or polychlorinated biphenyls.

"**Illustrative Working Capital Example**" means the illustrative example of the calculation of working capital as of May 31, 2021 as set forth on **Exhibit A**.

"**Indemnity Cap Amount**" means an amount equal to $500,000.

"**Lien**" means, with respect to any asset, any mortgage, lien, license, pledge, negative pledge, charge, security interest, deeds of trust, encroachments, right of way, deed of restriction, lease, bailment (in the nature of a pledge or for purposes of security), conditional sale  agreement or other title retention agreement, options, right of first refusal or first offer, easement, servitude, restriction, encumbrance or other restrictions on transfer or disposition or securities interests of any kind, in each case, in respect of such asset.

"**Loss**" or "**Losses**" means any loss, liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or expense, whether or not arising out of third-party claims (including interest, penalties, attorneys', accountants' and other professionals' fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing, whether in a dispute between any of the parties or a third party); provided that in no event shall Losses include any punitive or exemplary damages except to the extent the same are directly incurred by an Indemnified Party in connection with a claim by a third party.

"**Parent**" means Black & Veatch Holding Company.

"**Permitted Liens**" means (a) liens for Taxes not yet due and payable; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; and (c) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business.

ACTIVE/110509963.1

"**Person**" means any individual, partnership, limited liability company, corporation, cooperative, association, joint stock company, trust, joint venture, unincorporated organization or governmental authority, body or entity or any department, agency or political subdivision thereof.

"**Personal Information**" means information and data that is linked or linkable to a natural person, including, without limitation, any information specifically defined or identified in any of Seller's privacy policy as "personal information," "personal data," "personally identifiable information," or "PII". Personal Information may relate to any identifiable natural person, including a current, prospective or former customer, employee or vendor of any Person.  Personal Information includes information in any form, including paper, electronic and other forms.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the Pre-Closing Apportioned Period.

"**Retained Business**" means the business operated by an Affiliate of Seller to provide environmental services to Persons other than United States Federal governmental entities, including to private, municipal, and state entities in the biotech & technology, food & beverage, municipal, renewable energy, and transmission & distribution markets, as well as to other business units of Affiliates of Seller.

"**Seller Note**" means that certain Promissory, dated as of the date hereof, issued by the Buyer to the Seller in the original principal amount of $2,000,000.00.

"**Straddle Period**" means any taxable period that includes (but does not end on) the Closing Date.

"**Tax**" or **"Taxes"** means, without limitation, any and all U.S. federal, state, local or foreign income, gross receipts, capital gains, franchise, alternative or add-on minimum, estimated, imputed underpayment, sales, use, goods and services, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, unclaimed property or escheat, windfall profit, environmental, customs, duties, real property, ad valorem, special assessment, personal property, equity, social security, unemployment, employment, disability, payroll, license, employee or other withholding, contributions or other tax, of any kind whatsoever, whether disputed or not, imposed by any Governmental Authority, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing and including any obligations to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Tax Returns**" means returns, declarations, reports, claims for refund, information returns or other documents (including any amendments, related or supporting schedules, statements or other information) filed or required to be filed in connection with the determination, assessment or collection of Taxes of any party or the administration of any laws, regulations or administrative requirements relating to any Taxes.

"**Transaction Expenses**" means any change-of-control or similar payment or increased cost that is triggered in whole or in part as a result of the consummation of the transactions contemplated by this Agreement together with the employer portion of any payroll Taxes applicable to such payments.

ACTIVE/110509963.1

"**Working Capital**" means Current Assets as of immediately prior to the Closing, <u>minus</u> Current Liabilities as of immediately prior to the Closing, in each case, determined in accordance with GAAP, but specifically excluding (i) any current or deferred Tax assets, (ii) any Excluded Assets, and (iii) Cash. For purposes of this definition, (a) "**Current Assets**" means accounts receivable and Contract Assets included in the Purchased Assets, (b) "**Current Liabilities**" means accounts payable and Contract Liabilities included in the Assumed Liabilities, (c) "**Contract Assets**" means costs in excess of billings, and (d) "**Contract Liabilities**" means billings in excess of costs.

"**Working Capital Target**" means an amount equal to $1,300,000.00.

[SIGNATURE PAGE FOLLOWS]

- 34 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

VERSAR ENVIRONMENTAL SERVICES, LLC

By: _____

Name: Alex Wolf

Title:   Authorized Officer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

BLACK & VEATCH SPECIAL PROJECTS CORP.

By: _Randal R Castro_____

Name:  Randal Castro

Title:  President

*Signature Page to Asset Purchase Agreement*

## Exhibit A

### Illustrative Working Capital Example

See attached.

**Evergreen Working Capital**
**As of May 2021**

| Project | Project Name | | Total | 775,946 | 1,251,410 | 1,244,944 | | 782,412 |
|---|---|---|---|---|---|---|---|---|
| | | | | Accounts Receivable | Net Asset | Accounts Payable | | Working Capital |
| 42617 | OTT STORY WELL REHABILITATIONMP | | | - | 46,350 | 11 | | 46,339 |
| 43114 | Swope Park EDC | | | 75,223 | (19,028) | - | | 56,195 |
| 43123 | USAG Benelux - Env Reviews | | | - | (438) | - | | (438) |
| 43205 | USAG Benelux Env Reviews 2.0 | | | 13,750 | (4,156) | 10,596 | | (1,002) |
| 43128 | HGL Holcomb Creosote RD | | | - | 7,740 | - | | 7,740 |
| 43180 | Vienna Wells ESO Pilot Study | | | - | 3,309 | 416 | | 2,893 |
| 43212 | Pantesote - Superfund Site | | | 5,124 | 1,899 | - | | 7,023 |
| 45000 | Mississippi Phosphates Corp RD | | | - | (1) | - | | (1) |
| 45001 | Mississippi Phosphates Corp | | | 3,012 | 20,453 | - | | 23,465 |
| 45002 | 57st & N Broadway RD | | | 11,966 | (38,246) | - | | (26,280) |
| 45003 | Newton County DES | | | 5,931 | 5,337 | - | | 11,268 |
| 45004 | Cristex | | | 8,467 | (12,021) | 3,334 | | (6,888) |
| 45005 | North 25th Street Glass & Zinc Site | | | 15,238 | 13,313 | 16,214 | | 12,337 |
| 45006 | Oronogo-Duenweg Mining Belt | | | 28,857 | 26,741 | - | | 55,598 |
| 49074 | BREWER GOLD MIN REMEDIAL DESIGN | | | - | (538) | - | | (538) |
| 49079 | ABC CLEANERS OU3 FOCUSED RI FSMP | | | - | - | 860 | | (860) |
| 49097 | TO 509 Cristex Drum Site Remedial Des | | | - | (2) | - | | (2) |
| 49110 | Smalley Piper RES | | | 71,740 | 30,295 | 44,349 | | 57,686 |
| 49111 | GMH Electronics - RAF RES | | | 53,967 | 505,492 | 423,259 | | 136,200 |
| 49112 | Picayune Wood LTRA | | | 61,595 | (51,902) | 56,609 | | (46,916) |
| 49113 | Chem-Fab OU2 RA | | | 377,447 | 566,076 | 620,374 | | 323,149 |
| 43010 | Nationwide Infrsture Technical Assistar | | | - | (57,199) | - | | (57,199) |
| 43184 | Monitor Devices | | | 43,629 | 207,936 | 68,922 | | 182,643 |

## Exhibit B

### ChemFab Incident

**Client:** U.S. Environmental Protection Agency – Site Name ChemFab

**Project Location:** Doylestown, PA

**Scope of Work:**     Construction of a groundwater extraction/treatment system to extract groundwater from the site to prevent further migration of contaminants. Construction includes access road, parking lot, utilities, extraction wells, and conveyance piping. Construction of the treatment building includes the foundation, structure, and mechanical and electrical systems.

**Situation regarding the allegation:** On June 17, 2021, PRM Filtration (PRM) notified B&V of an allegation made by one of their employees of a hostile work environment. PRM Filtration is a subcontractor of B&V on the project. PRM has advised that their employee will not return to the site until the issue is investigated and the situation is resolved. The correspondence has not been copied to EPA or other Federal agencies.

**Project Team:**  **Program Manager:** Rob Gamble (not moving with transaction)

**Project Manager:** Chris Stone (moving to Versar with transaction)

**Field Superintendent/Site Safety Officer:** Brian Dobis (subject of allegation)

**Construction Quality Control Manager:** Shante Mason (not part of transaction, will be provided through TSA).

# EXHIBIT 2



# DEPARTMENT OF THE ARMY

PHILADELPHIA DISTRICT, CORPS OF ENGINEERS

SOUTHERN NJ RESIDENT OFFICE, 1405A NORTH MILL ROAD

VINELAND, NEW JERSEY 08360

REPLY TO
ATTENTION OF

CENAP-EC-CS                                                            17 December 2020

Serial Letter No. 01

SUBJECT: EPA Contract No. 68HERH19D0004, Task Order 68HE0320F0091, Chem-Fab Superfund Site OU2 Remedial Action, Doylestown, PA

Ed Hicks
Black & Veatch, Federal Business
6 Concourse Parkway, Suite 1600
Atlanta, GA 30328

Dear Mr. Hicks:

The EPA and USACE are committed to providing a high-quality product. This letter is prepared to address the lack of a construction quality systems manager (CQSM) on Black & Veatch – Envirocon JV's (BVE) project team. Without a consistent CQSM we are concerned impacts may be seen with the overall project quality. As cited in the contract award, EPAAR 1552.237-72 Key Personnel states:

(a) The Contractor shall assign to this contract the following key personnel:
   a. Project Manager (PM) – Ed Hicks
   b. Project Superintendent (PS) – John Weir
   c. Construction Quality Systems Manager (CQSM) – Ramiro Ojeda
   d. Remedy Operator – Kenneth Fulford

(b) During the first ninety (90) days of performance, the Contractor shall make no substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment. The Contractor shall notify the Contracting Officer within 15 calendar days after the occurrence of any of these events and provide the information required by paragraph (c) of this clause. After the initial 90-day period, the Contractor shall submit the information required by paragraph (c) to the Contracting Officer at least 15 days prior to making any permanent substitutions.

(c) The Contractor shall provide a detailed explanation of the circumstances necessitating the proposed substitutions, complete resumes for the proposed substitutes, and any additional information requested by the Contracting Officer. Proposed substitutes should have comparable qualifications to those of the persons being replaced. The Contracting Officer will notify the Contractor within 15 calendar days after receipt of all required information of the decision on substitutions. This clause will be modified to reflect any approved changes of key personnel.

Specific requirements of the CQSM are identified in the contract specification sections:

(a) Admin Requirements 01 30 00,1.6.4 Construction Quality Systems Manager
   a. Responsibilities, Qualifications, Duties are listed in this section.

(b) Quality Control 01 45 00.00 10, 1.8.2 Contractor Quality Control System Manager
   a. Reiterates the requirements of the role and states that an alternate CQSM must also be identified to fill the role as needed.

     b.  Part E states:  The CQC System Manager and Alternate CQC System Manager are required to have completed the Construction Quality Management (CQM) for Contractors course. If the CQC System Manager does not have a current certification, obtain the CQM for Contractors course certification within 90 days of award.

(c) Submittal Procedures 01 33 00, 1.6.2 Identifying Submittals
     a.  This section states that the CQSM must prepare, review, and stamp submittals prior to submittal to the government.

(d) Submittal Procedures 01 33 00, 1.11.4 QC Organization Responsibilities
     a.  Section G and H describe certification and approval statements that must be signed by the CQSM on every submittal prior to submitting to the government.

All the above referenced contract requirements are not being met as of this letter preparation, 79 days after award. This is unacceptable. You will be required to implement the following series of actions to ensure that a CQSM is identified and performing required duties.

1. Identify a primary and alternate CQSM within five business days of letter receipt.
2. Ensure the primary and alternate CQSM complete the CQM course within 30 business days of letter receipt.
3. All submittals and RFIs to date and going forward must be signed by the approved CQSM.

Quality performance is a rating element on your final performance rating in CPARS.  Continued problems in this area will result in a poor performance evaluation in this area.

If you have any questions, contact me at 856-325-9874.

Sincerely,

Ian Stewart
Project Engineer

CF:    BVE/Bob Gamble
       USEPA/Bob Stank, Huu Ngo
       CENAP-EC-CS/Brian Duffy, Steve Creighton
       CENAP-DP-PM/Tom Gibison

# EXHIBIT 3

| From: | Gamble, Robert |
|---|---|
| Sent: | Tuesday, January 12, 2021 6:21 PM EST |
| To: | Hicks, Edward C.; Gamble, Robert |
| Subject: | Conversation with Gamble, Robert,Hicks, Edward C. |

Just to remove any doubt although I don't think there should be any. I have your back on this IDWA. We are out of options and time. Shante is the anwer. Scott will have to live with the revenue loss. We compromised our processes when we bid Chem Fab. Now we (including Scott) will have to live with the pain.

# EXHIBIT 4

| | |
|---|---|
| **From:** | Gamble, Robert |
| **Sent:** | Wednesday, January 13, 2021 11:03 AM EST |
| **To:** | Hicks, Edward C. |
| **Subject:** | FW: Chem Fab - Draft IDWA with Water |

FYI – just wanted you to know I responded Scott's latest email. No need to respond.

**Rob Gamble, PMP**
1+ 913-458-8238 **P** | 1+ 303-908-9616 M | GambleR@BV.com

**From:** Gamble, Robert
**Sent:** Wednesday, January 13, 2021 9:01 AM
**To:** Olson, Scott <OlsonS@bv.com>
**Subject:** RE: Chem Fab - Draft IDWA with Water

Scott,

Let's have a one on one to discuss. We need to remember how Chem-Fab came about, we compromised our processes to submit a bid and this is the price we pay for that compromise. Memories get short and selective and should not be lost. The project team is doing everything that can be done to minimize the impact, but facts are facts we are one step away from a cure notice on Chem-Fab.

We spent effort each week from the start of the project looking for a replacement. These efforts were ineffective and you can lay that on me. I have an appreciation for the PGM pressures, but certainly do not have a full appreciation.

The program and project team are doing everything we can to mitigate impacts.

Rob

**Rob Gamble, PMP**
1+ 913-458-8238 **P** | 1+ 303-908-9616 M | GambleR@BV.com

**From:** Olson, Scott <OlsonS@bv.com>
**Sent:** Wednesday, January 13, 2021 8:24 AM
**To:** Hicks, Edward C. <HicksEC@bv.com>
**Cc:** Gamble, Robert <GambleR@bv.com>
**Subject:** RE: Chem Fab - Draft IDWA with Water

This is really troubling, especially considering the financial health of our BU.  I sincerely hope that we came away bruised and battered from fighting and negotiating for that PGM hit and that we didn't simply roll over due to waiting until the last minute and being in a box.  We cannot afford any PGM erosion on our jobs.

Scott

**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Tuesday, January 12, 2021 5:02 PM
**To:** Olson, Scott <OlsonS@bv.com>
**Cc:** Gamble, Robert <GambleR@bv.com>
**Subject:** FW: Chem Fab - Draft IDWA with Water

Scott,
When we budgeted for the bid, we used costs for a Geosyntec field QC guy. His raw direct cost was $130,666. We added $18K for G&A, plus $10,439 in fee, yielding a price (revenue) of $159K.

This IDWA gives Water $187K in revenue for the field work. So basically we're taking a $187K-$159K = $28K PGM hit I believe. Not that that I'm happy with this, but our options have been very limited and time is of the essence.
The as-bid PGM for the construction phase is around $1M.

Ed

**From:** Olson, Scott <OlsonS@bv.com>
**Sent:** Tuesday, January 12, 2021 6:06 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>
**Cc:** Gamble, Robert <GambleR@bv.com>
**Subject:** Re: Chem Fab - Draft IDWA with Water

So how much are we giving away in g&a, OH , and fee? Serious question - need to understand the impact.

On Jan 12, 2021, at 4:03 PM, Hicks, Edward C. <HicksEC@bv.com> wrote:

We did, but Water management nixed that plan.

Get Outlook for iOS

**From:** Olson, Scott <OlsonS@bv.com>
**Sent:** Tuesday, January 12, 2021 5:59:58 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>; Gamble, Robert <GambleR@bv.com>
**Subject:** Re: Chem Fab - Draft IDWA with Water

Thought we agreed that we would be transferring Shante to our group.
Scott

On Jan 12, 2021, at 3:43 PM, Hicks, Edward C. <HicksEC@bv.com> wrote:

Rob / Scott / Nancy,

Please see attached draft IDWA between BVSPC and BVCORP (Water), for use of Shante Mason, the new CQC Systems Manager. The excel file shows how I came up with all the values on the IDWA.

This is a T&M agreement. Water wanted her assigned full time beginning next week, so we plan on integrating her into the team quickly, where hopefully she can free up some time for Carrie and I.

I pulled the form off inet, but not certain it is the most current version. Towards the end, it has some names of people that are no longer in BVSPC.

Laura, could you please check on the form status?

I'm available to discuss any comments or questions any of you may have.

Thanks,

Ed

Edward C. Hicks, PE*, PMP

Project Manager

Black & Veatch, Federal Business

6 Concourse Parkway, Suite 1600

Atlanta, GA 30328

(770) 521-8141 ofc

(678) 471-5450 mobile

hicksec@bv.com email

*Licensed in Georgia, Florida

<BVSPC InterDivisional Work Authorization IDWA Form.docx>
<QCSM Budget R1.xlsx>

# EXHIBIT 5

| From: | Olson, Scott |
|---|---|
| Sent: | Wednesday, January 13, 2021 10:24 AM EST |
| To: | Hicks, Edward C. |
| CC: | Gamble, Robert |
| Subject: | RE: Chem Fab - Draft IDWA with Water |

This is really troubling, especially considering the financial health of our BU.  I sincerely hope that we came away bruised and battered from fighting and negotiating for that PGM hit and that we didn't simply roll over due to waiting until the last minute and being in a box.  We cannot afford any PGM erosion on our jobs.

Scott

**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Tuesday, January 12, 2021 5:02 PM
**To:** Olson, Scott <OlsonS@bv.com>
**Cc:** Gamble, Robert <GambleR@bv.com>
**Subject:** FW: Chem Fab - Draft IDWA with Water

Scott,
When we budgeted for the bid, we used costs for a Geosyntec field QC guy. His raw direct cost was $130,666. We added $18K for G&A, plus $10,439 in fee, yielding a price (revenue) of $159K.

This IDWA gives Water $187K in revenue for the field work. So basically we're taking a $187K-$159K = $28K PGM hit I believe. Not that that I'm happy with this, but our options have been very limited and time is of the essence.
The as-bid PGM for the construction phase is around $1M.

Ed

**From:** Olson, Scott <OlsonS@bv.com>
**Sent:** Tuesday, January 12, 2021 6:06 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>
**Cc:** Gamble, Robert <GambleR@bv.com>
**Subject:** Re: Chem Fab - Draft IDWA with Water

So how much are we giving away in g&a, OH , and fee? Serious question - need to understand the impact.


On Jan 12, 2021, at 4:03 PM, Hicks, Edward C. <HicksEC@bv.com> wrote:


We did, but Water management nixed that plan.

Get Outlook for iOS

**From:** Olson, Scott <OlsonS@bv.com>
**Sent:** Tuesday, January 12, 2021 5:59:58 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>; Gamble, Robert <GambleR@bv.com>
**Subject:** Re: Chem Fab - Draft IDWA with Water

Thought we agreed that we would be transferring Shante to our group.
Scott


On Jan 12, 2021, at 3:43 PM, Hicks, Edward C. <HicksEC@bv.com> wrote:


Rob / Scott / Nancy,
Please see attached draft IDWA between BVSPC and BVCORP (Water), for use of Shante Mason, the new CQC Systems Manager. The excel file shows how I came up with all the values on the IDWA.
This is a T&M agreement. Water wanted her assigned full time beginning next week, so we plan on integrating her into the team quickly, where hopefully she can free up some time for Carrie and I.

I pulled the form off inet, but not certain it is the most current version. Towards the end, it has some names of people that are no longer in BVSPC.
Laura, could you please check on the form status?

I'm available to discuss any comments or questions any of you may have.
Thanks,
Ed


Edward C. Hicks, PE*, PMP
Project Manager
Black & Veatch, Federal Business
6 Concourse Parkway, Suite 1600
Atlanta, GA 30328
(770) 521-8141 ofc
(678) 471-5450 mobile
hicksec@bv.com email
*Licensed in Georgia, Florida

<BVSPC InterDivisional Work Authorization IDWA Form.docx>
<QCSM Budget R1.xlsx>

# EXHIBIT 6



# DEPARTMENT OF THE ARMY
Philadelphia District, CORPS OF ENGINEERS
Southern New Jersey REO
130 North Broadway
Gloucester City, NJ 08030

REPLY TO
ATTENTION OF

April 2, 2021

CENAP-ECC-S                                                    C-0003

Ed Hicks
BVSPC - Envirocon JV
6800 WQ 115th Street - Suite 2200
Overland Park, KS 662112420

Subject:    Parking Area Plan, Support Zone Status and Establishment
            Contract No. 68HERH19D0004
            Chem-Fab Remedial Action Superfund Site
            Doylestown, PA

Dear Mr. Hicks:

   Several issues require your immediate attention. For over a month the government has been requesting a mobilization plan which includes parking for project vehicles until temporary facilities are operational. BV-Envirocon has also been aware of this concern since the start of the project. To date, with mobilization to occur the week of 5 Apr 2021, none has been provided. This is unacceptable. Request this plan be provided and be ready for implementation next week after government approval.

   Also, the site construction support zone should be established as soon as possible, specifically the parking and trailer locations. This area should be ready for trailer delivery, set-up and operational status (electricity/internet/voice communications, etc. per the specifications) within 10 business days of mobilization to the site. The government team needs to be on-site within a functional trailer as soon as possible to effectively monitor site progress while also having the ability to review critical project documents. Request that a plan is provided to the government next week indicating how this will be accomplished.

   Next, there are immediate concerns with the EZ-Storage shared easement access. This access is to be used for easement work on EZ-Storage only. Deliveries and direct loadouts through the shared easement access for trenching, piping, etc. on the EZ-Storage property is acceptable as planned/designed.

- -

However, using this shared easement access to enter the Tilley property easement is not part of the plan and therefore totally unacceptable. BV-Envirocon JV **shall not** use EZ-Storage shared easement to egress through onto the Tilley easement to bring in or out equipment and supplies. Directly related to the parking plan mentioned above, worker parking and/or meeting on the EZ-Storage property is unacceptable. All workers/visitors shall be aware of the off-site parking plan

   Using EZ-Storage for Conex box equipment storage is acceptable based on the condition that the box is placed in close coordination with EZ-Storage management. It is utilized only for overnight storage of equipment/materials. The box shall not be used for frequent worker access during the workday. Worker presence on EZ-Storage shall be kept to a minimum, as absolutely necessary, except for when the work is being conducted on that property. The Conex box will be removed from EZ-Storage and placed to its secure location in the laydown yard as soon as the work allows.

 Securing a rental unit to be used as a temp office is also unacceptable. In this situation using EPA's long-standing relationship with the business to leverage storage space for construction purposes is not in the government's best interest. The EPA does not want construction personnel egressing EZ-Storage all day long. **Periodic** entrance as needed for the work is acceptable as described above.

   If off-site storage is still necessary, you can investigate using other businesses in the area but not the next store neighbor (EZ-Storage) in which the EPA has spent years building a positive relationship. Request that a response/plan is provided outlining how you will comply with this direction concerning EZ-Storage shared easement access.

   If you have any further questions or concerns, please do not hesitate to call me at (856) 325-9874.

Sincerely,

Ian Stewart
Project Engineer

CF:   USEPA/Bob Stank, Huu Ngo
      CENAP-ECC-S/Brian Duffy, Steve Creighton
      CENAP-DP-PM/Sterling Johnson, Tom Gibison

# EXHIBIT 7

| From: | Stank, Robert |
|---|---|
| Sent: | Tuesday, April 6, 2021 1:25 PM EDT |
| To: | Hicks, Edward C. |
| Subject: | RE: Chem Fab - Two Trees by N. Broad |

Yes, agreed.

Let's confirm the other item as well. You are not authorized to do anything unsafe and you are expected to follow your mobilization plan. We didn't make it 15 minutes on the first day. Let's work to do better.

**Bob Stank**
Remedial Project Manager
Superfund & Emergency Management Division
USEPA - Region 3
1650 Arch Street (3SD21)
Philadelphia, PA 19103

Phone: (215) 814-2051
Cell:     (215) 740-7190

*stank.robert@epa.gov*



**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Tuesday, April 6, 2021 1:20 PM
**To:** Stank, Robert <Stank.Robert@epa.gov>
**Subject:** Chem Fab - Two Trees by N. Broad

Bob,
This email to confirm our conversation just now whereby you agreed it is acceptable to remove the two trees onsite in conflict with the site entrance, even though one of the trees is just beyond the easement limit. As I mentioned, the tree just beyond the easement line would almost certainly die because its roots will be damaged in order to install the concrete entrance apron.  You indicated EPA will likely plant new trees at select locations close to construction completion.

Edward C. Hicks, PE*, PMP
Project Manager
Black & Veatch, Federal Business
6 Concourse Parkway, Suite 1600
Atlanta, GA 30328
(770) 521-8141 ofc
(678) 471-5450 mobile

hicksec@bv.com email
*Licensed in Georgia, Florida

# EXHIBIT 8

Product Recovery Management, Incorporated
200 20th Street
Butner, NC 27509
(919) 957-8890

May 1, 2021

Mr. Rob Gamble
Black & Veatch
4600 S Syracuse  St., Suite 800
Denver, CO 80237

RE:    Chemfab Project
       Notice of Employee misconduct against a PRM employee
       Notice of Substantial Delays

Rob,

After consultation with our internal team yesterday, we felt it necessary to issue this letter as we feel that there are risks to PRM and our staff that are a result of the replacement of Ed Hicks with Chris Stone as the project manager.

**Item #1:  Discipline**
Yesterday, April 30th, 2021, Tim Vernia, our working Superintendent on the job was in a project meeting with site staff.  Present were Chris Stone, Jan Decker, Tim Vernia, Rob Gamble as well as others.  During the meeting, Tim tried to speak to the project conditions and work and he was shut down by Chris Stone with excessive yelling which was demoralizing.  After consulting with Tim and how this affects his personal morale, I have found out that not only does this affect him, but the actions of Chris have been consistent and they affect site morale with PRM as well as Black and Veatch employees.   This is notice that if the action occurs again against our employees, we will ask Black and Veatch to replace Chris Stone from working on the project with PRM employees.

**Item #2:  Site Shutdown and Associated Costs**
Yesterday morning, I had a call with Tim Vernia at approximately 7:30 AM where he notified me that things were going South for the day as he was shutting down the job.  I then spoke to Chris stone at 7:45 AM where he advised me he was hitting the reset button and fixing all of the site



deficiencies that existed which would have been PRM issues as well as Black and Veatch issues.  This of course caught everyone off guard at the site, including your field management. The cost of doing this yesterday was substantial as we had 14 loads of rock scheduled and lots of productivity in play.  We do understand that the day before that the geotextile material for the laydown yard was found to be a non Buy America product even though the brand was specified. My request was to allow the rock to continue and we would mitigate the issue with the fabric. Infact, we were able to secure the product on Friday for Monday delivery.

The result of this shutdown caused significant issues that I think Chris realized after the fact. This  destroyed our plans for next week onsite with the trailers which were scheduled for Monday and Tuesday.  **As a result we lost those 2 trailers**. The difficulty of finding trailers right now is a serious challenge.

It is important to identify that Chris consistently advised the specification and process of how work is planned and executed is key and important. I cannot agree more however after things were shut down, after lunch, Chris took the efforts to press us to get trailers back on Monday a with a radical (his words) plan to save the project and get trailers back on Monday and create an artificial area for a trailer to get the EPA a spot.  We complied and took the efforts to make this happen with the best possible delivery on Tuesday.

***The actions Chris took on Friday morning have a financial impact to PRM which may be $20,000 to $30,000 in the coming weeks that are real costs.***  I'm not asking for a financial offset right now for this however I need Black and Veatch to understand that Chris is making poor  decisions and they are affecting our schedule and our finances.

**Item # 3: Progress on RFIs**
I advised Chris yesterday of the importance of the RFI for raising the slab which I identified on Tuesday with Jan. The RFI was written quickly and was presented to Chris to review so we could get it out.  When I discussed this RFI yesterday with Chris, he confused this RFI with the Structural Foundation/Slab plan but after an explanation, I was advised that this was not an important item right now and he did not have time for it.  My comment to Chris was that it is important and that Black and Veatch has a substantial and experienced team to help with pushing these items along.  My experience on projects like this are that Field RFIs move quickly and here we are 5 days later and it has not moved. **I consider this a delay to PRMs schedule and productivity as it will delay the answer.**  Recommendation:  Use the teams experience and allow Jan Decker to push the RFI out.



### Item #4:  Foundation/Slab

I have consulted closely with Jan over the past several weeks.  We all agreed that the plans supplied by HGL are the design drawings we are instructed to build from.  We identified about 6 weeks ago that we need to update the drawings for the Field Construction crew as the HGL design drawings lacked clarity.  After turning drawings into Anja for review about 3 weeks ago, Anja identified to us some substantial deficiencies. This led to PRM engaging 3 Engineers to focus on design deficiencies and ultimately I hired a PE to work with our draftsperson to redo the drawings.  We made the necessary changes.  PRM has incurred roughly $15,000 in costs to date just getting to this point.  I had several calls this week with the engineer verifying all calculations and he identified to me that the HGL drawings submitted are inadequate by a large margin.  Another engineer has advised soil conditions also play into this.  ***We cannot build a foundation that is inadequate***.    On Tuesday, Chris identified to me that this is a basis for a change and the information has been supplied to Black and Veatch.  We would like to push this along as well.  PRM is not trying to blow up a profit here.  It's not what we do.  We do however need to push this along quickly as delaying this could require a  very expensive demobilization and remobilization to the site soon.   My recommendation is to allow us to work closely with Black and Veatch Staff to push this along.

### Item #5:  Site Oversite

On Friday, Chris Stone advised me that PRM needed to replace Tim with another Superintendent or Construction manager onsite that was a EM385-1 expert to allow us to press forward on the project with more direction.  I pondered on this and told Chris that I would think about it.  PRM has constantly has resources available to project, including our Kevin Hahn who works non-stop to help our field guys along.  I advised Chris that I would supply a PRM employee to the site who is a PE and well experienced construction guy.  He is also native to the Doylestown area even though he works for us in NC.  Chris shot down the offer and advised it had to be a 385 guy and he had a few friends he might connect us with.  I need to make it clear that if we are deficient here, we will staff someone of our choice but I don't think this is the case.   I did ask Jan  if we needed a separate manager and he advised us no.  I did not explain the request from Chris but I think he understood.   I did advise Chris of the project Tim just came off of. It was a 6 month Army Corp project at Camp Lejeune where he was accommodated for his performance.  He was the working Superintendent for PRM on that project and did a great job.

It's also worth mentioning that I discussed this topic with Tim this morning and Tim advised me that he has not only studied EM-385.1 but he keeps the app on his phone and he uses it routinely for reference.  A few days ago Chris advised  Tim that the portable generator was not



grounded properly and Tim advised Chris that portable generators are not required to be earth grounded. He pulled up EM-385.1 on his phone and he showed the section to Chris to make sure he understood it.  Chris advised Tim that he did not know that there was an app.

### *Item #6*
On April 23rd, I was told that there might be an issue with Easement access for the property with the recovery wells.   I was told that others already knew this but in our last Tuesday meeting (before mobe) with everyone on the phone, I asked if we had the easements complete and I was told yes in that meeting. I was advised they had been signed. I wish that they had advised that some of the easements had been signed.    Communication is King.  I did have a separate crew of 3 that was scheduled to roll in right after the first crew.  Their objectives besides helping with the road were to split teams and attack the recovery wells.   This was one of the reasons I was pressing CO#1 so hard which I think finally was accomplished this week. These things bare weight of Bob's questions which came out while I was onsite on Tuesday.  He asked me why we had such a slow start.  I did not get into the answers directly with him as it's out of sequence.  I think Chris was probably trying to explain things to him but I was not privy to those conversations.  I think this is a good spot for me to explain a few things here, just in case they are relevant to information Black and Veatch needs to pass along.

-The first 1.5 weeks onsite were held up  while onsite because of Permit issues with the silt fence. This was after mobilization.  This shut down PRM from sticking a shovel in the ground. My understanding after the fact was that Black and Veatch  had to scramble to get this handled. No fault of PRM but we tried not to make a big issue of it.
-Lack of CO1 pushed off us sending a 2nd crew and thankfully it was the right decision, otherwise we would have had the additional expenses of 3 guys to support for full days including perdiem.  That CO1 was just completed this week.

### Summary
PRM understands that there may be things in play that we do not understand, but we ask for transparency.  The more I understand, the better we can perform.  We also ask for respect onsite and we are not getting that from Chris.

I have asked Chris to document deficiencies.  His first response yesterday morning was that he was too busy and it would be the end of the weekend before he got to it.   I don't understand this as what we are doing onsite is pretty important.  By mid day yesterday, I got out of him that he would get me an email yesterday to lay out a broad overview of the issues. I did not receive that.  I'm hoping that things start rolling in today.

PRM has 2 more employees onsite Monday.  We will be impeded due to the actions of Friday. Our intent is to play catch up and get ahead of the game.

We need Black and Veatchs help on the RFI and the slab asap.  I am available all weekend to go through any details necessary to support forward movement.

Looking forward to finding our way to success on the project.

Thanks,

Mel Phillips
President
Product Recovery Management, Inc.

# EXHIBIT 9

| From: | Stone, Chris |
|---|---|
| Sent: | Sunday, May 2, 2021 1:47 PM EDT |
| To: | Kevin Hahn; Mel Phillips |
| CC: | Gamble, Robert; McCoy, Carrie; Hicks, Edward C.; Mason, Shante; Huynh-Ba, Gia; Dekker, Jan |
| Subject: | Incomplete Submittals and Corrective Actions Needed |

Kevin/Mel,

I will review the partial Standard Lift Plan for the vault pick if I get a chance, but as Kevin mentioned, please keep moving forward with its completion. For now, BV must insist on complete submittals even for review, as we are swamped with corrective action items and fending off our client with promises of corrective actions. Please call one of us if you have a specific question, but an interim review is tough right now.

BV has identified multiple items on site that must be improved or corrected before substantial progress can resume. We can present formal notice if you would prefer, but we were hoping to keep it informal at this time. I will be providing my suggestions to you for priorities of tasks in the field over the next few weeks starting tomorrow. It is not direction and you do not have to follow those suggestions, but your work might be halted if safety or quality issues demand. Please keep in mind that PRM needs to get at least two weeks or more out in front of most field planning and possibly longer if permits or other Government approvals are needed. To that end, please provide by 12:00 pm tomorrow a two-week look ahead for all activities you are planning for the period starting tomorrow for my review.

As PRM is entering this corrective phase, I believe it would be helpful if you reset your thinking in regard to some key milestones upcoming. For example, I mentioned on Thursday that the USACE would not rely on our judgement or our risk tolerance for concrete cure time, only hard data. They have said as much specifically. Similarly, the water tap will need significant coordination per the Government's safety and quality systems in order to begin.

With the corrective actions PRM must take and to complete effective planning moving forward, I feel we might all acknowledge that most of May will be taken up by PRM just getting the site really ready to support the project and preparing for the building slab installation. This acknowledgement will help PRM and BV to gain perspective on recognizing where the project is in terms of progress and to accurately project future milestone dates internally and to the Government. Then, you might find some ways down the road to regain a little schedule like the building being erected quickly by a first-time correct specialty sub or other pushes to be identified when you have time to look up. BV can also offer suggestions in these unless PRM is not interested in that offer of assistance and if I have underestimated the progress of acceptable work to come in May from PRM, then I will stand corrected at that time.

To clarify the magnitude of the corrective actions needed in order to progress, please see the following non-exhaustive list of current examples:

- Materials onsite from India and failure to comply with material submittals approved by the Government.
- Flagging personnel and signage per EM 385-1-1 and PA DOT standards to bring all deliveries onsite.
- Compliant fuel storage onsite per EM 385-1-1 and all NFPA standards referenced therein.

- Temporary site water supply from an acceptable source and an effective means to apply it for dust control and cleanup as required by specifications.
- Provision of a plan to protect the median on N. Broad Street from potential crossings. BV has gained permission by the Borough for PRM to cross the median, but only with the promise of advanced notice, flagging per PA DOT standards, and repair of and substantiated damages.
- Provision of temporary offices as specified per the approved schedule and site plan. (BV has secured a mild reprieve from the Government to enable PRM to provide the interim fix of two Mobile Mini-like offices with adequate temporary power properly installed, until the approved site plan can be fully realized.)
- Supplying a roll-off bin(s) for construction and sanitary wastes OR establishing a practice of removing such waste daily until such time as bins and be provided and staged. If removed from the site, the waste must be properly handled, stored, or disposed of including specifically not through the dumpsters owned or controlled by others. Construction waste is primarily comprised of excess materials and packaging for construction materials at this stage of the project.
- Maintaining proper site housekeeping and construction material storage. Prior to Friday, 30 APR 2021 housekeeping practices at the site were not acceptable. The two PRM personnel onsite Friday did a good job of improving housekeeping at the site. This level of housekeeping is expected to be maintained throughout the project.
- Extensive planning and coordination for impending cut of N. Broad Street and water tap including flagging personnel and signage per EM 385-1-1 and PA DOT standards, other requirements for tapping into an active line, and one week advanced notice to the Borough before the work starts.
- All of the above will require an increase of the PRM crew size, even without progressing the project. In my opinion, that increase needs to be at least 200% over where you were this week and a greater increase than that, including a non-working Superintendent, would be even better, but of course that's your call.

I understand that some of these items are currently being addressed. Please be aware that those actions taken need to be fully addressed to complete the deficiencies. In addition, any materials stored onsite that might be perceived by the Government as less than that promised via submittal, must be removed first and foremost. BV can offer advise and support for identifying all of the requirements for upcoming work, but will not provide direction of the work.

I can't know if the road as currently built will be accepted, but it needs to be improved to accept heavy traffic and Government vehicles. It is your prerogative to start over on the road at this point if you believe that is needed. I think repairs might ultimately be achieved, so in my opinion you should continue to try and progress the project. Either way, PRM must make the temporary road safe and passable to all that will use it.

As always, I'm here to help. Please call with any questions.

**Chris Stone, PMP | Program Manager**
Black & Veatch Federal Division **|** 16305 Swingley Ridge Road, Suite 230, Chesterfield, MO 63017
1+ 636-536-5812 **O** | 1+ 314-422-2296 **M** | StoneCL@bv.com

**Building a World of Difference.®**

# EXHIBIT 10



Black & Veatch-Envirocon Joint Venture
6800 W. 115th, Suite 2200, Overland Park, KS 66211

May 3, 2021

Product Recover Management
ATTN: Mel Phillips, President
200 20th Street
Butner, NC 27509

**SUBJECT:  Response to 02 MAY 2021 Notice Letter**

Dear Mel,

Dear Mel,

Black & Veatch Special Project Corps (BVSPC) acknowledges receipt of the subject letter to me on 02 May 2021. This response provides a point-by-point response to each of the six items in the subject letter below.

**Item #1: Discipline –** I was present at the morning safety meeting on 30 APR 2021 and acknowledge that the situation described in your letter should have been handled more professionally by myself and Chris Stone. During this meeting, Mr. Stone was making immediate adjustments to the work plan for the day in consideration of the number of deficiencies and adverse events that occurred during a site visit by the U.S. Army Corps of Engineers (USACE) on 29 APR 2021. On 29 APR 2021, USACE informally identified deficiencies in site infrastructure including but not limited to fuel storage, suspect counterfeit construction materials onsite (geotextile), and inadequate construction personnel and equipment available to safely receive aggregate and material deliveries. During the referenced event, Mr. Stone was communicating the change in the work plan for the day, Mr. Vernia attempted to interject and the situation got heated. I would not describe what occurred as excessive yelling, however, the interaction is not consistent with BVSPC values and as we discussed, I counseled Mr. Stone on this topic and will follow up appropriately.

On 29 APR 2021, I attempted to schedule a meeting with you, Kevin, and Chris to discuss 30 APR 2021, but we were not able to connect. This situation could likely have been avoided had we communicated the adjustments to the Friday work planning the day prior and not caught the crew off guard with last-minute adjustments to the work plan.

**Item #2 Site Shutdown and Associated Costs** – The PRM stated delay claims in this item have no validity on their face and are not supported by the evidence of fact. On 30 APR 2021, PRM did not have adequate resources on site to receive the claimed 14 loads of rock scheduled for the day. On 30 APR 2021, PRM had two personnel onsite. This level of staffing is not adequate for receiving the stated number of rock deliveries. Additional personnel is needed to safely implement traffic control measures for rock and other deliveries at the site entrance. On 29 APR 2021, USACE and BVSPC personnel witnessed at least one delivery with no traffic control signage or personnel at the site entrance. The two PRM crew members were occupied performing another task at the time of this delivery. Deliveries at the site without appropriate traffic controls that include placement of warning signs and deploying flag personnel create an unacceptable hazard. Previously, BVSPC site supervision has accepted and enabled rock and other deliveries with inadequate PRM personnel available. BVSPC personnel  has  served as  flag persons and spotters. I provided direction last week that this practice is to end. Considering this condition, it is advised that the PRM review Sections 00564.3 – Safety Requirements and Section 00564.6 – Labor of subcontract number 20-0144-49113 regarding safety and labor staffing requirements.



BV understands the difficulty in sourcing site trailers in this Environment. BVSPC and PRM mobilized on 06 APR 2021. Specification section 01 50 00, Paragraph 3.6.A details timing requirements for establishing the government field office. BVSPC and PRM are currently non-compliant with the timing requirement for the availability of the government field office. The actions taken by Mr. Stone are the result of a compromise with the U.S. Environmental Protection Agency as an interim measure to meet field office needs for the project team and customer.

**Item #3 – Progress on RFIs** – In principle, I agree that field requests for information (RFIs) need to move quickly during the construction phase. I however disagree that the processing of this RFI will result in a delay to the schedule considering the number of corrective actions that are necessary to safely resume productive work. BVSPC and PRM are in non-compliance with several contractual and safety-related requirements. These contractual and safety-related non-compliances must be remedied before resuming productive work. Considering the situation, BVSPC has the choice to stop and address the non-compliances and adequately staff the project ourselves or allow USACE to stop work and identify required corrective actions.

**Item #4 – Foundation/Slab** – I cannot comment on the adequacy/inadequacy of the HGL building foundation and slab design drawings. Referencing the Remedial Design document, the Treatment Building is performance-based which does not work in our favor regarding changes. During the site visit last week, I witnessed interaction with Mr. Stone and the USEPA Remedial Program Manager (RPM), Bob Stank. Mr. Stone addressed the issue with the RPM and the initial response receptive to a change for this work element. This is an example where the change in BVSPC project management can benefit PRM. Mr. Stone has considerable experience in change management and recovering equitable compensation for changes. Based on witnessed actions, Mr. Stone is an advocate for both BVSPC and PRM in recovering compensation for changes.

As for the PRM Building Foundation/Slab submittal, BVSPC received it on or about 26 APR 2021. Adequate time is required for BV review of all PRM submittals and understand the importance of this submittal approval to support the construction schedule and will expedite the review. We will also communicate the need date to USEPA/USACE. USEPA/USACE have by contract 30 days for submittal review, however, based on analysis of review turnaround times they are averaging 14 days. PRM needs to understand that it is unreasonable to request or expect a compressed USEPA/USACE review schedule for all submittals. I understand the complications and extra work required to prepare the Building/Slab submittal, but it was completed considerably late to support the construction schedule.

**Item #5 – Site Oversight** – There was discussion regarding Mr. Vernia's suitability as PRM's Superintendent and someone with experience with EM 385-1.1 is needed/recommended. During the referenced conversation the topic of replacing Mr. Vernia was discussed. Upon further consideration, one mitigating factor regarding Mr. Vernia is that to date, he has functioned more as a working foreman than someone in a Superintendent role. It is not reasonable to expect an individual to perform the functions of a Superintendent and provide 50% of the onsite craft labor force for the project. Mr. Vernia is a diligent and hard worker but based on observation to date in the function he is performing, suitability for the Superintendent role cannot be assessed.

Any discussion regarding specific PRM staffing with Mr. Stone and specific individuals are simply suggestions and I agree that it is PRM's purgative to staff the project with personnel of your choosing, with exception to the Project Field Manager (Superintendent) as described in Section 00564.6 of subcontract number 20-0144-49113.

Lastly, this item references conversations with the BVSPC Project Superintendent regarding PRM site

E



Black & Veatch-Envirocon Joint Venture
6800 W. 115th, Suite 2200, Overland Park, KS 66211

management which in this context can be interpreted as the contractually required Project Field Manager. Please be advised that the BVSPC Project Superintendent has no authority to alter subcontract terms and conditions with PRM.

**Item #6 – Unspecified Title** – This item addresses a broad range of topics and makes assertions regarding timing and mobilization of additional crews, the need for communication, possible delay caused by BVSPC during the first 1.5 weeks. Based on reading and re-reading this item, I can only determine that the point being presented is that greater communication is needed/desired. In Item #6 there is an assertion that PRM has was prepared to mobilize additional personnel to perform work on the recovery wells and lack of easements and finalization of CO#1 was needed to allow this to occur. Please be advised there are additional predecessors to performing this work. Predecessors include but are not limited to the performance of preparatory meetings for this definable feature of work, material receipt and inspection, personnel mobilization, qualification and training, designation of competent persons as applicable, and development and review of activity hazard analyses. This work cannot be unilaterally accelerated in the schedule by PRM as some of the functions described above are performed by BVSPC. In situations such as this, please reference Section 00563.4 – Weekly Progress and Schedule Review, specifically subsection 00563.4.3 – Subcontractor's look ahead schedule. This subsection outlines the appropriate means and methods for communicating planned work for the current week and next two-week periods in support of the overall construction schedule.

**Summary**- Based on the review of the 01 MAY 2021 Notice Letter, I believe that PRM does not recognize the gravity of our current situation on the Chem Fab Project. Both BVSPC and PRM signed up to a challenging contract and subcontract, with an aggressive schedule, and demanding customer. The customer, USEPA, and their agent, USACE expect BVSPC to fulfill the requirements of their contract likewise BVSPC expects PRM to fulfill the requirements of their subcontract. As of this writing, BOTH BVSPC AND PRM ARE FAILING TO DELIVER UNDER THEIR RESPECTIVE CONTRACTUAL AGREEMENTS. The decision to change BVSPC Project Management was not arbitrary, it was made because the change was necessary. The assignment of Mr. Stone as the Project Manager provides a greater probability of success in navigating this difficult situation by virtue of his experience and qualifications on similar projects and those managed using USACE systems. I have addressed the issue described in Item #1 and based on feedback from Mr. Stone, approaches have been devised to prevent conflict. Understand Mr. Stone has my full support and confidence to implement the necessary corrective actions to successfully recover the project and bring it to a successful outcome.

The performance of the overall project team up to mobilization has been good. Both parties have experienced missteps since mobilization initiation and corrective action is necessary. The BVSPC Team is here to support PRM and committed to making the corrective actions necessary to deliver the Chem Fab Project safely and with a high level of quality. If you have any questions concerning this response, please contact me.

Sincerely,

Robert D. Gamble, PMP
BLACK & VEATCH-ENVIROCON JOINT VENTURE

# EXHIBIT 11

| | |
|---|---|
| **From:** | McCoy, Carrie |
| **Sent:** | Tuesday, April 20, 2021 12:34 PM EDT |
| **To:** | Geller, Nancy D.; McCoy, Carrie |
| **Subject:** | Conversation with Geller, Nancy D.,McCoy, Carrie |

Chem-Fab is a beast and the client has no patience for excuses why we aren't adhering to our plans.

# EXHIBIT 12

| | |
|---|---|
| **From:** | Jenkins, John W. |
| **Sent:** | Thursday, April 22, 2021 2:49 PM EDT |
| **To:** | Geller, Nancy D.; Jenkins, John W. |
| **Subject:** | Conversation with Geller, Nancy D.,Jenkins, John W. |

just indicating we are not mature enough in construction to easily pull off a Chem Fab.....when I mentioned that I heard it was a difficult client, he said don't drink that cool aide......basically said that staff story vs client is like friends who divorce...the true story is somewhere in the middle........a bad message from someone who is dependent on so many staff

# EXHIBIT 13

| From: | Schlagel, Anja |
| --- | --- |
| Sent: | Wednesday, February 17, 2021 4:44 PM EST |
| To: | Dekker, Jan; Dekker, Jan |
| CC: | McCoy, Carrie; Hicks, Edward C.; Mason, Shante; McCoy, Carrie; Hicks, Edward C.; Mason, Shante |
| Subject: | RE: Chem Fab - Structural Support; Treatment Building Review |
| Attachments: | 168512 Preliminaries Treatment Building 20210203.pdf, 168512 Design Calculations.pdf |

Jan,

I started my review with the design assumption/structural calculations provided in file 168512 Design Calculations (Schulte) which were checked against specification design requirements and then confirmed that the provided ARCO drawings met the design.

1. Four design specifications/code referenced were used for the building design. All of them do not meet specification 13 34 19  requirements, as they are outdated (AISC Design Manual, AWS D1.1/D1.1M and IBC) or different documents than referenced in the specification (cold formed steel design reference).

2. Please note, that the spec reference to ASCE 7 (2017) is incorrect.  It should read:  ASCE 7-16 Minimum Design Loads and Associated Criteria for Buildings and Other Structures.

3. The specification is a mix of current codes and UBC values, and I am assuming that the more stringent of the two requirements shall apply.  Example, wind speed per spec is 90mph, but spec also calls for ASCE 7-16 which results in 114mph.  ARCO/Schulte is incorrectly using ASCE 7-10/IBC 2015, but wind speeds per that are 115mph, so there doesn't seem to be an immediate design impact.

4. Thanks to the spec seismic is also a little woozy. The specification calls for the UBC based Seismic Zone 2a in paragraph 1.2.2 of 13 34 19, which obviously does not work at all with ASCE 7-16. The design calculation by Schulte is based on "Seismic Zone B", which doesn't make any sense either. However, the ARCO drawings list Seismic Design Category B, and reviewer assumes that design software labeling is antiquated and as such confusing. ARCO drawings list the seismic accelerations per ASCE 7-10/IBC 2015, which I assumed are what was considered in the design, and is actually in excess of the ASCE 7-16 requirements, so seismic values are fine. The only caveat to that is the assumed Site Class C, that is driven by the geological site data that was not available to me, so I cannot confirm if 'C' is ok, or if the more commonly used 'D' (resulting in higher accelerations) should be used.

5. I could not confirm what roof snow loads were assumed for the design.  The spec provides a ground snow load of 30psf but also asks for considerations of unbalanced and drift loads, and there is no separate calculation explaining how to go from ground snow to applied roof load. I only know that load combinations considering snow load were included in the design. There are some ASCE 7-16 equations that IMO would result in a 21psf roof snow load but I cannot confirm that this is what Schulte used for the design.

6. Live Loads (LL): there is no value indicated in the Schulte design file, but load combinations include LL, just not sure where that value comes from and if it matches the 30psf roof LL indicated on the drawings (which seems to be a little low,  B&V typically uses 50psf).

7. Dead Loads (DL): there is nothing in the design calc that explains what values were used for the roof, panel DL (roof and wall), whether this includes allowances for overhead loads due to mechanical, electrical, plumbing (MEP or collateral) as required by paragraph 1.2.1.6 of spec 13 34 19.  However, the ARCO design drawings list MEP loads as 5psf, just not sure how all that fits together.  The ARCO drawings do not provide weights for the roof or wall panel, and as previously indicated, I have no idea what was assumed for the design.

8. Schulte's steel design is very automated, where one inserts the Wind Code and Seismic Zones (albeit based on older codes than what the spec requires), and the program automatically populates design loads. Problem is, that the way this design report was created, one goes straight from these two design inputs into reactions and design results, so I cannot confirm what wind speeds or seismic accelerations the design is based on. I am assuming that the engineer chose not to print design input data, which as stated above makes it impossible for me to verify any design inputs.  The design file does not allow for easy verification of building geometry, incl. building size, member locations and size, member framing conditions (pinned vs fixed). There are no graphic outputs that allow for easy confirmation of anything. There seems to be connection design, baseplate design etc, but it's all in table form and without any graphics I gave up trying to confirm accuracy of anything.

9. Per specification 13 34 19, Section 1.6.2.C "certified engineering calculations" shall be provided for the building loads. I can only find them listed on the ARCO drawings, without explicit calculations explaining assumptions and how numbers were derived. I have no idea if Schulte used the values indicated on the ARCO drawings.

10. I would have liked to see a detailed reaction summary in the design file that shows which column is which, and what reactions occur at each location, that allows to link the design output with the ARCO design drawings. As it stands I can only assume that both are for the same structure.

11. Neither Schulte nor ARCO has certified/sealed the design or drawings, which is a specification requirement.

12. As discussed over the phone, I did not check any architectural items. As such, I did not confirm adequacy/spec compliance for any paneling, detailing etc and just stuck with my structural stuff.

In summary, I was unable to confirm all design input values, and the design is based on outdated code references that are non-spec-compliant. Contractor needs to update code references and the design calculation by Schulte needs to be overhauled to be checkable and allow for verification that design calc and ARCO drawings are for the same structure and identical design assumptions and results. Lastly, design calculations and drawings need to be certified by a licensed professional engineer. I would assume a PA P.E. should do, unless there are other contract requirements to the effect.

I also looked at Appendix A from HGL, and I can only hope that their design inputs for the foundation design will be updated to match specification requirements and the column reactions provided on the ARCO drawings.

Please let me know if additional clarifications are required.
Thanks,

**Anja Schlagel, P.E.***
C/S Project Engineer, SPC
*Licensed in KS
Black & Veatch
6800 W. 115th St., Suite 2200, Overland Park, KS 66211
D +1 913-458-7047
E SchlagelA@bv.com

**Building a World of Difference.***

# EXHIBIT 14

| | |
|---|---|
| **From:** | Schlagel, Anja |
| **Sent:** | Wednesday, April 7, 2021 2:40 PM EDT |
| **To:** | Hicks, Edward C.; Hicks, Edward C. |
| **CC:** | Dekker, Jan; Mason, Shante; McCoy, Carrie; Dekker, Jan; Mason, Shante; McCoy, Carrie |
| **Subject:** | RE: Updated on Reinforcement Drawing - Chem Fab |
| **Attachments:** | Foundation Dawings.pdf |

Ed,

Please find attached my red-lines of the drawings submitted. I tried my best to find all issues, provide adequate code and specification references for resolution, but I wanted to give you the heads-up that this effort took 6 hours, and I am not sure if I missed anything considering the quality of these drawings. If this would have been a submittal for DOR review, I would have E-coded it without hesitation and rather quickly.

I am assuming that there will be a call with the sealing engineer to go over these comments.

Thanks,

**Anja Schlagel, P.E.\***
C/S Project Engineer, SPC
*Licensed in KS
Black & Veatch
6800 W. 115th St., Suite 2200, Overland Park, KS 66211
D +1 913-458-7047
E SchlagelA@bv.com

**Building a World of Difference.**\*



**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Monday, April 5, 2021 1:53 PM
**To:** Schlagel, Anja <SchlagelA@bv.com>
**Cc:** Dekker, Jan <DekkerJ@bv.com>; Mason, Shante <MasonS2@bv.com>; McCoy, Carrie <McCoyCE2@bv.com>
**Subject:** Updated on Reinforcement Drawing - Chem Fab

Hi Anja,
Looks like we'll have this drawing later today. Hopefully you can still get right on your review!
Thank you!

# EXHIBIT 15

| | |
|---|---|
| **From:** | Dekker, Jan |
| **Sent:** | Wednesday, April 28, 2021 3:46 PM EDT |
| **To:** | Schlagel, Anja |
| **CC:** | Hicks, Edward C.; Mason, Shante; Stone, Chris; McCoy, Carrie; Gamble, Robert |
| **Subject:** | RE: Foundation Drawings, Chem-Fab Treatment Building |

Friday works, we also need time for our strategy on the submission since the slab is so much more than the original bid design on the HGL PE stamped drawings. Any statements you can provide for required additional rebar or concrete thicknesses may be beneficial verses the original design picture on the HGL civil drawings. Nothing to detailed in that regard, just some observations you may note during your review. By all means call me with any concerns tomorrow or Friday on my cell, 816-419-1955,
Thanks Anja,

**Jan Garrett Dekker** | PROJECT FIELD MANAGER
**Black & Veatch - Building a World of Difference**™
*While creating a Zero-injury and Engaged workplace*
8602 NE Zac Lentz Pkwy, #418 Victoria, TX 77904
☎Cell Phone: (816) 419-1955
**E-**✉ mailto:DekkerJ@BV.com>

---

**From:** Schlagel, Anja <SchlagelA@bv.com>
**Sent:** Wednesday, April 28, 2021 1:35 PM
**To:** Dekker, Jan <DekkerJ@bv.com>
**Subject:** RE: Foundation Drawings, Chem-Fab Treatment Building

Jan,
What is my dead line, other than yesterday? I am trying to wrap up a submittal for another project that I am already late on, so is Friday enough? I looked, and all other folks in the department are busy as well, so I cannot hand it off either.
Thanks,

**Anja Schlagel, P.E.***
C/S Project Engineer, SPC
*Licensed in KS
Black & Veatch
6800 W. 115th St., Suite 2200, Overland Park, KS 66211
D +1 913-458-7047
E SchlagelA@bv.com

**Building a World of Difference.**ᵃ



**From:** Dekker, Jan <DekkerJ@bv.com>
**Sent:** Wednesday, April 28, 2021 11:43 AM
**To:** Schlagel, Anja <SchlagelA@bv.com>
**Subject:** Foundation Drawings, Chem-Fab Treatment Building

Hi, Anja,
How's your schedule looking for this review?
Thanks ahead of time for your support,
Jan


**From:** Mel Phillips <mel.phillips@prmfiltration.com>
**Sent:** Wednesday, April 28, 2021 12:17 PM
**To:** Schlagel, Anja <SchlagelA@bv.com>
**Cc:** Stone, Chris <StoneCL@bv.com>; Hicks, Edward C. <HicksEC@bv.com>; Dekker, Jan <DekkerJ@bv.com>
**Subject:** Fwd: dRAWINGS

# Anja,
# Here are the updated drawings and supporting calculations. Things got updated significantly when we factored the loads of tanks w water in the buildings.

Mel Phillips
*President*

| | |
|---|---|
| cell: | (919) 451-2635 |
| direct: | (984) 243-2242 |
| main: | (888) 873-2848 |
| address: | 200 20th St, Butner, NC 27509 |
| website: | www.prmfiltration.com |
| email: | mel.phillips@prmfiltration.com |



# EXHIBIT 16

| From: | Stone, Chris |
|---|---|
| Sent: | Wednesday, May 5, 2021 7:41 AM EDT |
| To: | Gamble, Robert |
| CC: | Hicks, Edward C.; McCoy, Carrie |
| Subject: | Site Grade Issue at Chem Fab |

All,

As far as I am concerned, we are back in a holding pattern on major activities. The discussions regarding the elevation of the building are not complete. BV Superintendent Jan Dekker is adamant that the grade will "all work out" in order to move forward and that I should "not worry about it." I am worried about it.

In my experience, completing work and then asking the client to approve is called negotiating with a gun to their head. In other words, what real choice would they have. PRM and Jan Dekker are pushing to complete the Laydown Area as soon as we get the nod on the revised submittals. The Change Order regarding the truck turnaround area says we will excavate 6" from the existing grade. At 175' by 175' area, that would be over 500 CY of cuttings. That stockpile does not exist. They have basically cleared and grubbed only at this point. We are designing "on the fly."

It also seems the road is already too high at the point it reaches the parking lot. Not sure how much but Jan Dekker says he did that because he didn't want to excavate the "good material" in that area. These two issues are strong motivations to PRM and Jan Dekker to get the building elevation raised. My inclination is to force PRM to cure all to the Change Order and the Civil Plan. If we do that now, we will prevent the wrath of the client in the future or a "stop work" if they tire further of our lack of planning in the field.

I feel that if I can see these issues, then the USACE and Bob Stank already have and are watching to see if we will allow PRM to dictate this to BV. I have been onsite when grade errors are made early and ignored. The end of the project can be no fun. I know the risks of surface water runoff from the Storage Property into our excavations and eventually into the building are real. My inclination is to tell the EPA that the trees must come out, place the building at its designed elevation, and then do the best we can at shaping what we have at the eastern limits of the site to prevent surface runoff and infiltration.

Please call me immediately if you feel strongly we should angle for increased height on the site.

**Chris Stone, PMP | Program Manager**
Black & Veatch Federal Division **|** 16305 Swingley Ridge Road, Suite 230, Chesterfield, MO 63017
1+ 636-536-5812 **O** | 1+ 314-422-2296 **M** | StoneCL@bv.com

**Building a World of Difference.®**

# EXHIBIT 17

| | |
|---|---|
| **From:** | Hicks, Edward C. |
| **Sent:** | Wednesday, May 12, 2021 2:39 PM EDT |
| **To:** | Dekker, Jan; McCoy, Carrie |
| **Subject:** | FW: PRM Revised Dwgs and Calcs |

Jan,

As you will see, I went ahead and forwarded PRM's revised submittal to Anja to see if PRM had addressed her most critical comments. They really did not. I think we are flirting with disaster here, if we don't have PRM's engineer address Anja's comments. I'm not opposed to submitting PRM's foundation drawing package to the gov't as-is, but while HGL is reviewing, I think we should require Mark/PRM answer Anja's comments.

But what do I know? I'm just the former PM. Lol
Ed

**From:** Schlagel, Anja <SchlagelA@bv.com>
**Sent:** Wednesday, May 12, 2021 2:28 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>
**Subject:** RE: PRM Revised Dwgs and Calcs

Ed,

They kind of tried a little. The calculation was just copied over onto engineering paper, other than that it is identical and as such did not address any of my design comments. On the drawings, some stuff was addressed, more was not, some addressed areas are now worse than before…. I wish they would have set up the call with the engineer, because I doubt they fully understood half of my comments based on what I am seeing here. I am not sure that one can construct this thing from these drawings, and I still do not think that the design is adequate considering missing load factors, questionable tank loading etc. If they don't think my comment has merit then at a bare minimum I would have expected some type of acknowledgement and justification why my comment did not apply, and I didn't see that. The modified some of the drawing notes and added another sheet that contains the previously missing rebar details (even though these details are in parts not legible). However, they also now have no rebar continuing underneath the drain, so that is where the concrete will crack and possibly separate.

I would say, we need that call to get onto the same page, because I don't think I can sign off on what I am looking at right now.

Thanks,

**Anja Schlagel, P.E.***
C/S Project Engineer, SPC
*Licensed in KS
Black & Veatch
6800 W. 115th St., Suite 2200, Overland Park, KS 66211
D +1 913-458-7047
E SchlagelA@bv.com

**Building a World of Difference.**



**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Tuesday, May 11, 2021 12:08 PM
**To:** Schlagel, Anja <SchlagelA@bv.com>
**Subject:** PRM Revised Dwgs and Calcs

Hi Anja,
Please take a quick look to see if all critical comments you had were addressed.
Maybe we can discuss tomorrow if you can look at them by then?

Thanks,
Ed
a,

**From:** Mel Phillips <mel.phillips@prmfiltration.com>
**Sent:** Monday, May 10, 2021 4:03 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>; Dekker, Jan <DekkerJ@bv.com>; Stone, Chris <StoneCL@bv.com>
**Cc:** Mark Hafenmaier <mark.hafenmaier@prmfiltration.com>; Chris Phillips <chris.phillips@prmfiltration.com>; Kevin Hahn <kevin.hahn@prmfiltration.com>
**Subject:**

Ed,
Attached are the final stamped drawings with the calculations for the foundation and slab.  A tremendous amount of energy went into the drawings and calcs as the provided plans were found to be inadequate.

All of Anjas comments were accounted for in these final drawings.

Now that we have these plans, we can do a calculation to identify the additional requirements for the additional cost that it would take to build what is represented in these drawings vs. the original plans.

The tank seismic and anchoring calcs are not represented on these foundation plans as there will be separate drawings for proper anchoring of the tanks. The engineers have identified that the foundation and slab is designed to handle any of those loads.

With Mark arriving in the morning, it I have asked him to work with Tim and Jan onsite to identify what we want to set that final slab grade at.  After seeing the email this morning about the slope concerns, I would like to see us drop somewhere between that measurement and the original 330.5 which I think we can probably do.  I'm thinking maybe 331.0 might be a good number.  I will wait to hear back on Jan on Mark on those numbers.

Thanks all for your patience on these.
Thanks,

Mel Phillips
*President*

| | |
|---|---|
| cell: | (919) 451-2635 |
| direct: | (984) 243-2242 |
| main: | (888) 873-2848 |
| address: | 200 20th St, Butner, NC 27509 |
| website: | www.prmfiltration.com |
| email: | mel.phillips@prmfiltration.com |



  

Shop Now!

*This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, confidential, and exempt from disclosure under applicable law or may constitute as attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication.*

*Product Recovery Management, Incorporated is a North Carolina Corporation. Your acceptance and responding communications acknowledge that you are doing business with a North Carolina Corporation. PRM may operate under the Trade Names of Product Recovery Management, Inc., PRM, PRM Filtration, BagFilters.com, or PD-Blowers.com.*

*Please consider the environment before printing this email.*

# EXHIBIT 18

BV Potential Claims and/or Disputes with EPA

| # | Topic / Feature | Issue | Impacts | Contract documents that support BV's position | Contract documents that support EPA's position |
|---|---|---|---|---|---|
| 1 | Bldg. Foundation Thickness/Rebar Schedule | HGL's PE-Sealed design drawings under-designed the treatment bldg. concrete slab thickness by ~50% (especially beneath treatment vessels/tanks), and steel reinforcement Rebar). | PRM's (BV's Major Sub) Bid price (presumably every bidder's pricing) is based on the detailed HGL design drawings that was part of the EPA's RFO, therefore BV/PRM's bid price significantly too low (concret and rebar is very expensive) and schedule to construct too short (additional costs for increased field duration not | HGL's PE-Sealed Design drawings provided to all bidders during the bid period, and which were incorporated into the Task Order by reference. Need to find and cite relevant spec sections and check Q&A. Spec for air stripper and a couple other treatment components state that Contractor should verify proposd building foor slab should be checked to see if the weight of these components will require a thickened slab beneath the components. However,the specs do not stipulate the same for the 3 heaviest treatment components (the 3 10,000 gallone tanks. | Specs do require that the the Contractor's erection plans are prepared and sealed by a PA PE. |
| | | Much more extensive Design Effort necessary by PRM and BV to prepare building foundation design plan. Minimal effort was budgeted since HGL's foundation and building plans were so detailed (concrete thicknesses and rebar size and placement shown in detail on HGL plans). If EPA takes 15 days to review PRM's foundation submittal, there will be at least a 10 day delay in the construction schedule. Since this issue impacts both cost and schedule, EPA is more likely to take 30 days to complete review of the foundation submittal, and may not agree that the cost and schedule impact is compensable. Approximately 3 weeks ago (mid-April) a draft RFI was prepared by BV's superintendent and edited BV engineers, to inform EPA of the issue and that it had cost and schedule impacts, but BV PM did not submit to EPA. | Significant schedule and costs for both BV and PRM. The build foundation submittal approval activity had float a few weeks ago, but all float has been consumed, and submittal approval is now on the projects critical path, meaning that for each day pproval is delayed, the entire project end date will likely be delayed. Depending how long EPA's approval of the submittal takes (easily at least 15 days just for technical review, more likely 30+ days since BV should be requesting a price and schedule change, the field crew will likely run out of approved field work, so it may be less costly to demobilize. | | |
| | Significant additional Costs in Concrete and Rebar | | Schedule and costs for both BV and PRM | | |
| | | Specifications only mention consideration of equipment loading on the foundation/slab for the Air Stripper, compressor, pumps and vapor phase carbon vessels (nothing specified for slab thickness beneath the heaviest treatment components (3 large tanks). The liklihood that portions of the concrete slab would likely need to be thicker and require additional rebar was identified by PRM and communicated to BV 2-3 weeks ago. This was informally verbally communicated to EPA at least 2 weeks. A draft RFI to formally inform EPA of this was drafted at least 2 weeks ago. No RFI has been formally submitted notifying EPA of this issue along with cost and schedule impacts. | Based on PRM's calculations, the 10,000 gal. influent Tank, 10,000 gal backwash, and 10K gallon effluent Tank each require additional rebar and thickened foundations not covered by specification. BV and PRM have incurred significant design hours to address and correct the foundation design deficiencies. There will also be significant cost and schedule impacts for BV and PRM. | | |
| 2 | Bldg Location/Proximity to SW Runoff from Extra Space Storage Property to the East | SW runoff from the Extra Space storage property (property adjoining the site due East of the primary site property) will potentially inundate the east end of the proposed treatment building foundation during construction (and potentially following construction) unless a diversion ditch is constructed on the slope leading up to the Extra Space storage property. Construction of such a ditch will be complicated by the presence of 4-5 large trees on the hill along the East side of the proposed building. EPA has at least verbally told BV that they don't want BV to remove any of these trees. HGL's design precisely prescribed the building location and size without consideration of this important issue. A potentially likely less costly potential fix would be to reshape/rehabilitate an existing poorly defined drainage swale along the property line with Extra Space Storage actually located on the Extra Space Storage property. However, EPA has failed to obtain the Easement for Extra Space storage property, so BV has directed BV not to do any work on the Extra Space storage property. (Note: all 7 of the projects' ground water extraction wells are located on the Extra Space storage property. BV's scope includes saw cutting existing asphalt on excavating trenching and installing piping and electrical on the extra space storage property). A RFI was drafted for submission to EPA informing them of this issue over a month ago, but still has not been submitted. | Inundation of the foundation trench during construction could potentially jeopardize the structural integrity of the foundation. If this occurrs, placed and compacted soils may have to be excavated/removed, and potentially rebar re-inforcing and forms that have been set may require removal and have to be prepared / installed again. This would have significant cost and schedule impacts to both PRM and BV. | | |

| # | Item | Description | | |
|---|---|---|---|---|
| 3 | 130' x 130' Turnaround Area | In HGL's original design, the plans showed a 90' x 90' laydown area located due south of the proposed treatment area. The area was mostly already cleared of most large trees and has a grass gound cover. Back in January or therabouts BV pointed out to EPA via RFI that the size of the proposed parking lot as shown on HGL's PE stamped final design, was too small for delivery trucks and emergency vehicles (fire truck) to enter the parking lot and to safely turn around to depart from the site. EPA concurred with BV's assessment, and sought and obtained a larger easement (130' x 130') and requested BV construct a 130' x 130' gravel turnaround area. The area would be used for temporary placement for office trailers and material storage/laydown during construction, and then as a turn around area for large trucks following construction. BV initially proposed 2 ft. of gravel for the area, but as a cost saving measure during negotiations EPA indicated they only wanted to pay for a 6" gravel layer. The final executed change order (date) called for the excavation and removal of the top 6-inches of vegetation and top soil, and tree felling/grubbing of ~0.1 acres of trees that were in conflict with the proposed larger area. There was no mention of the need for any significant grading of the 130' x 130' area or specific (numerical) compaction requirements for the preparing the subgrade prior to placement of the geotectile, geogrid, and 6-inch gravel layer, either in the Change Order or in BV's Supplemental Civil design package that was submitted to EPA and approved reflecting the above. | BV apparently directed PRM (not certain if in writing) to increase excavation depth along the eastern half of the proposed Turnaround Area from the approved 6-inch depth to ~4-5', and to place the extra excavated soils along the west half of the TA Area. Compaction of the relocated soils was reportedly done using just a dozer, which may or may not be sufficient). The apparent purpose in doing this was to create a more level TA Area, since removal of just 6-inches of soil and replacemnt with 6-inches of gravel across the area would have followed the existing grade, which slopes to the West. It is unclear whether EPA approved this significant design change prior to the work being conducted. | |
| 4 | Ion Exchange Resin | In BV's proposal to EPA, we proposed an "equal" but $70K less expensive ion exchange resin to EPA. BV's proposal text AND our cost assumptions clearly indicated the proposed substitution and the cost savings to EPA that were reflected in BV's pricing. BV anticipated EPA would have conducted a proposal clarification call prior to award, at which time we would have clarified EPA's acceptance of our proposed alternate resin, but instead the CO officer just issued BV an email asking us to confirm that everything in our proposal was correct. The proposal team reviewed and checked all our math of pricing, and seeing no errors responsed as such. A week later EPA awarded BV the FFP Task Order. During the TO Kickoff meeting, BV asked if EPA about the alternate resin, along with another alternate BV had proposed for the Advance Oxidation process. The EPA RPM Bob Stank indicted yes they had looked at these items and appreciated BV providing more cost effective solutions.<br><br>In april BV submitted our required submittal (manufacturer's product data sheets, etc.) for the resin (the alternated we had proposed in our proposal). Approximately 2 weeks later EPA's comment on the resin submittal was "Rejected". They cited a resin treatability study conducted by HGL during the RD as the reason. That study concluded that the original resin specified by HGL performed better than the alternate resin BV was proposing. There has been no further discussions on the topic that I am aware of. (Note: HGL's treatbility was very limted in scope, poorly defined, and none of the resins tested met the performance criteria). | If BV decides to switch to the originally specified resin, and direct PRM to do so, PRM will request a ~$70K change order. | |

# EXHIBIT 19

| From: | Stone, Chris |
|---|---|
| Sent: | Friday, May 21, 2021 7:52 AM EDT |
| To: | Hicks, Edward C. |
| SCubejt: | RE: Chem Fab Final Foundation Drawings and Calculations |

Ed,

I need your help please. I have not been able to get to writing an RFI identifying the undersized slab from the HGL design. Maybe this already exists but if it does, I do not know where it is at the moment. Would you please put together the basic text needed to identify the issue and indicating there would be a cost impact primarily for increased materials in terms of concrete and rebar and a reasonable effort for our engineering costs. For that I was wanting to use a set amount of hours (4 hours? 8 hours?) for PRM engineering and a small amount of hours for BV review (25% of PRM?), as for a first-time correct redesign. Basically reserving our rights, per your previous statements, and letting them know that an estimate for the cost impacts is forthcoming.

I had indicated to Bob Stank that this was coming and was waiting for a ballpark number on the cost increase, because he had asked for that. I looked back at emails on how long PRM has had this in the back and forth and your points on this RFI are well taken. Are you able to assist?

**chris Stone, PMP | Program Manager**
Black & Veatch Federal Division **|** 16305 Swingley Ridge Road, Suite 230, Chesterfield, MO 63017
1+ 636-536-5812 **O** | 1+ 314-422-2296 **M** | StoneCL@bv.com

**BCilding a World of Differenj e.®**

---

**From:** Hicks, Edward C. <HicksEC@bv.com>
**Sent:** Thursday, May 13, 2021 8:42 AM
**To:** Stone, Chris <StoneCL@bv.com>
**SCubejt:** FW: Chem Fab Final Foundation Drawings and Calculations

---

**From:** Hicks, Edward C.
**Sent:** Wednesday, May 12, 2021 4:32 PM
**To:** Mel Phillips <mel.phillips@prmfiltration.com>; Dekker, Jan <DekkerJ@bv.com>; Schlagel, Anja <SchlagelA@bv.com>; Mason, Shante <MasonS2@bv.com>
**cj :** Mark Hafenmaier <mark.hafenmaier@prmfiltration.com>
**SCubejt:** Chem Fab Final Foundation Drawings and Calculations

Mel / Mark,
I'm coordinating a call tomorrow with you two guys and Anja, to walk thru Anja's comments on your Final drawings and calculations. Anja advised that this Final set does NOT address many of her comments (or indicated why you disagreed), from the previous version, so I need you to explain how they were addressed or why they were not addressed. She also indicated the **j alj Clations** were not

revised since the previous submittal either. For everyone's benefit, I'm attaching her red line comments from the previous review along with what you are calling your Final set.

Please let me know what time slot works for yall tomorrow. Anja is in another meeting from 10-11 eastern, so pick another hour please and let me know. I will then send out a meeting invite.

Thanks,
Ed

**From:** Mel Phillips <mel.phillips@prmfiltration.com>
**Sent:** Monday, May 10, 2021 4:03 PM
**To:** Hicks, Edward C. <HicksEC@bv.com>; Dekker, Jan <DekkerJ@bv.com>; Stone, Chris <StoneCL@bv.com>
**cj:** Mark Hafenmaier <mark.hafenmaier@prmfiltration.com>; Chris Phillips <chris.phillips@prmfiltration.com>; Kevin Hahn <kevin.hahn@prmfiltration.com>
**SCubej t:**

Ed,
Attached are the final stamped drawings with the calculations for the foundation and slab.  A tremendous amount of energy went into the drawings and calcs as the provided plans were found to be inadequate.

All of Anjas comments were accounted for in these final drawings.
Now that we have these plans, we can do a calculation to identify the additional requirements for the additional cost that it would take to build what is represented in these drawings vs. the original plans.

The tank seismic and anchoring calcs are not represented on these foundation plans as there will be separate drawings for proper anchoring of the tanks. The engineers have identified that the foundation and slab is designed to handle any of those loads.

With Mark arriving in the morning, it I have asked him to work with Tim and Jan onsite to identify what we want to set that final slab grade at.  After seeing the email this morning about the slope concerns, I would like to see us drop somewhere between that measurement and the original 330.5 which I think we can probably do.  I'm thinking maybe 331.0 might be a good number.  I will wait to hear back on Jan on Mark on those numbers.

Thanks all for your patience on these.
Thanks,

Mel Phillips
*President*

| | |
|---|---|
| cell: | (919) 451-2635 |
| direct: | (984) 243-2242 |
| main: | (888) 873-2848 |
| address: | 200 20th St, Butner, NC 27509 |
| website: | www.prmfiltration.com |
| email: | mel.phillips@prmfiltration.com |



  

Shop Now!

*This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, confidential, and exempt from disclosure under applicable law or may constitute as attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication.*

*Product Recovery Management, Incorporated is a North Carolina Corporation. Your acceptance and responding communications acknowledge that you are doing business with a North Carolina Corporation. PRM may operate under the Trade Names of Product Recovery Management, Inc., PRM, PRM Filtration, BagFilters.com, or PD-Blowers.com.*

*Please consider the environment before printing this email.*

# EXHIBIT 20

**BLACK & VEATCH**

**Black & Veatch Special Projects Corporation**
16305 Swingley Ridge Road, Suite 230, Chesterfield, MO 63017
P +1 636-536-5812 E StoneCL@BV.com

June 3, 2021

Product Recovery Management, Inc.
ATTN: Mel Phillips, President
200 20th Street
Butner, NC 27509

Reference: Subcontract 20-0144-49113 – Clause 00562.23 Purchaser's Remedies
Subject: Purchaser Expeditious Means to Accomplish Correction of Work

Dear Mel:

The Black & Veatch Special Projects Corporation (BVSPC) is committed to the successful delivery of the Chem-Fab OU 2 Remedial Action project. As such, we have continuously endeavored to work cooperatively with Product Recovery Management, Inc. (PRM) to plan and progress complex and difficult elements of this project. With BVSPC's initial review of the Submittal 13 34 19-3 Treatment Building Structural Performance (Concrete Slab Design), Rev 4 prepared by PRM, it has become evident that PRM has not performed this work to an acceptable level of quality or timeliness after multiple attempts to do so and that the Project Schedule will be further adversely impacted if BVSPC does not intervene to correct the deficient design.

This submittal was initially transmitted by PRM on April 5, 2021, which was 26 Calendar Days late per the USACE approved Baseline Schedule. That initial transmittal also lacked requisite calculations and further delays continued to mount with subsequent revisions. Attachment 1 to this letter includes a timeline starting with the Baseline Schedule date of March 5, 2021 and tracking actions taken by both PRM and BV through the Rev 4 submittal received by BV yesterday, June 2, 2021. This timeline identifies a pattern of significant deficiencies in completing this task from the initial submittal to present.

In addition to specific prior warnings given to PRM regarding the submittal in question, as identified in Attachment 1, Robert D. Gamble's letter to you of May 3, 2021 provided warning that corrective actions may be taken by BV. The last sentence of Item #4 – Foundation/Slab section of that letter states, "I understand the complications and extra work required to prepare the Building/Slab submittal, but it was completed considerably late to support the construction scheduled." Further, the last paragraph of Robert D. Gamble's letter to you of May 3, 2021 states, "The performance of the overall project team up to mobilization has been good. Both parties have experienced missteps since mobilization initiation and corrective action is necessary. The BVSPC Team is here to support PRM and committed to making the corrective actions necessary to deliver the Chem Fab Project safely and with a high level of quality."

Per Clause 00562.23 of the referenced subcontract, specifically subclause 00562.23.3, BVSPC hereby provides written notice to PRM that we are taking the immediate action of producing a new Concrete Slab Design submittal with our own engineering resources. We are basing this action on our stated position that PRM's history with this submittal indicates it is unable or unwilling to proceed with the Work in a reasonable time. The cost of this intervening corrective action will be incurred by PRM, per the terms of this referenced subcontract clause.

**Building a World of Difference.®**

June 3, 2021 | Page 2

In the spirit of cooperation, BVSPC will endeavor to complete this new design task as quickly as possible to reduce negative impacts to the project schedule and to minimize the backcharge costs to PRM. In support of this, BVSPC will schedule a 30-minute conference call tomorrow, Friday, June 4, 2021, to discuss details of the exact design submittal elements that BVSPC will perform under this action.

BVSPC hereby requests that PRM cooperate fully with this action by continuing to progress all other aspects of PRM's subcontracted scope of work and avoid additional disruption to the project. Per the terms of the referenced subcontract paragraphs, please provide your acknowledgement of this notification within one day of receipt. Thank you.

Respectfully,
BLACK & VEATCH SPECIAL PROJECTS CORPORATION

Christopher Stone
Digitally signed by Christopher Stone
DN: C=US, E=stonecl@bv.com,
O=Black & Veatch, OU=Federal,
CN=Christopher Stone
Date: 2021.06.03 18:09:09-05'00'

Christopher L. Stone, PMP
Project Manager

cc:  BVSPC/Robert Gamble, PMP
     BVSPC/Carrie McCoy, PE
     BVSPC/Kevin Miller

Enclosure

**Building a World of Difference.**®

# EXHIBIT 21

| | |
|---|---|
| **From:** | Schlagel, Anja |
| **Sent:** | Monday, June 7, 2021 5:01 PM EDT |
| **To:** | McCoy, Carrie; Schlagel, Anja |
| **Subject:** | Conversation with McCoy, Carrie,Schlagel, Anja |

and I told them they wee missing the contractually required control joints to control cracking of the slab

# EXHIBIT 22

| | |
|---|---|
| **From:** | Schlagel, Anja |
| **Sent:** | Monday, June 21, 2021 12:09 PM EDT |
| **To:** | McCoy, Carrie; Schlagel, Anja |
| **Subject:** | Conversation with McCoy, Carrie,Schlagel, Anja |

the only concern I have is the concete strength

# EXHIBIT 23

| | |
|---|---|
| **From:** | Stewart, Ian M CIV USARMY CENAP (USA) |
| **Sent:** | Tuesday, June 15, 2021 11:03 AM EDT |
| **To:** | Stone, Chris; McCoy, Carrie |
| **Subject:** | Slab design meeting |

**Regarding this note in the meeting today. "Potential major changes to concrete slab design. Will request EPA/USACE/BV Meeting on 6/15/21 to discuss". We're available today and I'd like to have either Brian or Steve from my office on the call so let us know sooner than later. Tomorrow I am off so if we can't get this in today lets plan for Thursday.**
**Thanks,**


Ian Stewart, P.E.
Environmental Engineer
US Army Corps of Engineers - Philadelphia District
Southern NJ Resident Engineer Office
e. ian.m.stewart2@usace.army.mil
c. 856-325-9874

# EXHIBIT 24

| | |
|---|---|
| **From:** | McCoy, Carrie |
| **Sent:** | Wednesday, May 5, 2021 9:24 AM EDT |
| **To:** | Moyer, James; McCoy, Carrie |
| **Subject:** | Conversation with McCoy, Carrie,Moyer, James |

welcome to the slow-moving disaster that we call Chem-Fab

# EXHIBIT 25

## **Schedule 3.11**

### **Financial Statements**

- Refer to the attached "Schedule 3.11 Disclosure Schedule Support_Financial Statements"

46

**Profit & Loss Statement**

| | 12/31/2019 | 12/31/2020 | 4/30/2021 |
|---|---|---|---|
| **Revenue** | **$32,326,785** | **$12,933,551** | **$3,266,734** |
| Direct Labor | 4,629,063 | 2,401,651 | 627,255 |
| Payroll Burden | 1,853,979 | 958,765 | 242,870 |
| Direct Expense | 18,261,607 | 6,281,098 | 1,706,212 |
| Total Direct Costs | 24,744,650 | 9,641,513 | 2,576,337 |
| **Project Gross Margin** | **7,582,134** | **3,292,038** | **690,397** |
| | | | |
| **Support Groups** | **733,809** | **681,382** | **71,345** |
| | | | |
| Bids & Proposals | 734,498 | 1,107,250 | 266,748 |
| General Marketing | 442,108 | 426,672 | 204,183 |
| **Business Development** | **1,176,606** | **1,533,922** | **470,930** |
| Training | 161,108 | 166,974 | 49,462 |
| Meetings | 30,139 | 26,363 | 13,756 |
| Total Payroll Burden | (35,817) | 140,682 | 180,263 |
| B&V Assignments | 523,591 | 728,739 | 334,452 |
| Management & Support | 0 | 0 | 0 |
| Paid Time Off | 792,550 | 590,038 | 115,707 |
| Legal/Claim Settlement Cos | 660 | 17,409 | 9,263 |
| Other Employee Related Ope | 3,158 | 1,240 | 515 |
| Other Operating Expenses | 268,699 | (16,511) | 396 |
| Overhead Allocations | 26,129 | 30,000 | 6,693 |
| **Administration** | **3,680,632** | **3,900,237** | **1,252,781** |
| Computer-BVSD | 325,691 | 184,624 | 63,729 |
| Core Corporate Charge | 0 | 0 | 0 |
| Direct Corporate Charge | 0 | 0 | 0 |
| Professional Liability | 89,212 | 67,469 | 1,420 |
| Occupancy | 304,889 | 171,165 | 59,185 |
| **BVSD Expenses** | **719,791** | **423,258** | **124,334** |
| **Total Overhead** | **4,400,424** | **4,323,495** | **1,377,115** |
| **EBT** | **$3,181,711** | **($1,031,457)** | **($686,719)** |

**Balance Sheet**

| | 12/31/2019 | 12/31/2020 | 3/31/2021 |
|---|---|---|---|
| Accounts Receivable | $2,110,559 | $750,719 | $707,814 |
| Net Asset | 1,062,327 | 637,412 | 466,984 |
| Accounts Payable | (2,752,308) | (803,208) | (694,318) |
| **Project Balance** | **$420,578** | **$584,923** | **$480,480** |

# EXHIBIT 26

**Evergreen**
**6/18/21**
**Estimated Closing Balance Sheet**
**Schedule 1.4 (c)**

| Assets | | |
|---|---|---|
| Receivables | | 1,165,990 |
| Contract Assets | | 1,204,957 |
| | **Total assets** | 2,370,946 |

| Liabilities | | |
|---|---|---|
| Payables | | (1,557,077) |
| Contract Liabilities | | (280,205) |
| | **Total liabilities** | (1,837,282) |

| **Estimated Working Capital** | **533,664** |
|---|---|

Evergreen - Funds Flow v2  Sch 1.4 c BS  6/18/2021  12:36 PM

# EXHIBIT 27

| | |
|---|---|
| **From:** | Nelson, Catherine (Laura) |
| **Sent:** | Monday, June 14, 2021 3:43 PM EDT |
| **To:** | McCoy, Carrie; Nelson, Catherine (Laura) |
| **Subject:** | Conversation with McCoy, Carrie,Nelson, Catherine (Laura) |

LOL 😊 I actually started preparing management for this a few weeks back with a little heads up.  I'm pretty sure it was quite a shock when they saw the actual numbers.  I'm worried about the project review.  It's not going to be pretty.

# EXHIBIT 28

| | |
|---|---|
| **From:** | Stank, Robert |
| **Sent:** | Thursday, June 24, 2021 6:21 PM EDT |
| **To:** | Gamble, Robert |
| **CC:** | Parker, Ryan; Stewart, Ian M CIV USARMY CENAP (USA); Stone, Chris |
| **Subject:** | Chem Fab Serial Letter 004, Contract No. 68HERH19D0004 |

Subject:    Schedule Delays, Construction and Submittal Progress
Contract No. 68HERH19D0004
Chem-Fab Remedial Action Superfund Site
Doylestown, PA

Dear Mr. Gamble:

The government has concerns with the project proceeding diligently. The completion date as contracted is currently September 24, 2021.  In order to meet that timeframe and ensure success of the project, there are critical milestones that need to occur timely.  The May periodic schedule update submitted June 21, 2021 has a project completion date of November 12, 2021, a 46-day negative float.  The government is concerned with the milestone slippage to date and the probable risk of future missed milestones.  The schedule update narrative report did not include a discussion of the delaying factors nor corrective action as required per specification section 01 32 01.00 10 para 3.5.2.

In review of the May progress schedule important project deliverables such as the treatment building foundation/slab submittal are not submitted to date. The baseline schedule had a submittal delivery date of March 10 and a construction completion date of May 23. The lack of key project design related submittals is concerning for construction progress as field work on specific definable features of work cannot commence without approved submittals.  This may lead to missing future milestones.

Completing the mobilization task is another concern. Mobilization per the baseline schedule was to be completed in April. As discussed in Serial Letter C-003, the government was concerned with the slow progress and requested fully operational trailers, parking, and laydown yard as required in the mobilization feature of work. To date the laydown yard and construction trailer tasks are not complete. The laydown yard is not constructed per the layout drawing.  Delivery trucks are not able to turnaround as intended.  The required temporary power, internet, and communications lines are not installed in the trailers.  The supplied temporary internet "hot spots" are an unreliable and unsatisfactory method to providing internet to temporary offices.  The government is not able to efficiently conduct remedial construction management duties with the provided services.

By July 9 Black & Veatch shall provide a schedule narrative report detailing a description of current and anticipated problem areas or delaying factors and their impact, and an explanation of corrective actions taken or required to be taken.  Periodic schedule updates are expected by end of the first week of the following month.  Until schedule delays are remedied, or as determined by the government, schedule review meetings shall be conducted every two weeks (one of which may continue to be conducted concurrently with the invoice review meeting).

Black & Veatch shall provide reliable business high-speed internet and communication lines to the construction trailers as soon as possible.

Black & Veatch is notified that the Government considers the performance delays and other items mentioned to be endangering performance of the contract. The Government requests BV develop a satisfactory response to resolve all items discussed herein.  Please note that per 01 32 01.00 10 para 3.9.2, "failure to perform work and maintain progress in accordance with the supplemental recovery plan may result in an interim and final unsatisfactory performance rating and/or may result in corrective action directed by the Contracting Officer".

   If you have any further questions or concerns, please do not hesitate to call me at (215) 740-7190.


**Bob Stank**
Remedial Project Manager
Superfund & Emergency Management Division
USEPA - Region 3
1650 Arch Street (3SD21)
Philadelphia, PA 19103

Phone: (215) 814-2051
Cell:    (215) 740-7190

*stank.robert@epa.gov*



# EXHIBIT 29

| | |
|---|---|
| **From:** | Jenkins, John W. |
| **Sent:** | Monday, June 7, 2021 11:11 AM EDT |
| **To:** | Geller, Nancy D.; Jenkins, John W. |
| **Subject:** | Conversation with Geller, Nancy D.,Jenkins, John W. |

Chem Fab is headed towards a wall quickly......lots of self-inflicted wounds there!

# EXHIBIT 30

| | |
|---|---|
| **From:** | Gamble, Robert |
| **Sent:** | Friday, June 25, 2021 1:22 PM EDT |
| **To:** | McCoy, Carrie |
| **Subject:** | FW: Checking in on ChemFab |

FYI – For your enjoyment. The one on one conversation was much better. Also on my first read I took most of this directed at me (early morning).

**Rob Gamble, PMP**
1+ 913-458-8238 **P** | 1+ 303-908-9616 M | GambleR@BV.com

**From:** Gamble, Robert
**Sent:** Friday, June 25, 2021 7:22 AM
**To:** Castro, Randy <CastroR@bv.com>; Olson, Scott <OlsonS@bv.com>
**Cc:** Dudley, W. Todd (Todd) <DudleyWT@bv.com>
**Subject:** RE: Checking in on ChemFab

Randy,

I will call you do discuss. My tolerance to accept this type of communication considering this situation is limited. I would like to address this one on one.

**Rob Gamble, PMP**
1+ 913-458-8238 **P** | 1+ 303-908-9616 M | GambleR@BV.com

**From:** Castro, Randy <CastroR@bv.com>
**Sent:** Friday, June 25, 2021 6:48 AM
**To:** Gamble, Robert <GambleR@bv.com>; Olson, Scott <OlsonS@bv.com>
**Cc:** Dudley, W. Todd (Todd) <DudleyWT@bv.com>
**Subject:** Re: Checking in on ChemFab

Scott & Rob (I'm addressing you, Rob since Scott is not immediately available),
  The lack of communication on this project is appalling.  We have serious performance issues and Scott, you never let me know.  You all get letter from sub claiming hostile work environment and I am not informed.  You get a second one…again, not informed.  You hear of a cure notice…and again not informed.
Marty asks you to coordinate an answer and we get no update.
This is not acceptable and Rob…since Scott is off on leave, please update us on this kind of stuff going forward.
Randy

**From:** "Travers, Martin G. (Marty)" <TraversMG@bv.com>
**Date:** Friday, June 25, 2021 at 6:58 AM
**To:** "Gamble, Robert" <GambleR@bv.com>, "Olson, Scott" <OlsonS@bv.com>

# EXHIBIT 31

| From: | Stucke, Dale [USA - EMP] |
|---|---|
| Sent: | Wednesday, October 27, 2021 5:48 PM EDT |
| To: | Alex Wolf; Jim Renna; Clay Lechleiter |
| CC: | Stone, Dwane [USA - EMP] |
| Subject: | FW: Closing Working Capital |
| Attachments: | Evergreen - Final Closing Statement.pdf |

Message sent

**Dale R. Stucke**
Chief Financial Officer
Cell  (202) 379-6051
Office (703) 642-6907



**From:** Stucke, Dale [USA - EMP]
**Sent:** Wednesday, October 27, 2021 5:47 PM
**To:** Travers, Martin G. (Marty) <TraversMG@bv.com>
**Cc:** Stone, Dwane [USA - EMP] <DStone@versar.com>
**Subject:** Closing Working Capital

Marty,

Per Section 1.5(a) of the Evergreen Asset Purchase Agreement, as amended by the September 17, 2021 side letter, attached please find Buyer's calculation of the Closing Working Capital.  The Closing Working Capital results in a purchase price reduction of $576,102.

**Dale R. Stucke**
Chief Financial Officer
Cell  (202) 379-6051
Office (703) 642-6907



*This email and any files transmitted with it are confidential and intended solely for the named addressee. This message contains confidential information and is intended only for the person so identified. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. If you received this message by mistake, please reply to this message and then delete it, so that we can ensure such a mistake does not occur in the future.*

EXTERNAL SENDER

**Evergreen - Final Closing Statement**

*(USD)*

| | |
|---|---|
| Closing Working Capital | ($42,437) |
| Estimated Working Capital | 533,664 |
| Amount Closing Working Capital is less than Estimated Working Capital | $576,102 |

Note: Closing Working Capital reflects Accounts Receivable less Accounts Payable as other accounts could not be validated.
Closing Working Capital excludes working capital related to Chem-Fab due to unresolved project issues.

# EXHIBIT 32

**Evergreen - Working Capital Detail**
**Through June 21, 2021**

*(USD)*

| | | Accounts Receivable | Net Asset | Asset | Liability | Net Contract Position | Accounts Payable | Working Capital |
|---|---|---|---|---|---|---|---|---|
| **Estimated Working Capital** | | 1,165,990 | 924,752 | 1,204,957 | (280,205) | 2,090,741 | 1,557,077 | 533,664 |
| **Project** | **Project Name** | | | | | | | |
| 42617 | OTT STORY WELL REHABILITATIONI | $31,052 | $15,626 | $15,626 | -- | $46,678 | -- | $46,678 |
| 43114 | Swope Park EDC | 30,089 | (45,581) | - | (45,581) | (15,492) | - | (15,492) |
| 43128 | HGL Holcomb Creosote RD | - | 7,833 | 7,833 | - | 7,833 | - | 7,833 |
| 43180 | Vienna Wells ESO Pilot Study | - | 3,390 | 3,390 | - | 3,390 | 416 | 2,974 |
| 43184 | Monitor Devices | 109,875 | 158,776 | 158,776 | - | 268,652 | 121,669 | 146,983 |
| 43212 | Pantesote - Superfund Site | - | 1,899 | 1,899 | - | 1,899 | - | 1,899 |
| 43248 | Anniston OU1  OU2 | - | 231 | 231 | - | 231 | - | 231 |
| 43249 | Anniston PCB OU4 | - | 214 | 214 | - | 214 | - | 214 |
| 43250 | LCP Chemical OU1 | - | 192 | 192 | - | 192 | - | 192 |
| 45001 | Mississippi Phosphates Corp | 14,108 | 7,218 | 7,218 | - | 21,326 | - | 21,326 |
| 45002 | 57st & N Broadway RD | 14,677 | (45,575) | - | (45,575) | (30,898) | 1,863 | (32,761) |
| 45003 | Newton County DES | 19,979 | (807) | - | (807) | 19,172 | 6,000 | 13,172 |
| 45004 | Cristex | 13,129 | (20,084) | - | (20,084) | (6,955) | 3,594 | (10,550) |
| 45005 | North 25th Street Glass & Zinc Site | 42,111 | (2,454) | - | (2,454) | 39,657 | 31,987 | 7,670 |
| 45006 | Oronogo-Duenweg Mining Belt | 44,638 | (2,316) | - | (2,316) | 42,322 | - | 42,322 |
| 49110 | Smalley Piper RES | 98,052 | 170,564 | 170,564 | - | 268,616 | 237,338 | 31,278 |
| 49111 | GMH Electronics - RAF RES | 579,179 | 162,762 | 162,762 | - | 741,941 | 603,378 | 138,563 |
| 49112 | Picayune Wood LTRA | 40,488 | (62,951) | - | (62,951) | (22,463) | 73,571 | (96,034) |
| 49113 | Chem-Fab OU2 RA | 1,025,389 | 212,641 | 212,641 | - | 1,238,030 | 789,517 | 448,513 |

Case 1:23-cv-01450-RGA   Document 57-1   Filed 07/15/26   Page 130 of 140 PageID #: 18777

# EXHIBIT 33

*Execution Version*

THIS SUBORDINATED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF APPLICABLE STATES AND/OR "BLUE SKY" LAWS.  THIS SECURITY IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE UNDER THE ACT, STATE SECURITIES AND/OR "BLUE SKY" LAWS, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES AND/OR "BLUE-SKY" LAWS, PURSUANT TO REGISTRATION UNDER SUCH LAWS OR AN AVAILABLE EXEMPTION FROM SUCH REGISTRATION REQUIREMENT.

THIS SUBORDINATED PROMISSORY NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATED IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN EVERGREEN SELLER SUBORDINATION AGREEMENT, DATED AS OF THE DATE HEREOF (AS AMENDED AND OTHERWISE MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT") BY AND AMONG ISSUERS, HOLDER, THE OTHER PARTIES THERETO AND GRAYCLIFF MEZZANINE III LP, AS THE ADMINISTRATIVE AGENT. EACH HOLDER OF, OR PARTY TO, THIS SUBORDINATED PROMISSORY NOTE, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE EVERGREEN SELLER SUBORDINATION AGREEMENT.

## SUBORDINATED PROMISSORY NOTE

**$2,000,000, plus PIK Interest**                                       **June 21, 2021**

For value received, Versar Environmental Services, LLC, a Delaware limited liability company ("Buyer"), and Versar Inc., a Delaware corporation ("Versar," and together with Buyer, each an "Issuer" and collectively the "Issuers"), hereby jointly and severally promise to pay to Black & Veatch Special Projects Corp., a Missouri corporation ("Holder"), the principal sum of Two Million and 00/100 U. S. Dollars ($2,000,000.00), plus any capitalized interest added thereto from time to time in accordance with Section 1(c) hereof, in the amounts and on the dates set forth in this Subordinated Promissory Note (this "Note"). This Note is issued in connection with the Asset Purchase Agreement, by and between Buyer and Issuers, dated as of the date hereof (the "Asset Purchase Agreement").

By acceptance of this Note, Holder agrees to the terms and conditions of this Note.

1.    Payments; Cancellation.

(a)    Payment at Maturity.  The then outstanding principal amount of this Note, together with all accrued and unpaid interest thereon (including, without duplication, all unpaid PIK Interest), shall be due and payable on June 21, 2026 (the "**Maturity Date**") in cash in U.S. dollars by wire transfer of immediately available funds to an account designated in writing by Holder no later than the Maturity Date.

(b)    Prepayment of Principal and/or Interest.  Issuers may prepay, at any time and from time to time, the outstanding principal (including unpaid PIK Interest), in whole or in part, of this Note and/or interest accrued and unpaid thereon, before it becomes due without the prior written consent of Holder. Partial prepayments of this Note shall be applied *first* to pay unpaid expenses then due pursuant to this Note, *second*, to pay accrued and unpaid interest, and *third*, to reduce the principal amount outstanding hereunder.

(c)    Payment of Interest.

ACTIVE/110280859.6

(i)      Issuers shall pay interest on all principal outstanding under this Note at a rate equal to eight percent (8.0%) per annum from the date of issuance of this Note to the Maturity Date.

(ii)      Payments of interest on this Note shall be made quarterly in arrears on the last day of each fiscal quarter ending after the date of this Note (each such date, an "**Interest Payment Date**"), and on the Maturity Date, and, other than on the Maturity Date, shall be paid in kind (the "**PIK Interest**").  PIK Interest shall be added to the then outstanding principal of this Note automatically on the applicable Interest Payment Date and thereafter shall accrue interest at the rate, and in the manner, set forth in this Section 1(c); *provided*, *however*, that any PIK Interest payable under this Section 1(c) may, at an Issuer's written election to Holder prior to such PIK Interest automatically being deemed to paid as PIK Interest, be paid in cash on any one or more Interest Payment Dates in lieu of increasing the then outstanding amount of the principal of this Note.  All payments of interest paid in cash shall be paid in U.S. dollars in immediately available funds by wire transfer to an account designated in writing by Holder.

(iii)      Interest shall be calculated based on the actual number of days elapsed in a 365-day year.

(iv)      During any Event of Default, this Note shall bear interest at 11.00% per annum (the "**Default Rate**") payable in accordance with clause (ii) above.  Issuers and Holder agree that Holder's collection of interest at the Default Rate is not a fine or penalty, but is intended to be and shall be deemed to be reasonable compensation to Holder for increased costs and expenses that Holder will incur if an Event of Default exists hereunder. Collection of interest at the Default Rate shall not be construed as an agreement or privilege to extend the Maturity Date or to limit or impair any rights and remedies of Holder hereunder.

(d)      Reinstatement.  If any Holder is required by any court or judicial authority to return to any Issuer or any custodian, trustee, liquidator or other similar official acting in relation to such Issuer, any principal or interest amount paid by such Issuer to Holder pursuant to this Note, then this Note, to the extent discharged, will be reinstated in full force and effect and such principal and/or interest amount shall be deemed outstanding and evidenced by this Note.  Subject to the foregoing sentence, to the extent the principal amount due hereunder, together with all accrued and unpaid interest thereon and all unpaid fees and expenses required pursuant to this Note, are reduced or canceled in full pursuant to Section 1(b) or Section 5, then such reduction or cancellation shall be permanent.

(e)      Maximum Rate.  Notwithstanding anything to the contrary herein, Issuers' obligations to Holder with respect to the payment of interest hereunder are subject to the limitation that payments of interest to Holder shall not be required to the extent that receipt of any such payment by Holder would be contrary to provisions of law applicable to Holder limiting the maximum nonusurious rate of interest that may be charged or collected by Holder.  The portion of any such payment received by Holder that is in excess of the maximum nonusurious rate of interest permitted by such applicable law shall be credited against the then outstanding amount of the principal of this Note, or if such excess portion exceeds the then outstanding amount of the principal of this Note, then such excess portion shall be refunded to the applicable Issuer.  In determining whether the interest contracted for, charged, or received by Holder exceeds the maximum nonusurious rate of interest permitted by such applicable law, Holder and Issuers agree, to the extent permitted by such applicable law, to (i) characterize any payment that is not principal as an

-2-

expense or fee owed pursuant to the terms hereunder rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of this Note.

(f)    Business Day.  If any payments become due and payable in cash on a day other than a business day, then the due date thereof shall be extended to the next succeeding business day.

2.    Transfers by Holder.

(a)    This Note may not be Transferred by Holder without the prior written consent of Issuers, which consent may be granted or withheld by Issuers in their sole discretion.   This Note may be Transferred by an Issuer to an affiliate of such Issuer without the prior written consent of Holder. With respect to this Note, "**Transfer**" means the direct or indirect sale, assignment, conveyance, transfer, gift, bequest, demise, levy, execution, pledge, encumbrance, hypothecation or other disposition of all or any portion of this Note in any manner whatsoever, whether voluntary or involuntary.

(b)    In order to effect a permitted Transfer of this Note, Holder shall surrender such Note at the principal office of Issuers for Transfer or exchange, whereupon, Issuers shall issue in exchange therefor another note or notes for the same aggregate principal amount as the unpaid principal amount of this Note, having the same maturity and rate of interest, containing the same provisions and subject to the same terms and conditions as the Note so surrendered.  Any Transfer or attempted Transfer of this Note in violation of any provision of this Note shall be null and void, and no Issuer shall have any obligation to treat any such purported transferee of this Note as the owner or the holder of this Note for any purpose. This paragraph shall be construed so that the Note is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code of 1986, as amended (the "Code") and any related regulations (and any other relevant or successor provisions of the Code or such regulations).

3.    New Note.  Upon receipt of evidence reasonably satisfactory to Issuers, which evidence may be an affidavit of Holder, of the loss, theft, destruction or mutilation of the Note, Issuers will issue a new Note, of like tenor and amount and dated the date to which interest has been paid, in lieu of such lost, stolen, destroyed or mutilated Note, and in such event Holder agrees to indemnify and hold harmless Issuers in respect of any such lost, stolen, destroyed or mutilated Note.

4.    Acceleration Upon Sale or Change of Control. Issuers immediately shall pay to Holder the principal balance of this Note, together with all accrued but unpaid interest on such principal balance, upon a Change of Control. A "Change of Control" shall be the occurrence of any of the following: (a) a merger or consolidation of Versar, or of any parent of Versar, with or into any other entity unless, immediately following such transaction, the stockholders of Versar (or the equity holders of any parent of Versar, as the case may be) immediately prior to such transaction, possess, directly or indirectly, more than fifty percent (50%) of the voting power of the surviving entity in the merger or consolidation; (b) a sale, lease or other disposition of all or substantially all of the assets of the Versar; (c) the sale or transfer to a third party of beneficial ownership of securities of Versar, or of any parent of Versar, representing more than fifty percent (50%) of the combined voting power of the then outstanding securities of Versar (or of Versar's parent, as the case may be); or (d) approval by the stockholders or board of directors of Versar of a plan of complete liquidation or the occurrence of any other event that results in the liquidation and dissolution of Versar.

5.    Events of Default.

-3-

(a)    An event of default occurs upon the happening of any one of the following events (each, an "Event of Default"):

(i)    if Issuers shall fail to pay any amount when due hereunder and such failure shall continue for a period of ten (10) days;

(ii)    Either Issuer fails or neglects to timely perform, keep, or observe or cause to be timely performed, kept, or observed, as applicable, any other term, provision, condition, covenant, or agreement contained in this Note and such failure or neglect continues more than fifteen (15) days after Holder sends written notice to Issuers of such failure or neglect (provided that Issuers shall not be entitled to a cure period hereunder if Holder determines in good faith that such failure or neglect is not capable of being cured or is not capable of being cured within such 15-day period); or

(iii)    if (A) any Issuer commences any case, proceeding or other action (1) under the United States Bankruptcy Code and/or any creditors rights laws seeking to have an order for relief entered with respect to such Issuer, or seeking to adjudicate such Issuer as bankrupt or insolvent, or seeking a moratorium or reorganization, liquidation or dissolution, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for such Issuer for all or any substantial part of such Issuer's assets, or (B) any case, action or proceeding of a nature referred to in (A) above is commenced against such Issuer which remains undischarged or undismissed for a period of sixty (60) consecutive days.

(b)    Acceleration.  Upon the occurrence and during the continuance of any Event of Default, the Holder may, by notice to Issuers (which notice shall be deemed to have automatically been delivered upon the occurrence of an Event of Default under Section 5(a)(ii)), declare all obligations under this Note then outstanding to be due and payable, together with all unpaid accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Issuer.

(c)    Holder's Rights and Remedies.  Subject to the Subordination Agreement, upon the occurrence, and during the continuation, of an Event of Default, (a) Holder shall have all rights and remedies available to it at law or equity for collection of the amounts due under this Note. Holder's rights and remedies under this Note shall be cumulative. No exercise by Holder of one right or remedy shall be deemed an election, and no waiver by Holder of any Event of Default shall be deemed a continuing waiver.  No delay by Holder shall constitute a waiver, election, or acquiescence by it; [1]and (b) notwithstanding any other provision of this Note, during the period of existence of such Event of Default, interest on the principal balance of this Note shall accrue and be paid, not at the Interest rate, but at the lesser of (i) the Default Rate, or (ii) the maximum lawful rate of interest under the applicable law, if any.

6.    Holder's Fees, Expenses and Costs.  Issuers shall, jointly and severally, pay to Holder, upon demand, all expenses, costs, charges, disbursements, and reasonable attorneys' fees incurred by Holder in connection with the enforcement or collection of the obligations under this Note, and all such amounts incurred by Holder shall be part of the obligations under this Note, in an aggregate amount not to exceed $100,000.

---

[1] NTD: Covered by clause 6.

-4-

7.      Issuers Waivers.  Except as expressly set forth herein, to the fullest extent permitted by applicable law, Issuers, and their successors and assigns, expressly waive presentment, demand, protest, notice of dishonor, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and any and all other notices, demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Note, and hereby further waive stay of execution and all suretyship defenses to payment generally.  No extension of any time periods for any payments due hereunder, or release of collateral that may be granted by Holder from time to time, and no alteration, amendment or waiver of any provision of this Note or the Asset Purchase Agreement, shall modify, waive, extend, change, discharge, terminate or affect the liability of Issuer under this Note or the Purchase Agreement.

8.      Authority.  Each Issuer warrants and represents to Holder as of the date hereof that: (a) the execution, delivery and performance by such Issuer of this Note has been duly authorized by all necessary action, (b) no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, each Issuer of this Note except for those obtained or made on or prior to the date hereof, and (c) this Note constitutes the legal, valid and binding obligations of each Issuer, enforceable against such Issuer in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

9.      U.S. Federal Income Tax.  For U.S. federal income tax purposes, the parties will treat payments of principal to Holder in respect of this Note as payments of additional purchase price under Section 453 of the Internal Revenue Code of 1986, as amended (the "**Code**") in exchange for applicable equity interests of the Company pursuant to the Acquisition Agreement, and payments of interest to Holder as interest in accordance with Treasury Regulations Section 15A.453-1(c)(2)(ii) and Section 1274 of the Code.  The parties shall not take any position on any tax return or tax proceeding to the contrary of this Section 7, unless required by applicable law.

10.     Withholding.  If any applicable law (as determined in the good faith discretion of Issuers) requires the deduction or withholding of any tax from any payment by Issuers, then Issuers shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law; provided however, that Issuers shall use commercially reasonable efforts to provide Holder at least five (5) days' prior notice of any contemplated withholding, so Holder may provide such information or documentation to avoid such withholding.  Any amount that is so deducted and withheld and timely paid over to the appropriate governmental entity shall be treated as having been paid to the person with respect to which such withholding or deduction was made.

11.     Provision of Forms by Holder.  Holder (each of Holder's transferees, successors or assigns) shall provide to Issuers executed copies of IRS Form W-9 certifying that Holder (or such transferee, successor or assign) is exempt from U.S. federal backup withholding tax.

12.     Governing Law; Submission to Jurisdiction.  This Note shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Holder and each Issuer hereby irrevocably submits to the exclusive jurisdiction of any federal or state court sitting in the State of Delaware, over any suit, action or other proceeding brought by any party arising out of or relating to this Note, and Holder and each Issuer hereby irrevocably agrees that all claims with respect to any such suit, action or other proceeding shall be heard and determined in such courts.

-5-

13.     No Rights or Liabilities as an Equityholder.  This Note does not by itself entitle Holder to any voting rights or other rights as an equityholder of any Issuer or any of its affiliates.

14.     Waiver of Jury Trial.  EACH PARTY TO THIS NOTE HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE SUBJECT MATTER HEREOF OR (2) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO IN CONNECTION WITH THIS NOTE, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE EXERCISE OF ANY SUCH PARTY'S RIGHTS AND REMEDIES UNDER THIS NOTE OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES TO THIS NOTE, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES HERETO HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT EACH HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS NOTE MAY BE FILED AS A CONSENT BY ALL PARTIES TO A TRIAL BY THE COURT.

15.     Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

16.     Addresses for Notices, etc.  All notices, requests, demands or other communications that are required or may be given pursuant to the terms of this Note shall be in writing and shall be deemed to have been duly given (i) on the date of delivery, if personally delivered by hand, (ii) upon the third (3rd) business day after such notice is deposited in the mail, if mailed by registered or certified mail, postage prepaid, return receipt requested, (iii) upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier if the delivery date is a business day or otherwise the next business day, or (iv) by email if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, and in each case, no transmission error received, in each case, addressed (a) if to Issuers, as set forth below Issuers' name on the signature pages hereto, and (b) if to Holder, at Holder's address as set forth below Holder's name on the signature pages hereto, or at such other address as Issuers or Holder may designate by advance written notice to the other parties hereto.

17.     Headings; Interpretation.  In this Note, (a) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined; (b) the captions and headings are used only for convenience and are not to be considered in construing or interpreting this Note and (c) the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation". All references in this Note to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.

18.     Counterpart.  This Note may be executed in one (1) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Note may be executed by facsimile signature, .PDF or other electronic transmission.

19.     Amendments. This Note may not be amended, restated, supplemented or otherwise modified except by an instrument in writing signed by Holder and Issuers.

ACTIVE/110280859.6

20.  <u>Subordination</u>.  Notwithstanding anything to the contrary herein, this Note shall be subject to that certain Evergreen Seller Subordination Agreement, dated as of the date hereof (the "<u>Subordination Agreement</u>"), by and between, inter alia, Holder, Issuers, and Graycliff Mezzanine III LP, as administrative agent for the Lenders (as defined in the Subordination Agreement) under the Credit Agreement (as defined in the Subordination Agreement), and all Subordinated Payments (as defined in the Subordination Agreement) hereunder is unsecured, subordinated, and junior in right of payment to the prior Payment in Full (as defined in the Subordination Agreement) in cash of Senior Indebtedness (as defined in the Subordination Agreement) to the extent and in the manner set forth in the Subordination Agreement. Notwithstanding anything herein to the contrary, it is understood and agreed that no payments in cash under this Note shall be permitted except to the extent expressly permitted by the Subordination Agreement.  In the event of any conflict or inconsistency between the terms hereof and the Subordination Agreement, the Subordination Agreement shall govern.

21.  <u>Joint and Several</u>. The liabilities of each Issuer are joint and several, provided, however, the release by Holder of any one or more such persons shall not release any other person obligated on account of this Note. Each reference in this Note to any Issuer and any endorser, is to such person individually and also to all such persons jointly.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-7-

ACTIVE/110280859.6

**IN WITNESS WHEREOF**, each of the undersigned has caused this Subordinated Promissory Note to be executed by its duly authorized officers as of the date first written above.

**ISSUERS**:

VERSAR ENVIRONMENTAL SERVICES, LLC

By: _Alex Wolf_

Name:   Alex Wolf
Title:    Authorized Officer

**VERSAR INC.**

By: _Alex Wolf_

Name:   Alex Wolf
Title:    Authorized Officer

[Signature Page to Subordinated Promissory Note]

**ACKNOWLEDGED AND AGREED**
**by HOLDER as of the date first above written:**

**Black & Veatch Special Projects Corp.**

By: _____
Name: Randal Castro
Title:  President


Address:
11401 Lamar Ave
Overland Park, KS 66211
Email:  TraversMG@bv.com

[Signature Page to Subordinated Promissory Note]